UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE INDEMNITY COMPANY; and
ALLSTATE PROPERTY & CASUALTY
INSURANCE COMPANY,

                    Plaintiffs,

vs.

GREATER LAKES AMBULATORY
SURGICAL CENTER, LLC d/b/a
ENDOSURGICAL CENTER AT GREAT LAKES;
GREATER LAKES ANESTHESIA, PLLC;
SUMMIT MEDICAL GROUP, PLLC;
GREATER LAKES MEDICAL MANAGEMENT,
LLC; MICHIGAN HEALTH CARE SERVICES
MANAGEMENT, LLC; PACIFIC MARKETING,
INC.; ELITE SURGICAL MEDIA
CONSULTANTS, L.L.C.; WEINER &
ASSOCIATES, PLLC; WILLIAM J. FOCAZIO,
M.D.; MICHAEL ANGELO; REESE JAMES,
D.O.; MICHIGAN SURGICAL GROUP, PLLC;
DAVID P. JANKOWSKI, D.O.; LUCIA J.
ZAMORANO, M.D.; ARIA O. SABIT, M.D.;
MICHIGAN BRAIN & SPINE PHYSICIANS
GROUP, PLLC; MARTIN F. QUIROGA, D.O.;
and EDWARD FIROSZ,

                    Defendants.

Civil Action No. _____

**Demand for Jury Trial**

## **COMPLAINT**

       Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and Allstate

Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their

attorneys SMITH & BRINK, hereby allege as follows:

## I.    <u>INTRODUCTION</u>

1.      This is a case about medical providers, a law firm, a lawyer referral entity, and the owners, agents, and representatives of the same, who worked in concert with each other to engage in a scheme to defraud Allstate by submitting, or causing to be submitted, false and fraudulent medical records, bills, and invoices (collectively, "false medical documentation") through the U.S. Mail seeking reimbursement under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3100 *et seq.*, for treatment and services that were medically unnecessary and the charges for which were not reasonable.

2.      Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes ("Endosurgical"), which is owned and operated by Greater Lakes Medical Management, LLC ("GLMM") and Michigan Health Care Services Management, LLC ("Michigan Health"); Greater Lakes Anesthesia, PLLC ("Greater Lakes Anesthesia"), its owners William J. Focazio, M.D. ("Focazio") and Michael Angelo ("Angelo"); Summit Medical Group, PLLC ("Summit"), its owner David P. Jankowski, D.O. ("Jankowski"); Elite Surgical Media Consultants, L.L.C. ("Elite Surgical"), its owners Focazio and Angelo, and Pacific Marketing, Inc. ("Pacific Marketing"), its owner Angelo, both of which have certain interests and rights in the lawyer referral service 800-US-LAWYER and 1800uslawyer.com; Weiner & Associates, PLLC ("Weiner & Associates"); Edward Firosz ("Firosz"), an agent of Endosurgical and a representative of 800-US-LAWYER; Reese James, D.O. ("James"), the medical director of Endosurgical and member of Michigan Surgical Group, PLLC ("Michigan Surgical Group"); Lucia J. Zamorano, M.D. ("Zamorano"), a physician affiliated with Endosurgical and Summit; Aria O. Sabit ("Sabit"), also a physician affiliated with Endosurgical and Summit, and member of Michigan Brain & Spine Physicians Group, PLLC ("Michigan Brain & Spine"); and Martin F.

2

Quiroga, D.O. ("Quiroga"), a physician affiliated with Michigan Surgical Group who performed procedures at Endosurgical, (collectively, "defendants") conspired to, and did in fact, defraud Allstate by perpetrating a healthcare billing fraud scheme in violation of state and federal law.

3.       The purpose of the defendants' fraudulent scheme was to generate claims to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had been (or claimed to have been) involved in motor vehicle accidents.

4.       To achieve their fraudulent objective, the defendants engaged in a comprehensive scheme involving an attorney referral service, personal injury attorneys, and medical providers, all of whom conspired to refer insureds for medical treatment that was not reasonably necessary for the patients' care, recovery, or rehabilitation, and the charges for which were not reasonable.

5.       The defendants' fraudulent scheme was fueled in part by referrals from personal injury attorneys, including defendant Weiner & Associates (which often obtained clients using the lawyer referral service 800-US-LAWYER), to defendants Endosurgical, Greater Lakes Anesthesia, Summit, Michigan Surgical Group, and Michigan Brain & Spine (collectively, "medical facility defendants") and Dr. James, Dr. Jankowski, Dr. Zamorano, Dr. Sabit, and Dr. Quiroga (collectively, "physician defendants").

6.       The medical facility defendants and the physician defendants performed medically unnecessary procedures on the legal clients/medical patients in order to submit inflated bills to Allstate seeking payment to which they were not entitled under the Michigan No-Fault Act because (1) the services were not reasonably necessary for the injured person's care, recovery, or rehabilitation; (2) the charges for such services were not reasonable; and (3) the billed-for services were not actually provided.

7.      Each of the individuals and entities named above conspired with one another to accomplish and/or to further the objectives of their fraudulent scheme.

8.      All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

9.      The defendants' insurance fraud scheme was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to, or on behalf of, the defendants.

10.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their fraudulent scheme.

11.     By this Complaint, Allstate brings this action against the defendants for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) payment under mistake of fact, and (4) unjust enrichment.

12.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to or on behalf of the defendants in reliance upon the defendants' false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) payments made by Allstate to or on behalf of the defendants in reliance upon the false medical documentation submitted by the defendants, (3) treble damages, (4) statutory interest, (5) costs, including, but not limited to, the costs of claims handling and the cost of investigation to uncover the defendants' fraudulent scheme, and (6) attorney's fees.

13.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the medical facility defendants and the physician defendants have no right to receive payment for any unpaid bills whereas (1) the medical facility defendants and the physician defendants fraudulently billed

4

Allstate for medical services and treatment that were not reasonably necessary; (2) the medical facility defendants and the physician defendants did not bill Allstate reasonable charges for the medical services purportedly rendered to patients; and (3) the medical facility defendants and the physician defendants engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

## II.    THE PARTIES

### A.    Plaintiffs

14.    Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company are wholly-owned subsidiaries of The Allstate Corporation, a corporation duly organized and existing under the laws of the State of Delaware.

15.    Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company have their principal places of business in Northbrook, Illinois.

16.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in Michigan.

### B.    Defendants

#### 1.    Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes

17.    Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes is a Michigan ambulatory surgery center located in Clinton Township, Michigan.

18.    It was established on November 14, 2008 and was originally owned entirely by Focazio and managed by Michigan Health, which is owned and operated by Angelo.

19.    Under the current Operating Agreement in effect, GLMM, a company owned and operated by Focazio, and Michigan Health are both members of Endosurgical.

20.     At all relevant times, Endosurgical was under the ownership and control of Focazio and Angelo and/or entities under their control.

### 2.     Greater Lakes Anesthesia, PLLC

21.     Greater Lakes Anesthesia, PLLC is Michigan professional limited liability company.

22.     It was established on October 9, 2009 and is owned and controlled by Focazio and Angelo.

23.     Greater Lakes Anesthesia exclusively provides anesthesia services to patients receiving treatment at the medical facility defendants.

### 3.     Summit Medical Group, PLLC

24.     Summit Medical Group, PLLC is a Michigan professional limited liability company located in Clinton Township, Michigan that was established on April 27, 2010.

25.     Jankowski is the sole member and manager.

### 4.      Greater Lakes Medical Management, LLC

26.     Greater Lakes Medical Management, LLC is a New Jersey limited liability company with an initial filing date of June 15, 2011.

27.     It is owned and controlled by Focazio.  Pursuant to the current Operating Agreement, GLMM is a member of Endosurgical.

### 5.     Michigan Health Care Services Management, LLC

28.     Michigan Health Care Services Management, LLC is a Michigan limited liability company located in Clinton Township, Michigan.

29.     It was established on December 17, 2010 and is owned and controlled by Angelo.

30.     Pursuant to the current Operating Agreement, Michigan Health is a member of Endosurgical.

### 6.     Pacific Marketing, Inc.

31.     Pacific Marketing, Inc. is a New Jersey corporation based in Morris County, New Jersey with an initial filing date of February 9, 1998.

32.     Angelo is the sole listed principal of Pacific Marketing.

33.     Pacific Marketing established and owns the toll-free phone number 800-US-LAWYER and the website 1800uslawyer.com.

### 7.     Elite Surgical Medical Consultants, L.L.C.

34.     Elite Surgical Medical Consultants, L.L.C. is a New Jersey limited liability company with an initial filing date of May 4, 2009.

35.     It is owned by Focazio and Angelo, and Focazio is the managing member.

36.     Focazio and Angelo formed Elite Surgical for the primary purpose of designating it the assignee of certain rights and interests in the legal referral service 800-US-LAWYER.

### 8.     Weiner & Associates, PLLC

37.     Weiner & Associates, PLLC is a Michigan professional limited liability company established on June 5, 2008 that practices primarily in the area of personal injury law.

### 9.     William J. Focazio, M.D.

38.     William J. Focazio, M.D. is a licensed medical doctor in Michigan and New Jersey.

39.     He is a resident and citizen of New Jersey.

40.     At all relevant times, Focazio, or a company under his control, was a co-owner of Endosurgical and Greater Lakes Anesthesia.

41.     Focazio also owns and controls GLMM and is a part owner of Elite Surgical, which has certain rights and interests in 800-US-LAWYER and 1800uslawyer.com.

42.     In addition to Endosurgical, Focazio owns additional ambulatory surgical centers in New Jersey.

### 10.     Michael Angelo

43.     Michael Angelo is a resident and citizen of New Jersey.

44.     At all relevant times, Angelo, or a company under his control, co-managed and operated Endosurgical.

45.     Angelo is also the owner of Pacific Marketing, which owns 800-US-LAWYER and 1800uslawyer.com, and a co-owner of Elite Surgical, which has certain rights and interests in 800-US-LAWYER and 1800uslawyer.com.

### 11.     Reese James, D.O.

46.     Dr. Reese James, D.O. is an osteopathic physician licensed in Michigan.

47.     He is the medical director at Endosurgical.

48.     Dr. James is also affiliated with Summit and Michigan Surgical Group.

### 12.     Michigan Surgical Group, PLLC

49.     Michigan Surgical Group, PLLC is a Michigan professional limited liability company located in Clinton Township, Michigan.

50.     It was formed on September 20, 2010.

51.     Dr. James is the sole member and manager of Michigan Surgical Group.

52.     Dr. James often billed Allstate through Michigan Surgical Group for procedures he performed at or in connection with services rendered by Endosurgical and Summit.

### 13.   David P. Jankowski, D.O.

53.    Dr. David P. Jankowski, D.O. is an osteopathic physician licensed in Michigan.

54.    He is the sole member and manager of Summit.

55.    Dr. Jankowski is also affiliated with and performed medical procedures at Endosurgical.

### 14.   Lucia J. Zamorano, M.D.

56.    Dr. Lucia J. Zamorano, M.D. is a medical doctor licensed in Michigan.

57.    She was affiliated with Endosurgical and Summit, and performed medical procedures at Endosurgical.

### 15.   Aria O. Sabit, M.D.

58.    Dr. Aria O. Sabit, M.D. is a medical doctor licensed in Michigan.

59.    He is affiliated with and performed medical procedures at Endosurgical.

60.    Dr. Sabit is also the sole member and manager of Michigan Brain & Spine.

### 16.   Michigan Brain & Spine Physicians Group, PLLC

61.    Michigan Brain & Spine Physicians Group, PLLC is a Michigan professional limited liability company located in Southfield, Michigan.

62.    It was formed on April 5, 2011.

63.    Dr. Sabit is the sole member and manager of Michigan Brain & Spine.

64.    Dr. Sabit often billed Allstate through Michigan Brain & Spine for procedures performed at or in connection with services rendered by Endosurgical and Summit.

### 17.   Martin F. Quiroga, D.O.

65.    Dr. Martin F. Quiroga, D.O. is an osteopathic physician licensed in Michigan.

66.     Dr. Quiroga is a surgeon at Michigan Surgical Group and performed procedures at Endosurgical.

### 18.     Edward Firosz

67.     Edward Firosz is an agent and representative of Endosurgical.

68.     Upon information and belief, Firosz is also a representative of the legal referral service 800-US-LAWYER and marketed the service to attorneys in Michigan.

## III.     JURISDICTION AND VENUE

69.     Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.  Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

70.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the wrongful acts known to Allstate alleged herein with particularity were carried out within the Eastern District of Michigan.

## IV.     MICHIGAN'S NO-FAULT ACT

71.     Allstate underwrites automobile insurance in the State of Michigan.

72.     Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.

73.     Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107(1)(a).

74.     "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the

10

product or service itself is not reasonably necessary."  Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

75.     A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and that the charge for the service is reasonable.  Nasser, 435 Mich. at 49.

76.     Claims for personal injury benefits under the No-Fault Act are available only if the benefits are "for accidental bodily injury" and only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ."  Mich. Comp. Laws § 500.3105(1).

77.     Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of the motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of loss sustained."  Mich. Comp. Laws § 500.3142(2).

78.     The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation."  Mich. Comp. Laws § 500.3148(2)

**V.   USE OF 800-US-LAWYER TO GENERATE REFERRALS TO MEDICAL FACILITY DEFENDANTS AND PHYSICIAN DEFENDANTS**

79.     The defendants' fraudulent scheme relied in part on the legal referral service 800-US-LAWYER and 1800uslawyer.com.

80.     Angelo, through his company Pacific Marketing, was the original owner and operator of 800-US-LAWYER, a legal referral service that markets specifically to automobile accident victims, including motor vehicle accident victims in Michigan.

11

81.     The website 1800uslawyer.com was also originally owned and operated by Angelo, through Pacific Marketing, to market to victims of automobile accidents.

82.     The website instructs visitors to call 800-US-LAWYER.

83.     On January 1, 2010, Angelo assigned all of his rights, title, and interest in and to 800-US-LAWYER and the 1800uslawyer.com website within the State of Michigan to Elite Surgical, a company formed and equally owned by Focazio and Angelo.

84.     Angelo, through Pacific Marketing, maintained sole ownership and control of the 800-US-LAWYER toll-free phone number and 1800uslawyer.com website in all geographical areas except Michigan.

85.     Pursuant to the assignment agreement, Angelo and Pacific Marketing were not permitted to use the 800-US-LAWYER toll-free number or the 1800uslawyer.com website in Michigan.

86.     Upon information and belief, however, Angelo and Pacific Marketing have entered into an agreement with at least one law firm in Michigan to utilize 800-US-LAWYER in the law firm's local advertising and marketing.

87.     As such, both Focazio, through Elite Surgical, and Angelo, individually and through Pacific Marketing and Elite Surgical, have interests in and control 800-US-LAWYER and 1800uslawyer.com in Michigan.

88.     Weiner & Associates is a Michigan law firm that uses 800-US-LAWYER prominently in its advertising.

89.     Upon information and belief, in return for client referrals generated by 800-US-LAWYER, law firms, including Weiner & Associates, are required to refer their clients to certain designated medical providers, including the medical facility defendants.

12

90.     The law firms also refer their clients to other designated medical providers who, in turn, refer the patient on to the medical facility defendants, which bill Allstate for expensive and unnecessary medical treatment.

91.     Upon information and belief, the law firms, including Weiner & Associates, do not have to pay for the use of 800-US-LAWYER nor pay for any clients obtained thereby, provided that they agree to refer to designated medical providers, including the medical facility defendants.

92.     The referrals from the law firms, including Weiner & Associates, and other medical providers to the medical facility defendants are not based on the clients'/patients' individual clinical symptoms and actual medical needs, but instead are made, upon information and belief, pursuant to predetermined arrangements that ensure patients are ultimately treated by the medical facility defendants.

93.     Focazio has stated under oath that 800-US-LAWYER is used to generate patient referrals to particular medical providers.

94.     Dr. Jankowski has admitted that he received referrals from 800-US-LAWYER.

95.     Dr. Jankowski has also admitted that he treated patients at the Endosurgical facility based in part on the fact that he was receiving referrals from 800-US-LAWYER.

96.     That Focazio and Angelo, both of whom control 800-US-LAWYER and 1800uslawyer.com in Michigan, would use the same to generate patients (and, therefore, billing claims) for Endosurgical and Greater Lakes Anesthesia is not surprising as Focazio, individually and through GLMM, and Angelo, individually and through Michigan Health, have financial interests in Endosurgical and Greater Lakes Anesthesia.

97.     Thus, Angelo and Focazio directly benefit from the predetermined referrals from Weiner & Associates, and other law firms using 800-US-LAWYER and 1800uslawyer.com, to Endosurgical and Greater Lakes Anesthesia and/or to designated medical providers who in turn refer patients to and/or treat patients at Endosurgical and Greater Lakes Anesthesia.

98.     Dr. Jankowski and Summit are examples of medical providers who agreed to treat patients at Endosurgical because they received referrals from 800-US-LAWYER.

99.     The scheme to secure patients for Endosurgical by requiring law firms and attorneys who use 800-US-LAWYER to refer their clients, whether directly or indirectly, to Endosurgical was previously employed by Focazio and Angelo to great success in New Jersey.

100.     In addition to Endosurgical in Michigan, Focazio also owns an ambulatory surgical center in Clifton, New Jersey called Endo/Surgical Center of North Jersey, P.C.

101.     In the mid-2000s, Focazio hired Angelo's company Pacific Marketing, which at that time owned all interests in 800-US-LAWYER and 1800uslawyer.com, to provide marketing and networking services for his New Jersey ambulatory surgical center.

102.     As a result of his ownership and operation of 800-US-LAWYER, Angelo had relationships with many personal injury attorneys.

103.     Angelo utilized these relationships to substantially grow Focazio's business and revenue.

104.     Focazio and Angelo sought to duplicate their success in New Jersey by purchasing an ambulatory surgical center in Michigan (i.e., Endosurgical) and similarly utilizing 800-US-LAWYER to guarantee patient referrals to Endosurgical.

105.     Angelo has testified that marketing efforts for Endosurgical in Michigan were directed to both doctors and lawyers.

14

106.    Firosz is an agent and representative of Endosurgical.

107.    Upon information and belief, Firosz made "sales pitches" to law firms and attorneys in Michigan to persuade them to use 800-US-LAWYER.

108.    By virtue of his affiliation with Endosurgical, Firosz also benefitted from patient referrals generated by 800-US-LAWYER to Endosurgical.

109.    Patients were not referred to the medical facility defendants by users of 800-US-LAWYER based on their actual medical needs, but instead, upon information and belief, based on a predetermined protocol established by Focazio and Angelo.

110.    As such, the medical treatment provided by the medical facility defendants to the patients at issue in this Complaint was unnecessary and/or did not arise out of a motor vehicle accident.

## VI.    UNNECESSARY MEDICAL SERVICES

111.    The medical facility defendants are closely related.

112.    Indeed, almost every patient at issue in this Complaint who was treated at Endosurgical was also seen at or treated by Summit, Michigan Surgical Group, and/or Michigan Brain & Spine.

113.    Greater Lakes Anesthesia was the sole provider of anesthesia services for Endosurgical patients.

114.    Greater Lakes Anesthesia did not provide anesthesia services for any patient other than those of the medical facility defendants.

115.    Endosurgical, Greater Lakes Anesthesia, and Summit are located in the same building in Clinton Township, Michigan.

15

116.    The medical facility defendants billed Allstate for medical services and medical procedures that were not warranted by the patients' actual clinical symptoms and/or that were not done in accordance with established medical standards.

117.    The physician defendants were affiliated with and rendered medical services at or through the medical facility defendants.

118.    The goal in treating patients of the medical facility defendants was to perform as much treatment as could be justified, regardless of whether such treatment was reasonably necessary to the patient's care, recovery, or rehabilitation and/or arose out of a motor vehicle accident.

119.    Tests were ordered by the medical facility defendants and the physician defendants to see what additional procedures could be done, rather than to acquire information to improve patient care or direct the course of treatment.

120.    This is evidenced by the medical facility defendants and the physician defendants ordering tests, but doing treatments contraindicated by the test results and/or not waiting for the test results before proceeding with additional treatment.

121.    The services and treatment rendered by the medical facility defendants and the physician defendants were not medically necessary.

122.    These unnecessary services include manipulations under anesthesia, injections, spinal fusion surgeries, and platelet-rich plasma injections, all of which are discussed more fully below, and all treatment that was ancillary to and/or derivative of these unnecessary procedures, including, but not limited to, the services and equipment set out in the charts attached hereto at Exhibit 1 (Endosurgical), 2 (Greater Lakes Anesthesia), 3 (Summit), 4 (Michigan Surgical Group), and 5 (Michigan Brain & Spine).

16

A.     **Manipulation Under Anesthesia**

123.     Manipulation under anesthesia (MUA) involves mobilizing parts of a patient's musculoskeletal system while the patient is sedated and, therefore, unable to tighten his muscles and guard against movement.

124.     Patients may tense up during manipulations without anesthesia (MWA) due to fear, anxiety, unfamiliarity with techniques, and guarding.

125.     Many clinicians will use other forms of manipulation before resorting to MUA, including myofascial release, strain/counterstrain, muscle energy, active release technique, acupressure, functional release technique, and cranio-sacral.

126.     All of these techniques avoid high-velocity thrusts, work well in treating chronic pain, and are well-tolerated by patients with most painful disorders.

127.     No evidence exists that shows the long-term benefit of MUA.

128.     The vast majority of publications regarding MUA are from fringe medical journals.

129.     In letters to Allstate appealing for coverage for MUA procedures, the medical facility defendants and the physician defendants cite case studies, but not peer-reviewed medical journals or any other publication, regarding the proven efficacy of MUA.

130.     Individual case studies do not speak to the long-term efficacy of a procedure.

131.     MUA is considered experimental, investigational, and/or unproven for use on most areas of the body, including the spine (cervical, lumbar, and thoracic); ankle; finger; hip; pelvis; temporomandibular joint; toe; and wrist.

132.    MUA is generally considered reasonable for treatment of the following conditions only: arthrofibrosis of the knee; arthrofibrosis of the elbow; reduction of a displaced fracture; reduction of an acute dislocation; and adhesive capsulitis (i.e., frozen shoulder).

133.    Nearly every patient at issue in this Complaint who received MUA had his or her spine manipulated.  Many also had their pelvis and/or hips manipulated.

134.    As MUA was performed on areas of the body for which MUA is not generally accepted, the procedures were not reasonably necessary and the MUA treatment was not lawfully rendered.

135.    Even where MUA was performed on generally accepted body regions, the need for resort to MUA is not evident in the patients' medical records and is not supported by documented diagnoses.

136.    Moreover, the defendants failed to adhere to the community standards for performing MUA.

137.    The National Association of MUA Physicians (NAMUAP) issues guidelines to recommend, promote, and review protocols and standards for the ethical use of MUA.

138.    The guidelines published by the NAMUAP include clinical justification for performing MUA, establishing medical necessity for MUA, frequency of MUA procedures, safety guidelines, compensation, and anesthesia standards.

139.    The procedure notes and operative reports from the medical facility defendants and the physician defendants cite and reference the NAMUAP guidelines.

140.    In a September 1, 2010 letter to Allstate recommending MUA, Dr. Jankowski, on behalf of Endosurgical, states that patient T.G. (Claim No. 0162469241) is a candidate for MUA

18

based on "The [N]ational Academy [sic] of MUA Physician's standards and protocols." *See Exhibit 6.*

141.     As the medical facility defendants and the physician defendants reference the NAMUAP standards frequently in medical records and in correspondence to Allstate, it is clear that they were aware of and purported to rely on and adhere to the NAMUAP guidelines.

142.     However, as detailed below, the defendants frequently violated the NAMUAP standards.

143.     The MUA procedures performed by the medical facility defendants and the physician defendants were unnecessary for the following reasons:

### 1.     Performing MUA Before Conservative Treatment

144.     MUA should only be performed after the patient has tried, and failed to experience relief from, conservative and generally-accepted treatment, including MWA, pain medication, and injections.

145.     The defendants, however, recommended and performed MUA without regard for whether conservative treatment had been employed and/or been utilized a sufficient amount of time to determine if it would relieve the patient's symptoms.

146.     This is evidenced in several ways.

147.     First, most of the patients who received MUA were undergoing MWA without any documented fear or nervousness that would limit the usefulness of MWA.

148.     Second, several patients had documented positive responses to conservative treatment, yet were needlessly referred for MUA.

149.     Third, though MUA should only be resorted to where MWA has failed, numerous patients received MWA after undergoing MUA to the same area of the body.

150.   Finally, though MUA should only be resorted to where more conservative treatment, such as injections, has failed, several patients received injections only during and/or after undergoing MUA.

### a.   Patients Not Experiencing Difficulty with MWA

151.   As MUA is just manipulation with the patient under anesthesia, the results to be expected from MUA should not differ from MWA.

152.   There is no logical reason to expect results from MUA to be better than MWA.

153.   Thus, the only justification for MUA is lack of success using MWA.

154.   The defendants, however, often performed MUA on patients who were progressing with MWA.

155.   The medical records and notes for these patients do not document that the patients had fear or anxiety while undergoing MWA.

156.   In fact, several patients had MWA during and after undergoing MUA.

157.   As such, resort to MUA was not justified and was medically unnecessary.

### i.   Exemplar Claims

### (1)   K.B. (Claim No. 0100212501)

158.   Patient K.B. testified that he was relaxed and had no nervousness while receiving MWA.

159.   As there was no barrier to MWA, there was no need for MUA.

160.   Nevertheless, K.B. underwent three MUA procedures at Endosurgical on March 5, 2011, March 12, 2011, and March 19, 2011 that were performed by Dr. Jankowski and Dr. James (assistant surgeon), none of which had any lasting effect on his pain symptoms.

20

**(2)     R.H. (Claim No. 0100203001)**

161.     At the time of her MUA procedures, patient R.H. had undergone over 150 sessions of MWA.  None of the notes from these sessions indicate that she could not tolerate these manipulations.

162.     To the contrary, R.H.'s lower back pain had improved and her knee and neck pain had resolved before she underwent MUA.

163.     Nevertheless, three MUA procedures were performed on R.H. by Dr. James on March 24, 2011, March 26, 2011, and March 31, 2011 at Endosurgical.

164.     As there was no justification for resort to MUA where the patient was tolerating and benefitting from MWA, the MUA procedures were not medically necessary.

**(3)     S.T. (Claim No. 0167726223)**

165.     At the time of her MUA procedures, S.T. had undergone over 150 sessions of MWA.

166.     None of the notes from these sessions describe any difficulties being adjusted due to spasm or difficulty relaxing.

167.     Nevertheless, S.T. underwent three MUA procedures performed by Dr. Zamorano at Endosurgical on January 14, 2011, January 15, 2011, and January 16, 2011.

168.     As the results to be expected from MUA are the same as those to be expected from MWA, and as S.T. was not experiencing difficulty with MWA that would warrant resort to MUA, the MUA procedures performed on S.T. were not medically necessary.

**b.     Patients Had Not Failed Conservative Treatment**

169.     MUA should only be performed after the patient has tried, and failed, more conservative treatment.

21

170.    Several patients, however, were still undergoing and/or were still progressing with conservative treatment at the time MUA was performed.

171.    MUA was not reasonably necessary in these circumstances.

### i.    Exemplar Claims

### (1)    S.S. (Claim No. 0147742571)

172.    Dr. Zamorano stated that S.S. failed conservative treatment, but Dr. Zamorano's own notes indicate that chiropractic treatment, muscle relaxers, and ice were helping S.S.'s symptoms.

173.    On S.S.'s first visit with Dr. Zamorano on August 12, 2010, Dr. Zamorano gave the patient a lumbar brace.

174.    On S.S.'s second visit on September 2, 2010, Dr. Zamorano gave the patient Mobic, Vicodin, Valium, and a Lidocaine patch, all of which had not previously been tried by the patient.

175.    Instead of waiting to assess whether this more conservative treatment would help the patient, and ignoring her own findings that chiropractic treatment, muscle relaxers, and ice were helping, Dr. Zamorano instead scheduled MUA for the spine at the time of S.S.'s second visit on September 2, 2010.

176.    MUA was performed on S.S. by Dr. Zamorano on September 24, 2010, September 25, 2010, and September 26, 2010 at Endosurgical.

177.    Conservative treatment was not adequately attempted and its positive effect was improperly ignored before resort to MUA.

178.    The MUA procedures were, therefore, medically unnecessary.

### (2)   S.C. (Claim No. 0151883022)

179.   In S.C.'s MUA operative reports from September 2, 2010, September 11, 2010, and September 15, 2010, the treating physician, who was assisted by Dr. James, states that "considering the patient . . . has not experienced relief or fears treatment with chronic medications, MUA is medically necessary and appropriate at this time."

180.   There is no indication that S.C. had fear of using chronic medications.

181.   In fact, S.C. used medications consistently until the time of the MUA procedures.

182.   As S.C. had not exhausted conservative treatment (namely, medication), MUA was not medically necessary.

### c.   Patients Underwent MWA During and/or After MUA

183.   As discussed above, MUA and MWA are the same procedure, the only difference being that the patient is under anesthesia.

184.   The only justification for performing MUA, therefore, is that the patient engages in tightening and guarding during MWA such that sedation is required for manipulation.

185.   Several patients, however, underwent MWA after receiving MUA.

186.   The subsequently-performed MUA was done on the same area of the body as the MUA.

187.   If patients were not exhibiting fear or anxiety such that MWA was recommended and performed as a necessary medical procedure, there was no need for resort to MUA.

### i.   Exemplar Claims

### (1)   R.H. (Claim No. 0100203001)

188.   Patient R.H. had her first MUA procedure, performed by Dr. James at Endosurgical, on March 24, 2011 and her second MUA procedure on March 26, 2011.

189.    In between, on March 25, 2011, R.H. underwent MWA.

190.    R.H. also had additional MWA in excess of thirty (30) times after receiving MUA.

191.    MUA should be employed only where MWA is no longer a viable treatment option.

192.    Here, MWA was still an appropriate treatment option for R.H., as evidenced by the dozens of MWA procedures she received to the same area of her body (namely, her spine) after undergoing MUA.

193.    Accordingly, the MUA procedures were not medically necessary, and Allstate is not obligated to pay for such services pursuant to Michigan law.

### (2)    S.T. (Claim No. 0167726223)

194.    Patient S.T. had MWA on January 10, 2011, January 11, 2011, and January 13, 2011.

195.    S.T. then underwent MUA to her spine on three consecutive days from January 14-16, 2011, performed by Dr. Zamorano at Endosurgical.

196.    S.T. again had MWA, also to her spine, on January 18, 2011, January 19, 2011, and January 20, 2011.

197.    As S.T. was still undergoing MWA to the same area of her body, there was no need for MUA procedures.

### d.    Patients Received Injections During and/or After MUA

198.    Patients under the care of the medical facility defendants and the physician defendants were often given injections at the same time as and/or after MUA.

199.    This is problematic for two reasons.

24

200.    First, MUA should be largely a procedure of last resort for patients and clinicians.

201.    This means that more generally-accepted and proven procedures, such as epidural steroid injections (ESIs) and trigger point injections (TPIs), should be administered and their effect on the patient measured before MUA is justified.

202.    Second, as discussed more fully below, the NAMUAP guidelines state that a patient should be evaluated over a period of time after a MUA procedure to determine what, if any, lasting relief is experienced.

203.    The use of any other intervention or treatment, such as the administration of ESIs or TPIs, hinders the ability of the physician to evaluate the patient's response to the MUA because it may not be possible to deduce which treatment – the MUA or the injection – actually helped the patient and to what degree.

### i.    Exemplar Claims

#### (1)    D.R. (Claim No. 0200584076)

204.    Dr. James performed MUA on and administered an ESI and TPIs to D.R.'s spine on the same day on two separate occasions: March 5, 2011 and March 12, 2011.

205.    As the spine was injected with anesthetics and steroids at the same time that MUA was performed on the spine, there is no way to know if the MUA helped D.R. or how much.

206.    Moreover, the ESI and TPIs should have been administered prior to MUA being done to determine if they could relieve D.R.'s pain without the need for MUA, particularly where MUA is not generally accepted for use on the spine.

#### (2)    T.G. (Claim No. 0162469241)

207.    T.G. purportedly underwent MUA procedures performed by Dr. Jankowski at Endosurgical on June 30, 2010, July 1, 2010, and July 6, 2011.

208.    After undergoing MUA, T.G. received multiple ESIs and TPIs from Dr. James, also at Endosurgical, including injections administered on September 11, 2010, October 2, 2010, November 18, 2010, and December 11, 2010.

209.    Injections, such as ESIs and TPIs, are well-researched and approved treatment options for pain, such as pain arising from a motor vehicle accident.

210.    Thus, MUA was improperly rendered before injections were utilized as a treatment option.

### (3)    S.C. (Claim No. 0151883022)

211.    On the same days that MUA procedures were done on September 11, 2010 and September 15, 2010, S.C. also received ESIs at the lumbar level and multiple bilateral paraspinal TPIs.

212.    Dr. James, who assisted on the MUA procedures, administered the injections.

213.    The MUA procedures were thus medically unnecessary because more conservative treatment – namely, the ESIs and TPIs – had not yet been tried and found unsuccessful in treating S.C.'s symptoms.

214.    Moreover, the fact that S.C. received these injections on the same day that he received MUA made it impossible to tell the efficacy of the MUA procedures.

215.    As such, justification for the subsequent MUA performed on S.C. on September 15, 2010 cannot be discerned.

### 2.    Unsubstantiated Diagnoses Made to Justify MUA

216.    Several patient medical records list diagnoses and/or findings that are unsubstantiated and/or false and which appear to be made only to support performing expensive, but unnecessary, MUA procedures.

217.    For example, several patient pre-operative reports list "displacement" of a spinal disc, "dislocation of the pelvis," and/or "closed dislocation, coccyx" as the diagnosis for which MUA is being prescribed.

218.    However, these diagnoses are almost never substantiated by imaging or clinical examination.

219.    For every patient who underwent MUA, there was no MRI or CT of the pelvis performed to assess the diagnosis of dislocated pelvis.

220.    A dislocation of the pelvis is a serious condition that involves a complete separation of the pubic symphysis or sacroiliac joint, or it can refer to a hip dislocation, where the femoral head slides completely out of the socket.

221.    The medical records of the patients at issue in this Complaint do not demonstrate anything as significant as a dislocation of the pelvis or hip, yet the diagnosis is routinely made to justify performing MUA on the pelvis/hip.

222.    Similarly, patient medical records do not show dislocation of the coccyx, yet that diagnosis is often made and cited as justification for performing MUA.

                    a.    **Exemplar Claims**

                    i.    **J.B. (Claim No. 0215247941)**

223.    The following are listed as MUA pre-operation and post-operation diagnoses in patient J.B.'s medical records by Dr. James: displacement of the cervical intervertebral disc without myelopathy; displacement of the thoracic intervertebral disc without myelopathy; displacement of the lumbar intervertebral disc without myelopathy; dislocation of the pelvis, closed; dislocation of the coccyx, closed; enthesopathy of the hip region; contracture of the pelvic/thigh region; and dislocation of the sacrum, closed.

27

224.    None of these diagnoses are specifically noted in any clinical exam or imaging study in J.B.'s medical records.

225.    In fact, the MRIs of J.B.'s spine show only spinal disc bulges, not displacements.

226.    Nor is there any effort to substantiate these diagnoses.

227.    For example, there is no orthopedic exam done to the hip other than simply finding trigger points.

228.    Despite the lack of substantiated diagnoses, J.B. underwent MUA on March 3, 2012, March 17, 2012, and March 24, 2012 at Endosurgical.

229.    As the diagnoses that Dr. James cited and relied on to justify performing MUA are not supported, there was no medically reasonable basis to perform MUA.

**ii.      R.H. (Claim No. 0100203001)**

230.    R.H. had neck and knee pain that had resolved after she was struck by a motor vehicle.  Her medical records do not contain complaints of thoracic or hip pain.

231.    No imaging was ever done of R.H.'s thoracic spine, coccyx, or pelvis.

232.    No physical examination was ever done of R.H.'s thoracic spine, coccyx, or pelvis.

233.    R.H. had MRIs taken of her cervical and lumbar spine on December 30, 2010. Both reports showed no pathology at any vertebral level.

234.    Yet, Dr. James stated that R.H.'s pre-MUA and post-MUA diagnoses included displacement of the cervical, thoracic, and lumbar intervertebral discs; closed dislocations of the coccyx and pelvis; and enthesopathy of the hip.

235.    R.H. received cervical, thoracic, lumbar, pelvis, and hip joint MUA on three separate occasions on March 24, 2011, March 26, 2011, and March 31, 2011, despite the fact the diagnoses supporting MUA on these regions were unsubstantiated.

### iii.    J.L. (Claim No. 0200584076)

236.    Two diagnoses were made by Dr. Jankowski regarding J.L.'s shoulder: "adhesive capsulitis" and "contracture of the shoulder joint," which are in fact the same.

237.    However, there were no measurements made to justify this diagnosis.

238.    Nor was imaging or a clinical examination of J.L.'s shoulder performed.

239.    Nonetheless, MUA was performed on J.L.'s shoulder three times at Endosurgical on March 5, 2011 and March 12, 2011 (Dr. James), and March 19, 2011 (Dr. Jankowski).

### iv.    S.T. (Claim No. 0167726223)

240.    S.T.'s medical records do not contain any diagnoses involving the pelvis or hips.

241.    Nor was any dedicated imaging of the pelvis or hips ever done.

242.    S.T.'s physician, Dr. Zamorano, never examined the pelvic ring or hips, nor palpated these structures.

243.    Despite the lack of diagnosis, Dr. Zamorano performed MUA on S.T.'s hips and pelvic ring (in addition to her spine) on three consecutive days from January 14-16, 2011.

244.    As no proper diagnosis existed to justify the MUA procedures, MUA was not medically necessary.

### 3.    Contraindications to MUA

245.    Several patients exhibited symptoms that are clear contraindications to the performance of MUA.

246.     Most frequently, patients had disc herniations in excess of five (5) millimeters, which are absolute contraindications to MUA.

a.       **Exemplar Claims**

i.       **S.S. (Claim No. 0147742571)**

247.     A MRI of S.S.'s thoracic spine was taken on September 13, 2010.

248.     The thoracic MRI revealed a disc herniation of one (1) centimeter.

249.     Despite the existence of a herniation in excess of five (5) millimeters, S.S. had MUA on her spine done by Dr. Zamorano on three consecutive days from September 24-26, 2010 at Endosurgical.

ii.       **S.C. (Claim No. 0151883022)**

250.     S.C.'s December 5, 2009 lumbar spine MRI showed a L5-S1 herniation measured at approximately 8.66 millimeters.

251.     The presence of a disc herniation in excess of five millimeters is an absolute contraindication to MUA.

252.     Nonetheless, MUA was performed on S.C.'s spine on three occasions on September 2, 2010, September 11, 2010, and September 15, 2010.  Dr. Quiroga and Dr. James performed and/or assisted in these procedures.

4.       **Serial MUA Procedures**

253.     According to the NAMUAP standards, a subsequent MUA after a preceding MUA procedure should only occur after evaluation to determine if the patient's response falls within the guidelines established by the NAMUAP to justify additional MUA.

254.    Specifically, the NAMUAP states that if a patient regains 80% or more of normal biomechanical function during the first MUA and retains at least 80% of the functional improvement during post-MUA evaluation, then subsequent MUA is usually unnecessary.

255.    If a patient regains 50% - 70% or less of normal biomechanical function during the first procedure and retains only 50% - 70% of improvement during post-MUA evaluation, then a second MUA is recommended.

256.    If the patient continues to improve with the second MUA, but does not achieve at least an 80% improvement in function, then a third MUA is recommended.

257.    If a patient shows a 10% - 15% improvement during the first MUA and continues to show a 10% - 15% functional improvement during post-MUA evaluations, it is recommended that additional evaluations be completed to establish the appropriateness of additional MUA.

258.    The NAMUAP guidelines clearly state that evaluation is necessary after each MUA procedure in order to measure the effectiveness of the preceding procedure and to determine whether additional MUA is necessary.

259.    The medical facility defendants and the physician defendants, however, prescribe "a series of three MUAs" for every patient.

260.    This recommendation for serial MUA is made in violation of NAMUAP standards, despite the fact that the medical facility defendants' and the physician defendants' procedure notes all contain the following sentence immediately after recommending three consecutive MUA procedures:  "The standards and protocols followed are set forth by the National Academy [sic] of MUA Physicians."

261.    The medical facility defendants and the physician defendants also ignore the NAMUAP guidelines regarding appropriate patient responses to warrant subsequent MUA.

31

262.    As discussed above, the ability to gauge a patient's response to MUA was often compromised by the fact that injections were commonly administered at or near the same time that MUA was performed.

263.    For all of these reasons, the serial MUA procedures recommended and performed by the medical facility defendants and the physician defendants were medically unnecessary.

### a.    Exemplar Claims

#### i.    S.T. (Claim No. 0167726223)

264.    Patient S.T. was scheduled for and underwent MUA on three consecutive days: Friday, January 14, 2011; Saturday, January 15, 2011, and Sunday, January 16, 2011.

265.    As S.T.'s MUA procedures were scheduled without any intervening time between each over the course of a weekend, it is clear that Dr. Zamorano planned to proceed with all three MUA regardless of S.T.'s response to the preceding procedure.

266.    This is a clear violation of the NAMUAP guidelines, which mandate evaluation after each MUA procedure to justify the need for subsequent MUA.

#### ii.    S.S. (Claim No. 0147742571)

267.    Patient S.S. was also scheduled for and underwent MUA on three consecutive days from September 24-26, 2010.

268.    As S.S.'s MUA procedures were scheduled and performed without any intervening time between each, it is clear that Dr. Zamorano planned to proceed with all three regardless of S.S.'s response to the preceding procedure.

269.    S.S.'s MUA procedures were performed in violation of the NAMUAP guidelines and without any medically-documented justification for the subsequent MUA procedures.

### iii.   S.C. (Claim No. 0151883022)

270.   Patient S.C. reported 90% relief of his pain after undergoing his second MUA treatment on September 11, 2010.

271.   Nonetheless, S.C. underwent a third MUA on September 15, 2010.

272.   The NAMUAP guidelines state that a third MUA is recommended where the patient does not achieve at least an 80% improvement in function after the second MUA.

273.   As S.C. reported improvement in excess of 80% (namely, 90%), the third MUA was performed in violation of NAMUAP standards and was medically unnecessary.

### iv.   T.G. (Claim No. 0162469241)

274.   After her first MUA procedure, allegedly performed by Dr. Jankowski on June 30, 2010, T.G. reported a 10%-20% relief from pain.

275.   The NAMUAP guidelines state that if the patient shows a 10%-15% improvement during the first MUA and continues to show a 10%-15% function improvement thereafter, additional evaluation should be conducted to establish the appropriateness of additional MUA.

276.   However, T.G. underwent a second MUA procedure the very next day, July 1, 2010.

277.   Her medical records do not reflect that an evaluation was done first to determine if the second MUA was appropriate.

278.   As the NAMUAP guidelines were ignored by the medical facility defendants and the physician defendants, and as the patient reported relief that may have rendered the second MUA unnecessary, the defendants are not entitled to reimbursement for the same.

33

### v.     R.H. (Claim No. 0100203001)

279.    Patient R.H. had her first MUA procedure on March 24, 2011 and her second MUA procedure on March 26, 2011.

280.    Both were performed by Dr. James at Endosurgical.

281.    In between, on March 25, 2011, R.H. underwent MWA.

282.    The NAMUAP guidelines state that "After the first MUA, patient rests at home after heat, interferential, stretching.  No manipulation."

283.    As R.H. underwent MWA the day after her first MUA, the efficacy of the first MUA could not be accurately assessed.

284.    Accordingly, there was no medical justification to perform the second MUA.

### vi.     A.C. (Claim No. 0159236595)

285.    Patient A.C. had MUA done on June 30, 2010, July 13, 2010, and July 20, 2010, all performed by Dr. Jankowski.

286.    A.C. fell sometime between the second MUA (July 13, 2010) and the third MUA (July 20, 2010).

287.    A.C. stated that she had almost 90% relief of her pain until her fall between the second and third MUAs.

288.    After her fall, she again experienced significant pain.

289.    Despite a separate trauma that occurred between the second and third MUAs and which dramatically increased the patient's pain, Dr. Jankowski did not examine A.C. or order testing or imaging to determine the source of her new pain or whether she had any fractures.

290.    MUA is not indicated for an acute injury, particularly where there is no diagnosis.

34

291.    Yet, Dr. Jankowski proceeded with a third MUA, even though A.C. had reported 90% pain relief after the second MUA until she suffered an acute injury (her fall).  There was thus no diagnosis to justify the third MUA.

###### 5.    Excessive Anesthesia

292.    The NAMUAP guidelines state in no uncertain terms that "MUA is performed with the patient in a semiconscious state."

293.    Semiconscious is also called "twilight" anesthesia.

294.    The medical facility defendants and the physician defendants were aware of the NAMUAP guidelines regarding anesthesia and also represented to Allstate that they used twilight anesthesia.

295.    Indeed, in a letter to Allstate, Dr. Jankowski stated, "By placing the patient in a *twilight sleep*, . . . ."  *See Exhibit 6 (emphasis added).*

296.    Despite the NAMUAP guidelines and the medical facility defendants' and the physician defendants' own representations, most patients were fully sedated during their MUA procedures, usually with Propofol.

297.    The medical facility defendants and the physician defendants ignored the guidelines that they represented to Allstate they adhere to and which are established by the same entity that trains them to perform MUA, and rejected other sedation options in favor of one that is more costly and poses a higher risk to patients.

298.    Full sedation is not needed for MUA.

299.    In fact, twilight anesthesia is often used in procedures more invasive than MUA, including gastrointestinal endoscopic procedures such as colonoscopies and esophagogastroduodensocopies.

300.    Serious complications can arise from the use of excessive anesthesia.

    **a.    Exemplar Claims**

    **i.    K.B. (Claim No. 0100212501)**

301.    As discussed above, patients were subjected to excessive anesthesia when undergoing MUA.

302.    K.B. was one such patient.

303.    K.B. was fully sedated during a MUA procedure performed by Dr. Jankowski and Dr. James on March 12, 2011.

304.    In recovery after this procedure, K.B.'s blood oxygenation plummeted to 29%, an extremely low level.

305.    A jaw thrust maneuver was required to reestablish K.B.'s airway.

306.    Despite this serious trauma, K.B. was discharged from Endosurgical less than thirty (30) minutes after the MUA procedure.

    **ii.    S.S. (Claim No. 0147742571)**

307.    Patient S.S. underwent MUA on three consecutive days from September 24-26, 2010, all performed by Dr. Zamorano at Endosurgical.

308.    S.S.'s airway became blocked while undergoing the second MUA procedure.

309.    S.S. became cyanotic and awoke to a clinician performing a jaw thrust maneuver to reestablish her airway.

310.    Despite the complications during the second MUA, S.S. had a third MUA the very next day.

311. Three days after the jaw thrust maneuver was done to reestablish her airway, and two days after S.S. completed MUA, S.S. developed Bell's Palsy, which is paralysis of the facial nerve.

312. A brain MRI and MRA of S.S.'s head and neck revealed swelling of the facial nerve.

313. Bell's Palsy can be caused by virus, but it can also be caused by trauma.

314. Three consecutive days of cervical neck thrusts, which involve hands on the skull over the facial nerve, and emergency jaw thrusts to reestablish an airway are a more plausible and logical explanation for S.S.'s Bell's Palsy than a virus.

315. Moreover, if S.S. had been placed only in twilight sleep, which the defendants should have done for the reasons discussed above, hypoxia may not have occurred, the jaw thrust may not have been necessary, and S.S.'s Bell's Palsy may never have developed.

**B.      Other Unnecessary Medical Treatment**

316. In addition to performing medically unnecessary MUA, the defendants also subjected patients to other unnecessary medical procedures.

**1.      Injections**

317. For example, ESIs and TPIs were often administered in areas where patients had not complained of symptoms and/or where there had not been an examination or imaging of the area to be injected.

**a.      Exemplar Claims**

**i.      E.B. (Claim No. 0200485696)**

318. Patient E.B. never complained of thoracic pain.

319.    E.B. was examined by no less than four medical professionals whose records and notes do not document that there was tenderness or pain in E.B.'s thoracic region.

320.    In fact, on September 1, 2011, E.B. separately saw Dr. Sabit and another physician.

321.    In both visits, she stated that she had no pain and that she was going back to the Philippines because she was pain-free.

322.    Nonetheless, five days later, on a recommendation from Dr. Sabit, Dr. James saw E.B.

323.    Dr. James's pre-operative and post-operative diagnosis was "severe lumbar and thoracic pain due to post motor vehicle accident trauma."

324.    Dr. James then administered thoracic TPIs on E.B. on September 6, 2011.

325.    There was no justification for the TPIs, as the patient never complained of thoracic pain and no doctor ever found anything wrong with her thoracic spine during the entire course of her treatment.

### ii.      S.B. (Claim No. 0188111892)

326.    Dr. James performed thoracic paraspinal TPIs on patient S.B. on September 22, 2011.

327.    S.B.'s medical records do not contain any mention of thoracic pain until September 22, 2011, when Dr. James performed the TPIs.

328.    In fact, Dr. Quiroga had earlier stated that S.B.'s cervical and thoracic spine were asymptomatic.

329.    As there was no documented need for S.B. to receive TPIs to her thoracic spine, the same were medically unnecessary.

38

### iii.    L.M. (Claim No. 0159823789)

330.    On February 22, 2010, in his first visit with patient L.M., Dr. James recommended and planned to administer ESIs and TPIs.

331.    L.M.'s motor vehicle accident had occurred only three weeks earlier (February 3, 2010).

332.    No imaging had been done before Dr. James made his recommendation for injections.

333.    L.M. in fact received ESIs on May 22, 2010 and June 5, 2010 at Endosurgical.

334.    As there was no documented basis to administer ESIs, the same were medically unnecessary.

### 2.    Spinal Fusion Surgeries

335.    Dr. Sabit performed lumbar vertebral fusions on three of the patients at issue in this Complaint.

336.    There was little indication for such invasive procedures as to any of the three patients.

337.    Indeed, all three patients were young at the time of their respective fusion surgeries.

338.    Young patients are not routine candidates for intervertebral fusions without overt evidence of instability, such as vertebrae sliding off of another (spondylolisthesis), vertebral fractures, or defects.

339.    Moreover, lumbar fusion is not recommended as routine treatment following primary or recurrent disc excision, unless there is evidence of preoperative lumbar deformity, instability, or chronic low back pain.

340.    Nor is posterolateral lumbar fusion recommended as a treatment option in patients with lumbar stenosis without preexisting spinal instability.

341.    Finally, lumbar fusion should not be pursued where nonsurgical treatment options exist.

### a.    Exemplar Claims

### i.    N.P. (Claim No. 0164903106)

342.    N.P. underwent lumbar fusion surgery on November 30, 2011, performed by Dr. Sabit and assisted by Dr. Jankowski.

343.    At the time of his fusion surgery, N.P. was in his early thirties.

344.    In August 2010, just a few months after his alleged motor vehicle accident on April 7, 2010, N.P. was examined by an orthopedic spine surgeon, who stated, "I do not think that the pathology that I see is significant enough to warrant surgery based on his symptoms and the examination."

345.    N.P. also told the orthopedic spine surgeon that the pain in his leg only went to his knee, not past, which is not a typical referral pattern for lumbar radiculopathy, particularly at the L4-5 level where N.P.'s fusion eventually occurred.

346.    N.P.'s pathology leading up to the surgery did not support the fusion surgery recommendation made by Dr. Sabit.

347.    Moreover, N.P. had not exhausted less invasive treatment than spinal surgery before undergoing fusion.

348.    For all of these reasons, the lumbar fusion performed on N.P. was not medically necessary.

40

### ii.    J.L. (Claim No. 0200584076)

349.    J.L. underwent lumbar fusion surgery on May 20, 2011 that was performed by Dr. Sabit and assisted by Dr. Jankowski.

350.    J.L. was in his early thirties at the time of the surgery.

351.    J.L. was involved in a minor motor vehicle accident on November 23, 2010.

352.    J.L.'s vehicle was rear-ended and had little damage as a result of the accident.

353.    Nonetheless, less than six months after this minor accident, J.L. underwent a two-level spinal fusion at L4-5 and L5-S1.

354.    J.L.'s MRIs showed only annular tears at the two levels and a disc protrusion at L5-S1.

355.    These findings were not sufficient to warrant spinal fusion surgery.  As such, J.L.'s surgery was not medically necessary.

### iii.    D.R. (Claim No. 0200584076)

356.    D.R. was involved in the same motor vehicle accident as J.L. on November 23, 2010.

357.    Again, this was a minor, low-impact accident that resulted in minimal property damage.

358.    Dr. Sabit performed a one-level fusion procedure on D.R. on May 4, 2011.

359.    D.R. was also in her early thirties at the time of this surgery.

360.    There is a lack of significant findings to support resort to spinal fusion.

361.    Indeed, Dr. Sabit's preoperative note states that "[g]iven the fact that her predominant symptom is back pain with radicular symptoms, I think that she will require a fusion rather than simple decompression."

362.   Back pain with radiculopathy is not a criterion for fusion.

363.   As such, D.R.'s spinal fusion surgery was medically unnecessary.

### 3.   Platelet-Rich Plasma Injections

364.   Platelet-rich plasma (PRP) injection is a procedure that involves drawing blood from the patient; spinning the blood in a centrifuge to separate the red blood cells from the healing elements in the plasma, including platelets; and then injecting the healing elements back into the patient's tissue.

365.   PRP is not a mainstream procedure and no long-term research supports its use as a first-line treatment for pain.

366.   PRP is not approved for pain management and is not designed to manage pain.

367.   PRP is not appropriate treatment for rotator cuff impingement.

368.   Indeed, no long-term evidence exists to support its use in rotator cuff tendinitis or tears.

### a.   Exemplar Claims

### i.   S.N. (Claim No. 0181065624)

369.   S.N. was allegedly injured in a motor vehicle accident on May 1, 2010.

370.   S.N. treated with Dr. Jankowski at Summit for several months thereafter related to her complaints of low back pain.

371.   On February 1, 2011, S.N. complained of right shoulder pain for the first time.

372.   Dr. Jankowski diagnosed S.N. with right shoulder internal derangement, including rotator cuff tendinitis and impingement, but did not perform an exam to measure her strength scales, though he purported to rely on the same in rendering his diagnosis.

373.   Nor was imaging of S.N.'s shoulder ever done to support this diagnosis.

374.    Neither Dr. Jankowski nor any other physician at Summit recommended physical therapy and/or a therapeutic corticosteroid injection, both of which are scientifically proven to treat rotator cuff impingement.

375.    Instead, on April 30, 2011, S.N. needlessly underwent PRP at Endosurgical performed by Dr. James.

376.    The operative report for the PRP procedure states that it is "being performed today for pain management."

377.    PRP is not approved for pain management and is not designed to manage pain.

378.    As the diagnosis of rotator cuff tendinitis and impingement was never substantiated, and as PRP is not indicated for the use it was expressly prescribed for (namely, pain management), the PRP injection administered to S.N. was not medically necessary.

379.    Allstate was also billed $3,630 for anesthesia services provided during the PRP.

380.    The use of anesthesia for PRP injections is unnecessary.

381.    Indeed, the pain provoked by the PRP injection continues well after the injection procedure.

382.    Thus, there is no justification to sedate the patient during the procedure itself.

### ii.    J.L. (Claim No. 0200584076)

383.    Patient J.L. also received a series of PRP injections to his shoulder.

384.    As noted previously, PRP is not approved for pain management.

385.    Nonetheless, Dr. James states that "a plasma rich platelet therapy injection have [sic] been prescribed along with a manipulation under anesthesia procedure to help [J.L.] with his pain management."

386.    Nor was an examination of J.L.'s shoulder ever done to substantiate the diagnosis of rotator cuff tear or impingement.

387.    Accordingly, the PRP injections administered to J.L. were not medically necessary.

**C.    Use of Boilerplate and Template Reports/Notes**

388.    The procedure notes for MUA and for the injections performed by the medical facility defendants and the physician defendants reveal that the defendants did not evaluate and document treatment and progress for individual patients.

389.    Instead, the medical facility defendants and the physician defendants utilized template reports and boilerplate notes in the records of nearly every patient to justify the expensive, but unnecessary, procedures they were recommending and performing.

390.    The same note is repeated throughout the patient's file by the medical facility defendants.

391.    The only change is an extra paragraph referencing the patient's response to a prior procedure.

392.    That additional paragraph is also remarkably similar each time.

393.    Susan Barone ("Barone"), the office manager of Endosurgical, testified on October 14, 2011 that she prepares the notes and reports for the procedures done at Endosurgical using templates.

394.    The only change Barone makes to the report to make it accurate to the patient to whom it applies is to note the date of the particular procedure.

395.    Barone further testified that doctors do not review and sign the reports she generates.

44

396.    Instead, the reports are sent directly to the billing company.

397.    Clinic notes should accurately describe what happened in every physician encounter with the patient.

398.    This is essential for proper billing and compliance with medical and ethical standards.

399.    The lack of properly maintained clinic notes can lead to needless duplicative services being documented in medical records and billed to Allstate.

400.    Moreover, the occurrence of multiple physicians dictating the same note undermines the credibility of any note written by the physician defendants.

401.    Using boilerplate templates leads to procedures and techniques being performed that are not specific to the patient's individual complaints and findings.

402.    They allow clinicians, like the medical facility defendants and the physician defendants, to bill for procedures that can be done rather than should be done.

## VII.    SERVICES NOT RENDERED

403.    In addition to billing Allstate for medical procedures that were not reasonably necessary, the defendants also billed Allstate for procedures that never actually occurred.

### A.    Exemplar Claims

#### 1.    T.G. (Claim No. 0162469241)

404.    For example, Allstate was billed for a MUA procedure that was purportedly performed on patient T.G.

405.    Dr. Jankowski generated a report for MUA that he purportedly performed on T.G. on June 30, 2010.

406.    Reports were also created for two additional MUA procedures on July 1, 2010 and July 6, 2010.

407.    The procedure notes for all three MUA are nearly identical, except where Dr. Jankowski references the prior MUA in the notes for the second and third MUA.

408.    Allstate was billed for the performance of MUA to three regions of the body on the three days of MUA treatment, including June 30, 2010.

409.    Nursing notes from June 30, 2010, however, show that T.G.'s blood pressure was elevated each time it was measured on that day.

410.    The nursing notes state that the scheduled MUA procedure was cancelled because the patient's blood pressure was not controlled.

411.    Indeed, the following handwritten note appears on the operative note from Dr. Jankowski and Summit: "Procedure was cancelled/stopped due to patient not taking meds." *See Exhibit 7.*

412.    Despite the fact that the June 30, 2010 procedure was cancelled, a procedure note was generated for a MUA procedure that never happened.

413.    Subsequent procedure notes also indicate that MUA took place on June 30, 2010.

414.    For example, the note for the July 1, 2010 MUA procedure references improvement in pain and sleep in response to the first MUA, even though the June 30, 2010 procedure never happened.

415.    The defendants billed Allstate for the June 30, 2010 MUA procedure, a service that was never actually rendered to T.G.

46

2.      **E.H. (Claim No. 0140663634)**

416.     Patient E.H. underwent MUA at Endosurgical on three consecutive days from April 17-19, 2010.

417.     For each MUA performed on each date of service, Allstate was billed by four separate entities: Endosurgical, Summit, Greater Lakes Anesthesia, and a chiropractor.

418.     For the MUA performed on April 17, 2010, Summit billed Allstate for the services of Dr. James.

419.     Endosurgical also billed Allstate for Dr. James's services rendered during the same MUA procedure on this day.

420.     For the MUAs performed on April 18, 2010 and April 19, 2010, Summit billed Allstate for the services of Dr. Hyo Kim ("Kim").

421.     Endosurgical separately billed Allstate for Dr. Kim's services on the same dates and for the same respective MUA procedures.

422.     For the April 17, 2010 MUA, Endosurgical billed Allstate for Dr. James's services in the amount of $7,149 and Summit billed Allstate for Dr. James's services in the amount of $11,600.

423.     For the April 18, 2010 MUA, Endosurgical billed Allstate for Dr. Kim's services in the amount of $7,149 and Summit billed Allstate for Dr. Kim's services in the amount of $11,600.

424.     For the April 19, 2010 MUA, Endosurgical billed Allstate for Dr. Kim's services in the amount of $7,149 and Summit billed Allstate for Dr. Kim's services in the amount of $11,600.

425.    The operative reports for each of the MUA procedures do not reveal why Summit and Endosurgical billed separately for the services of the same physician during the same procedures.

426.    The reports themselves are submitted on Endosurgical letterhead.

427.    There is no indication that Summit, or any physician associated with Summit, provided any services at all in connection with the three MUA procedures.

428.    As such, Allstate was billed for services that were never provided by Summit.

## VIII.    FRAUDULENT BILLING PRACTICES

429.    Michigan's No-Fault Act requires an insurer to reimburse all reasonable and customary charges and expenses rendered to an insured injured in a motor vehicle accident.

430.    The medical facility defendants routinely charged Allstate amounts substantially higher than the norm in Michigan for the same and/or similar services provided by other providers in the same zip code.

431.    As such, the medical facility defendants violated the Michigan No-Fault Act.

432.    Patricia Clarke ("Clarke"), the biller for the ambulatory surgery center in New Jersey that is owned by Focazio, testified on August 25, 2011 that she performed the billing for Endosurgical for at least some of the time relevant to the allegations contained in the within Complaint.

433.    Clarke testified that she used the amount charged for services rendered at Focazio's ambulatory surgical center in New Jersey to bill for services performed at Endosurgical in Michigan and that she never adjusted the bills to reflect the difference between reasonable New Jersey charges and reasonable Michigan charges.

48

434.    Clarke agreed during her deposition that "charges in New Jersey are substantially higher than in Michigan."

435.    In his own deposition, also taken on August 25, 2011, Focazio too acknowledged that fees differ between New Jersey and Michigan.

436.    Despite this acknowledgement, Focazio further testified that the charges for procedures performed in Michigan at Endosurgical are the same as the charges for services provided at his New Jersey ambulatory surgical center.

437.    The testimony of Clarke and Focazio makes clear that many of the charges submitted to Allstate by Endosurgical and Greater Lakes Anesthesia were not reasonable because they were based on the amounts charged in New Jersey, a state with significantly higher average charges.

438.    As such, Allstate is not liable to pay said charges and is entitled to reimbursement for payments already made.

439.    The defendants violated the Michigan No-Fault Act and defrauded Allstate by several of their billing practices, including charging unreasonable amounts far in excess of the norm in Michigan for procedures, office visits, anesthesia, and devices.

440.    The defendants also improperly billed for the use of surgical assistants.

**A.    Amount Charged for Procedures Is Not Reasonable**

441.    The fees charged by the defendants for MUA, ESIs, TPIs, and other procedures performed on the patients at issue in this Complaint were unreasonable and grossly disproportionate to charges from other Michigan providers for the same or similar procedures.

442.    The NAMUAP guidelines state that "[f]ees [for MUA] must be reasonable and in relation to standards and relative values within each state."

2:12-cv-13500-GER-DRG   Doc # 1   Filed 08/09/12   Pg 50 of 92   Pg ID 50

443.    Healthcare Blue Book is a guide that allows users to determine fair prices for healthcare services in a given zip code.

444.    The amounts charged by the medical facility defendants far exceed the fair price identified by Healthcare Blue Book for the same procedure in the same geographical location as the medical facility defendants.

        1.      **Exemplar Claims**

           a.      **E.H. (Claim No. 0158776823)**

445.    Patient E.H. received an ESI to her spine from Dr. James at Endosurgical on September 18, 2010.

446.    Allstate was billed $5,000 for this ESI.

447.    According to the Healthcare Blue Book, the typical cost for a spinal injection in Southeast Michigan is $436.

448.    Thus, the charge of $5,000 is over eleven (11) times higher than the standard medical practice price.

           b.      **J.L. (Claim No. 0186226692)**

449.    Patient J.L. received a series of PRP injections from Dr. James at Endosurgical.

450.    Despite the fact that PRP only involves drawing blood from the patient, spinning it in a centrifuge to separate the platelets from the red blood cells, adding an element to the mixture (described as a "propriety component"), and putting the mixture into a syringe so that it can be injected into the patient, Endosurgical billed Allstate $8,500 for Dr. James's services obtaining and spinning J.L.'s blood.

451.    Endosurgical additionally billed Allstate $5,000 for Dr. James's injection of the mixture back into J.L.'s shoulder.

452.    These charges are far in excess of the reasonable and customary charges for such services.

453.    The unreasonable charges are compounded by the facts that the shoulder diagnosis was not substantiated and that PRP is not approved for pain management.

### c.    S.N. (Claim No. 0181065624)

454.    Similarly, Allstate was billed $8,500 for obtaining and spinning S.N.'s blood in preparation for PRP injections.

455.    This charge represents a departure from the standard medical practice price and is unwarranted and unreasonable for an unsubstantiated and inappropriate treatment.

### d.    N.P. (Claim No. 0164903106)

456.    Dr. Sabit, assisted by Dr. Jankowski, performed a lumbar vertebral fusion on patient N.P. on November 30, 2011.

457.    Specifically, Dr. Sabit performed a posterior lumbar interbody fusion at L4-5 and laminectomies at L4 and L5.

458.    The charges for these procedures totaled in excess of $48,655.

459.    Dr. Jankowski billed Allstate $20,948 for his services acting as an assistant to Dr. Sabit.

460.    Thus, for a fusion of a single level in the lumbar spine, Allstate was charged just under $70,000.

461.    These charges are beyond any reasonable charge for such services in Michigan.

### e.      A.C. (Claim No. 0159236595)

462.    The standard charge for knee arthroscopy in Southeast Michigan, according to the Healthcare Blue Book, is $3,737 ($1,145 for physician services; $2,132 for ambulatory surgical center services; and $460 for anesthesia).

463.    Patient A.C. underwent knee arthroscopy on July 11, 2011 to remove hardware.

464.    The charge for A.C.'s knee arthroscopy from Summit alone totaled $21,610.

465.    This charge is more than five (5) times higher than the standard medical practice price.

466.    As such, the charge is not reasonable.

### B.      Amount Charged for Office Visits Is Not Reasonable

467.    The fee for office visits at Summit are also grossly out of line with the standard amount charged for such visits in Michigan.

468.    For example, patient N.P. (Claim No. 0164903106) met with a family nurse practitioner associated with Dr. Sabit on February 9, 2012.

469.    The nurse practitioner's note was not cosigned by an attending physician, nor did an attending physician see N.P. that day.

470.    The February 9, 2012 visit merely served to review the patient's history and describe what was going to happen with Dr. Sabit.

471.    In her note, the nurse practitioner states, "I wish him the best of luck in going to the next couple of procedures that he is to face with and hopefully they can help him with most of his pain that he is having." *See Exhibit 8.*

472.    This visit did little for N.P.

473.    He did not receive therapy or medication.

474.    No decision-making occurred.

475.    Nor was a referral made.

476.    Despite the fact that this visit did not involve any decision-making or evaluation and was with the nurse practitioner only, Allstate was nonetheless billed $696.

C.    **Amount Charged for Anesthesia Is Not Reasonable**

477.    Greater Lakes Anesthesia provides anesthesia services for all procedures done at Endosurgical and some performed at Summit.

478.    Anesthesia is billed based on time.

479.    That is, every number of minutes increases the number of units billed.

480.    Greater Lakes Anesthesia, however, does not take time into consideration when billing for anesthesia services.

481.    On July 6, 2011, Greater Lakes Anesthesia billed Allstate $1,500 for twenty-one (21) minutes of anesthesia in connection with patient T.G. (Claim No. 0162469241).

482.    On July 1, 2011, Greater Lakes Anesthesia billed Allstate $1,200 for ten (10) minutes of anesthesia in connection with the same patient.

483.    In addition to not properly billing based on time, Greater Lakes Anesthesia's charges are also well in excess of the norm for anesthesia services in Michigan.

484.    By way of example, the fair price for a full hour of anesthesia rendered to a patient undergoing knee arthroscopy in Southeast Michigan at an ambulatory surgical center is $472 according to Healthcare Blue Book.

485.    Greater Lakes Anesthesia's charge of $1,500 for twenty-one (21) minutes is thus more than nine (9) times the standard medical practice price.

### D.      Improper Charges for Surgical Assistants

486.     A first surgical assistant was present during the MUA procedures performed on the patients at issue in this Complaint.

487.     In several cases, Allstate was also billed for services purportedly rendered by a second surgical assistant.

488.     The procedure notes for these patients do not indicate that the second assistant participated or contributed in any way during the MUA procedure.

489.     For example, Dr. Zamorano was the primary physician who performed MUA on S.T. (Claim No. 0167726223) on three consecutive days from January 14-16, 2011.

490.     Dr. John Mufarreh, D.C. served as first assistant for all three MUA procedures.

491.     Lindsey Gletzen, P.A.-C., served as second assistant for the MUA procedures done on January 14, 2011 and January 15, 2011.

492.     There was no second assistant for the MUA procedure performed on S.T. on January 16, 2011.

493.     The procedure notes for all three MUA are the same, aside from their descriptions of S.T.'s pain, and none mention the second assistant doing anything during the MUA.

494.     As the procedure notes do not change regardless of the presence of a second assistant, and as the third MUA procedure was able to occur even in the absence of a second assistant, the necessity for the second assistant is not demonstrated and the charges related to the second assistant are not reasonable.

E.      **Amount Charged for Devices Is Not Reasonable**

495.    Dr. Sabit utilized a device called the "P-Stim™ Articular Electropuncture Stimulation Device," which uses electrical stimulation on three percutaneous needles placed in auricular acupuncture points, on certain patients at issue in this Complaint.

496.    The P-Stim device adheres to the back of the patient's ear.  Three needles are inserted into the skin.

497.    The insertion of the three needles is akin to any acupuncture treatment, which are done in an office setting.

498.    Yet, Dr. Sabit performed this basic procedure in an operating room.

499.    The P-Stim device costs $166.50 to the clinician.

500.    The average charge of the P-Stim treatment to the patient is $400 according to the company that manufactures the device.

501.    Dr. Sabit, however, charged Allstate substantially higher than these rates.

502.    For example, in the case of S.D. (Claim No. 0185505104), Dr. Sabit, through Endosurgical, charged Allstate $2,250 for the implantable neurostimulator device, $2,190 for the percutaneous implant, and $1,150 for electronic analysis of the same.

503.    For the same patient, Allstate was also charged by Michigan Brain & Spine in the following amounts: $2,000 for the percutaneous implant and $850 for electronic analysis of the same, for services purportedly provided by Lisa Parsons, PA-C.

504.    Thus, the total charges for the installation of the P-Stim device in S.D. totaled $8,440, more than twenty-one (21) times the average cost cited by the company that manufactures the device.

## IX.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

505.    The defendants created, prepared, and submitted, or caused to be created, prepared, and submitted, false medical documentation and intentionally violated the laws of the United States by devising and intending to devise a scheme to defraud and obtain money and property by means of false and fraudulent pretenses in representations and by placing or causing to be placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing such fraudulent scheme and attempting to do so.

506.    Unless otherwise pled to the contrary, all documents, medical records, notes, reports, health insurance claim forms, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

507.    Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

508.    The defendants either personally used the mails to further their fraudulent scheme by causing records, bills, and invoices from the medical facility defendants to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the mails would follow in the ordinary course of business.

56

509.     Through the false medical documentation submitted through the U.S. Mail, the medical facility defendants fraudulently represented that the medical treatment they purportedly provided was medically necessary and compensable under the Michigan No-Fault Act.

510.     The defendants knew that the Endosurgical, Summit, and/or Greater Lakes Anesthesia offices, a patient, a claimant, an insurance carrier, a patient's attorney, other healthcare provider, or the plaintiffs would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the defendants' false medical documentation and fraudulent representations.

511.     Allstate estimates that the defendants' fraudulent medical billing scheme generated hundreds of mailings.  A table highlighting selected examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 9.

## X.     ALLSTATE'S JUSTIFIABLE RELIANCE

512.     Through the submission of patient records, invoices, and other medical documentation, the medical facility defendants and the physician defendants attested to the fact and medical necessity of the visits, examinations, interviews, screenings, testing, procedures, and ancillary services for which they billed Allstate.

513.     At all relevant times, the defendants concealed from Allstate facts regarding the fact and medical necessity of medical procedures performed on patients of the medical facility defendants to prevent Allstate from discovering that the claims submitted by Endosurgical, Greater Lakes Anesthesia, Summit, Michigan Surgical Group, and Michigan Brain & Spine were not compensable under the No-Fault Act.

57

514.    As licensed medical professionals, Dr. James, Dr. Jankowski, Dr. Zamorano, Dr. Sabit, and Dr. Quiroga were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

515.    Each Health Insurance Claim Form ("HICF") submitted to Allstate by the medical facility defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

516.    At the time the medical facility defendants and the physician defendants submitted patient invoices for payment, Allstate reasonably believed that the defendants were abiding by the law and their avowed ethical obligations.

517.    To induce Allstate to promptly pay the fraudulent charges for unnecessary medical services, the medical facility defendants and the physician defendants submitted or caused to be submitted to Allstate false medical documentation which represented that the medical services they provided were necessary within the meaning of the Michigan No-Fault Act and that the charges for the same were reasonable.

518.    These facially valid documents, combined with the material misrepresentations described above, were designed to, and did in fact, induce Allstate to rely on the accuracy of such documents.

519.    Evidence of the defendants' fraudulent scheme was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

520.     Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed the within Complaint.

521.     In reliance on the defendants' misrepresentations, Allstate paid money to the medical facility defendants to its detriment.

522.     Allstate would not have paid these monies had the defendants provided true and accurate information about the necessity of the medical services provided.

523.     As a result, Allstate has paid in excess of $171,064 in reasonable reliance on the defendants' false medical documentation and false representations regarding the medical facility defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XI.     <u>DAMAGES</u>

524.     The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

525.     Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $171,064.

526.     Exhibits 10 (Endosurgical), 11 (Greater Lakes Anesthesia), 12 (Summit), 13 (Michigan Surgical Group), and 14 (Michigan Brain & Spine), annexed hereto and incorporated herein as if fully set forth in their entirety, identify all monies paid by Allstate to the defendants.

527.     Allstate's claim for compensatory damages, as set out in Exhibits 10-14, does not include payment made with respect to any assigned claim facility claimant.

528.     Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the defendants' fraudulent activities and the cost of claims handling for claims submitted by the defendants pursuant to Mich. Comp. Law § 500.3148(2).

## XII.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O., and Edward Firosz**

529.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

530.     In connection with each of the claims identified in the within Complaint, Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O., and Edward Firosz ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation from Endosurgical in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

531.     The Count I defendants employed one or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 9.

532.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

533.    Policies of insurance were delivered to insureds through the U.S. Mail.

534.    Payments to the defendants from Allstate were transmitted through the U.S. Mail.

535.    As documented above, the Count I defendants repeatedly and intentionally submitted, or caused to be submitted, documentation to Allstate for medical expenses and/or services that were purportedly performed at and/or by Endosurgical to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

536.    As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Endosurgical for the benefit of the Count I defendants that would not otherwise have been paid.

537.    The Count I defendants' pattern of submitting, or causing to be submitted, fraudulent claims that appeared legitimate on their face prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

538.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

539.    By filing numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

540.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Endosurgical for the benefit of the Count I defendants.

541.    Endosurgical constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

542.     The Count I defendants associated with the foregoing enterprise and participated, both directly and indirectly, in the conduct of this enterprise through a pattern of racketeering activities.

543.     Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

544.     The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

545.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

546.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

547.     By virtue of the Count I defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, or caused to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O. and Edward Firosz**

548.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

549.     Defendants Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O. and Edward Firosz ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Endosurgical.

550.     The Count II defendants each agreed to further, facilitate, support, and/or operate the Endosurgical enterprise.

551.     As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

552.     The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Endosurgical even though Endosurgical was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

553.     The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim and legal documents containing material misrepresentations and/or material omissions.

554.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

555.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; and David P. Jankowski, D.O.**

556.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

557.     In connection with each of the claims identified in the within Complaint, Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; and David P. Jankowski, D.O. ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation from Greater Lakes Anesthesia in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

558.     The Count III defendants employed one or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 9.

559.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

560.     Policies of insurance were delivered to insureds through the U.S. Mail.

561.     Payments to the defendants from Allstate were transmitted through the U.S. Mail.

562.     As documented above, the Count III defendants repeatedly and intentionally submitted, or caused to be submitted, documentation to Allstate for medical expenses and/or

64

services that were purportedly performed by Greater Lakes Anesthesia to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

563.    As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Greater Lakes Anesthesia for the benefit of the Count III defendants that would not otherwise have been paid.

564.    The Count III defendants' pattern of submitting, or causing to be submitted, fraudulent claims that appeared legitimate on their face prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

565.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

566.    By filing numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

567.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Greater Lakes Anesthesia for the benefit of the Count III defendants.

568.    Greater Lakes Anesthesia constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

569.    The Count III defendants associated with the foregoing enterprise and participated, both directly and indirectly, in the conduct of this enterprise through a pattern of racketeering activities.

570.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

571.    The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

572.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

573.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

574.    By virtue of the Count III defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, or caused to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga; and Edward Firosz**

575.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

576.    Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael

Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O.; and Edward Firosz ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Greater Lakes Anesthesia.

577.   The Count IV defendants each agreed to further, facilitate, support, and/or operate the Greater Lakes Anesthesia enterprise.

578.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

579.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Greater Lakes Anesthesia even though Greater Lakes Anesthesia was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

580.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim and legal documents containing material misrepresentations and/or material omissions.

581.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

582.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; and Michigan Brain & Spine Physicians Group, PLLC**

583. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

584. In connection with each of the claims identified in the within Complaint, Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; and Michigan Brain & Spine Physicians Group, PLLC ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation from Summit in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

585. The Count V defendants employed one or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 9.

586. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

587. Policies of insurance were delivered to insureds through the U.S. Mail.

588. Payments to the defendants from Allstate were transmitted through the U.S. Mail.

589. As documented above, the Count V defendants repeatedly and intentionally submitted, or caused to be submitted, documentation to Allstate for medical expenses and/or

services that were purportedly performed at and/or by Summit to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

590.     As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Summit for the benefit of the Count V defendants that would not otherwise have been paid.

591.     The Count V defendants' pattern of submitting, or causing to be submitted, fraudulent claims that appeared legitimate on their face prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

592.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

593.     By filing numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

594.     The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Summit for the benefit of the Count V defendants.

595.     Summit constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

596.     The Count V defendants associated with the foregoing enterprise and participated, both directly and indirectly, in the conduct of this enterprise through a pattern of racketeering activities.

597. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

598. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

599. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

600. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

601. By virtue of the Count V defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, or caused to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Edward Firosz**

602. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

603. Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael

70

Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Edward Firosz ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Summit.

604.    The Count VI defendants each agreed to further, facilitate, support, and/or operate the Summit enterprise.

605.    As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

606.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Summit even though Summit was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

607.    The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim and legal documents containing material misrepresentations and/or material omissions.

608.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

609.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT VII</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**Against William J. Focazio, M.D.; Michael Angelo; and Edward Firosz**

610.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

611.    In connection with each of the claims identified in the within Complaint, William J. Focazio, M.D.; Michael Angelo; and Edward Firosz ("Count VII defendants"), through the operation and management of Pacific Marketing, intentionally caused to be prepared and mailed false medical documentation from the medical facility defendants in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

612.    The Count VII defendants utilized their control over Pacific Marketing, including 800-US-LAWYER, to obtain patients for the medical facility defendants, who employed one or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 9.

613.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail related to the clients/patients obtained via Pacific Marketing and 800-US-LAWYER.

614.    Policies of insurance were delivered to insureds through the U.S. Mail.

615.    Payments to the medical facility defendants from Allstate were transmitted through the U.S. Mail.

616.    As documented above, the Count VII defendants repeatedly and intentionally caused documentation to be submitted to Allstate for medical expenses and/or services that were purportedly performed at the medical facility defendants to collect payment from Allstate under

the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

617.    As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to the medical facility defendants for the benefit of the Count VII defendants that would not otherwise have been paid.

618.    The Count VII defendants' pattern of obtaining patients for the medical facility defendants by and through the use of Pacific Marketing and 800-US-LAWYER, and causing to be submitted fraudulent claims from the medical facility defendants that appeared legitimate on their face, prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

619.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

620.    By participating in a scheme that caused numerous fraudulent claims to be filed with Allstate by the medical facility defendants, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

621.    The activities alleged in this Complaint had the effect of causing funds to be transferred from Allstate to the medical facility defendants for the benefit of Pacific Marketing and the Count VII defendants.

622.    Pacific Marketing constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

623.    The Count VII defendants associated with the foregoing enterprise and directly participated in the conduct of this enterprise through a pattern of racketeering activities.

624.     Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

625.     The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

626.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

627.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

628.     By virtue of the Count VII defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, or caused to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz**

629.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

630.     Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz ("Count VIII defendants")

74

conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Pacific Marketing.

631.    The Count VIII defendants each agreed to further, facilitate, support, and/or operate the Pacific Marketing enterprise.

632.    As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

633.    The purpose of the conspiracy was to obtain patients for the medical facility defendants through the use of automatic referrals generated by attorneys who used 800-US-LAWYER, which is owned by Pacific Marketing.

634.    The medical facility defendants then sought No-Fault payments from Allstate though they were not eligible to collect No-Fault payments by virtue of their unlawful conduct, namely, providing unnecessary medical services.

635.    The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including using Pacific Marketing and 800-US-LAWYER to generate mandatory referrals to the medical facility defendants, who in turn created insurance claim and legal documents containing material misrepresentations and/or material omissions.

636.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

637.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT IX</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**Against William J. Focazio, M.D.; Michael Angelo; and Edward Firosz**

638.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

639.     In connection with each of the claims identified in the within Complaint, William J. Focazio, M.D.; Michael Angelo; and Edward Firosz ("Count IX defendants"), through the operation and management of Elite Surgical, intentionally caused to be prepared and mailed false medical documentation from the medical facility defendants in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

640.     The Count IX defendants utilized their control over Elite Surgical, including 800-US-LAWYER, to obtain patients for the medical facility defendants, who employed one or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 9.

641.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail related to the clients/patients obtained via Elite Surgical and 800-US-LAWYER.

642.     Policies of insurance were delivered to insureds through the U.S. Mail.

643.     Payments to the medical facility defendants from Allstate were transmitted through the U.S. Mail.

644.     As documented above, the Count IX defendants repeatedly and intentionally caused documentation to be submitted to Allstate for medical expenses and/or services that were purportedly performed at the medical facility defendants to collect payment from Allstate under

76

the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

645.     As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to the medical facility defendants for the benefit of the Count IX defendants that would not otherwise have been paid.

646.     The Count IX defendants' pattern of obtaining patients for the medical facility defendants by and through the use of Elite Surgical and 800-US-LAWYER, and causing to be submitted fraudulent claims from the medical facility defendants that appeared legitimate on their face, prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

647.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

648.     By participating in a scheme that caused numerous fraudulent claims to be filed with Allstate by the medical facility defendants, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

649.     The activities alleged in this Complaint had the effect of causing funds to be transferred from Allstate to the medical facility defendants for the benefit of Elite Surgical and the Count IX defendants.

650.     Elite Surgical constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

651.     The Count IX defendants associated with the foregoing enterprise and directly participated in the conduct of this enterprise through a pattern of racketeering activities.

77

652.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

653.    The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

654.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

655.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

656.    By virtue of the Count IX defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, or caused to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz**

657.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

658.    Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; David

P. Jankowski, D.O.; and Edward Firosz ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Elite Surgical.

659.    The Count X defendants each agreed to further, facilitate, support, and/or operate the Elite Surgical enterprise.  As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

660.    The purpose of the conspiracy was to obtain patients for the medical facility defendants through the use of automatic referrals generated by attorneys who used 800-US-LAWYER, which is controlled by Elite Surgical in Michigan.

661.    The medical facility defendants then sought No-Fault payments from Allstate though they were not eligible to collect No-Fault payments by virtue of their unlawful conduct, namely, providing unnecessary medical services.

662.    The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including using Elite Surgical and 800-US-LAWYER to generate mandatory referrals to the medical facility defendants, who in turn created insurance claim and legal documents containing material misrepresentations and/or material omissions.

663.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

664.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

79

## COUNT XI
## COMMON LAW FRAUD
### Against All Defendants

665.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

666.     The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully rendering medical treatment in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

667.     The misrepresentations of fact made by the defendants include, but are not limited to, material misrepresentations regarding the necessity and fact of medical services provided by the medical facility defendants and/or whether the injury arose out of a motor vehicle accident.

668.     The defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

669.     The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting, or causing to be submitted, to Allstate non-compensable claims for payment under the Michigan No-Fault Act.

670.     The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

671.     Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims.

672.     As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged as previously described herein.

## COUNT XII
### PAYMENT UNDER MISTAKE OF FACT
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Martin F. Quiroga, D.O.**

673.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

674.    Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the defendants' scheme to defraud Allstate by misrepresenting the necessity of medical services purportedly provided.

675.    Allstate sustained damages by paying under a mistake of fact the claims submitted by, or on behalf of, defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Martin F. Quiroga, D.O. ("Count XII defendants"), which misrepresented the reasonableness and necessity of the medical treatment allegedly rendered and/or whether the patient's injury arose out of a motor vehicle accident.

676.    The Count XII defendants, individually and jointly and severally, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

677.    Allstate is entitled to restitution from each of the Count XII defendants, individually and jointly and severally, for all monies paid to and/or received by them from Allstate.

## COUNT XIII
## UNJUST ENRICHMENT
### Against All Defendants

678.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

679.     Allstate paid monies in response to the claims submitted, or caused to be submitted, by the defendants in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

680.     Allstate's payments constitute a benefit which the defendants aggressively sought and voluntarily accepted.

681.     The defendants caused the medical facility defendants to wrongfully obtain payments from Allstate through their fraudulent scheme detailed herein.

682.     The defendants have been unjustly enriched by receipt of these wrongfully-obtained payments from Allstate.

683.     The defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIV
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Martin F. Quiroga, D.O.**

684.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

685.     Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese

James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Martin F. Quiroga, D.O. ("Count XIV defendants") routinely performed medically unnecessary and fraudulent treatments.

686.    The Count XIV defendants also billed Allstate for procedures and services that were never actually rendered.

687.    Pursuant to the Michigan No-Fault Act, Mich. Comp. Law. § 500.3100 *et seq.*, an insurer is liable to pay benefits only for reasonable and necessary expenses arising out of a motor vehicle accident.  Mich. Comp. Law §§ 500.3105 and 500.3107.

688.    The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Law § 500.3107.

689.    Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

690.    The Count XIV defendants continue to submit claims under the No-Fault Act for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

691.    The Count XIV defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay pending, previously-denied, and/or any future No-Fault claims submitted by any of the Count XIV defendants.

692.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIV defendants, at all relevant times, were engaged in a fraudulent scheme whereby they provided medically unnecessary treatment and submitted unreasonable charges for the same to Allstate.

693.     As such, the Count XIV defendants have no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

## XIII.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O., and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga, D.O. and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; and David P. Jankowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; Martin F. Quiroga; and Edward Firosz**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; and Michigan Brain & Spine Physicians Group, PLLC**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

86

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
**Against William J. Focazio, M.D.; Michael Angelo; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATIONS OF 18 U.S.C. § 1962(c)
**Against William J. Focazio, M.D.; Michael Angelo; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XI
### COMMON LAW FRAUD
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XII
### PAYMENT UNDER MISTAKE OF FACT
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC; and Martin F. Quiroga, D.O.**

(a)    AWARD Allstate its actual damages in an amount to be determined at trial; and

89

(b)      GRANT all other relief this Court deems just.

**COUNT XIII**
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at

trial; and

(b)      GRANT all other relief this Court deems just.

**COUNT XIV**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at
Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese
James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J.
Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PLLC;
and Martin F. Quiroga, D.O.**

(a)      DECLARE that Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical

Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC;

Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J.

Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group,

PPLC; and Martin F. Quiroga, D.O. were operating in violation of Michigan law;

(b)      DECLARE that the activities of Greater Lakes Ambulatory Surgical Center, LLC d/b/a

Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical

Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski,

D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians

Group, PPLC; and Martin F. Quiroga, D.O. were unlawful;

(c)      DECLARE that Allstate has no obligation to pay pending, previously-denied, and/or

future No-Fault insurance claims submitted by Greater Lakes Ambulatory Surgical

Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC;

90

Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; Aria O. Sabit, M.D.; Michigan Brain & Spine Physicians Group, PPLC; and Martin F. Quiroga, D.O.; and

(d)     GRANT all other relief this Court deems just and appropriate.

## XIV.   <u>**JURY TRIAL DEMAND**</u>

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

91

Respectfully submitted,

SMITH & BRINK MI, PLLC

*/s/ Lisa K. Anderson*

_____

Lisa K. Anderson (P52913)
38777 W. Six Mile Road
Suite 314
Livonia, MI  48152
734-308-4668 (phone)
landerson@smithbrink.com


SMITH & BRINK, P.C.

Richard D. King, Jr., *admission pending*
Nathan A. Tilden, *admission pending*
Michael W. Whitcher, *admission pending*
Jacquelyn A. McEttrick, *admission pending*
350 Granite Street
Suite 2303
Braintree, MA  02184
617-770-2214 (phone)
rking@smithbrink.com
ntilden@smithbrink.com
mwhitcher@smithbrink.com
jmcettrick@smithbrink.com


*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Property & Casualty*
*Insurance Company*


Dated:  August 8, 2012