# EXHIBIT 2



LexisNexis®

**CLIFTON E. JACKSON and CHRISTOPHER M. SCHARNITZKE, on behalf of themselves and other persons similarly situated, Plaintiff(s), v. SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., and COCA COLA ENTERPRISES, INC., foreign corporations, and DR. PAUL DROUILLARD, jointly and severally, Defendant(s).**

Case No. 09-11529

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

*2010 U.S. Dist. LEXIS 22792*

March 11, 2010, Decided
March 11, 2010, Filed

**SUBSEQUENT HISTORY:** Reconsideration denied by *Jackson v. Sedgwick Claims Mgmt. Servs., 2010 U.S. Dist. LEXIS 26565 ( E.D. Mich., Mar. 22, 2010)*

**PRIOR HISTORY:** *Jackson v. Segwick Claims Mgmt. Servs., 2009 U.S. Dist. LEXIS 62747 ( E.D. Mich., July 22, 2009)*

**DISPOSITION:** Plaintiffs' motions to amend the complaint denied; action dismissed.

**COUNSEL:** [*1] For Clifton E Jackson, Christopher M Scharnitzke, Plaintiffs: Marshall D. Lasser, Southfield, MI.

For Segwick Claims Management Services, Inc., Defendant: Kathleen H. Klaus, Maddin, Hauser, Southfield, MI.

For Coca Cola Enterprises, Inc., Defendant: Matthew F. Leitman, Miller Canfield Paddock & Stone, PLC, Troy, MI; Thomas W. Cranmer, Miller, Canfield, Troy, MI.

For Paul Drouillard, Dr., Defendant: Daniel B. Tukel, Katherine D. Goudie, Butzel Long (Detroit), Detroit, MI; Lynn A. Sheehy, Butzel Long, Detroit, MI.

**JUDGES:** Honorable Nancy G. Edmunds, United States District Judge.

**OPINION BY:** Nancy G. Edmunds

**OPINION**

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS [15, 21, 39] AND DENYING PLAINTIFFS' MOTIONS FOR LEAVE TO AMEND [31, 44]**

This matter comes before the Court on Plaintiffs' second and fifth motions to amend their First Amended Complaint and Defendants' motions to dismiss or alternatively for a stay of proceedings. For the reasons set forth below, Plaintiffs' motions for leave to amend are DENIED and Defendants' motions to dismiss are GRANTED.

**I. Facts**

The named Plaintiffs in this case, who seek to represent a class of similarly situated individuals, allege injuries related to an improper denial of workers' [*2] compensation benefits under a scheme to defraud by Defendants Sedgwick Claims Management (Sedgwick), Coca Cola Enterprises, Inc. (Coca Cola), and Dr. Paul Drouillard (Drouillard) stemming from Plaintiffs' claimed work-related disabilities incurred while employed by Coca Cola.

The following allegations are summarized from the Complaint. [1]

1    As a matter of convenience, allegations from the proposed Second Amended Complaint, [Docket Text # 31], and from the proposed Second Amended Complaint (Second Revision), [Docket Text # 44], are also summarized here. Such proposed amendments are identified as such.

## A. Parties

### 1. Defendants

Coca Cola is, or was, the employer of each Plaintiff. Coca Cola has self-insured its obligations under Michigan's Workers Disability Compensation Act (WDCA), *Mich. Comp. Law § 418.101, et seq.*

Sedgwick administers workers' compensation benefit claims filed by Coca Cola employees and also adjusts those claims for Coca Cola.

Drouillard, a board certified orthopedic surgeon, provides independent medical examinations (IME) for Sedgwick. Drouillard has performed IMEs on numerous Coca Cola employees who have filed workers' compensation benefit claims, including one of the named [*3] Plaintiffs and one of the proposed Plaintiffs in this action.

### 2. Plaintiffs

#### a. Jackson

Plaintiff Clifton Jackson alleges that he suffered a lumbosacral spinal injury on September 17, 2007 while employed by Coca Cola. He was treated by Dr. Shlomo Mandel, a back specialist with the Henry Ford Hospital System. Dr. Mandel determined that Jackson had been disabled by his claimed work-related back injury since the date of that injury and continuing forward. Sedgwick--as part of its adjustment obligations to Coca Cola--requested that Jackson receive two separate IMEs, the first of which was conducted in May 2008. Both IMEs were performed by Dr. Terry Weingarden. Following each IME, Dr. Weingarden also determined that Jackson was disabled.

On January 6, 2009, LaTara Lewis, an employee of Sedgwick, sent Jackson a letter notifying him that another IME [2] had been scheduled for January 14, 2009--this time with Drouillard. According to Plaintiffs, Drouillard is not a back surgeon, but a surgeon specializing in knees, shoulders, and other joints. Drouillard performed the IME and mailed his report, dated January 14, 2009, to Sedgwick. Sedgwick, in turn, mailed a copy to Jackson. Plaintiffs allege that [*4] "[t]he report contained lies" concerning the pain reported by Jackson, including an erroneous characterization of Jackson's self-reported

pain as substantially more manageable. Drouillard's report also stated that "[t]here are thick calluses in the palms over both hands ... suggestive of ongoing manual labor despite [Jackson's] historical account," which Plaintiffs deny existed. Drouillard reviewed an MRI of Jackson's spine, opined that "[t]here was no evidence of disc herniation," and concluded that Jackson could return to work unrestricted.

2    Plaintiffs claim that the letter was fraudulent in that no IME was to be conducted because Drouillard was not "independent." Plaintiffs allege that Drouillard was hired by Sedgwick for this evaluation--like many others he performed for Sedgwick in which Drouillard was paid hundreds of thousands of dollars--to fraudulently and dishonestly deprive Jackson, and the other workers' compensation claimants, of their entitlement to benefits. Plaintiffs conclude that Drouillard was financially dependent on the IMEs and the related dispositions and, thus, was not "independent." (Am. Compl. P 31A.) Plaintiffs further allege that Drouillard, by phone or facsimile, [*5] communicated with Lewis and "conspired with her to conduct a fraudulent examination of ... Jackson, in which he would conclude, regardless of the facts, that ... Jackson had no work related disability." (Proposed Sec. Am. Compl. P 31A; Pls.' Renewed Mot. at 9 [Docket Text # 31].)

Plaintiffs claim that Drouillard's diagnosis was outside the scope of his specialty and was part of a scheme to fraudulently deprive Jackson of workers' compensation benefits to which he was entitled. Plaintiffs also contend that Drouillard's conclusion--that Jackson could return to work unrestricted--was fraudulent, as "it was not within the reasonable range of [the] medical opinion and was made part of a scheme to assist insurers in depriving [Jackson] and others of their workers compensation benefits by writing examination reports that insurers could use to cut off or deny benefits."

Relying on Drouillard's report, Sedgwick cut off Jackson's benefits. As a result, Plaintiffs claim that Jackson suffered damages in the form of medical and related expenses, attorney fees and deprivation of workers' compensation benefits. (Am. Compl. P 31A.)

#### b. Scharnitzke

Plaintiff Christopher Scharnitzke alleges that he suffered [*6] a left shoulder injury while employed by Coca Cola as a delivery driver. Scharnitzke claims that he was injured as a result of the repetitive nature of his work.

Scharnitzke acknowledges that he was "disabled for a time beginning in August 2007 and returned to work in Feb[ruary] 2008." [3] He did not file a claim for workers' compensation benefits for that period of disability, although he did inform his personal doctors of that injury and its cause. [4]

> 3   On August 13, 2007, Scharnitzke went to see his personal orthopedic surgeon, Dr. Marc Milia, complaining of pain associated with overhead activity and heavy pushing and pulling at work. Dr. Milia ordered an MRI and diagnosed Scharnitzke with acromioclavicular arthritis. Dr. Milia treated Scharnitzke and released him for work on February 23, 2008.
>
> 4   Scharnitzke claims that--in 2004, 2006 and 2007--he informed his family doctor, Dr. Marcia Vanderbock, that he was experiencing left shoulder pain when performing heavy lifting at work.

After Scharnitzke returned to work in February 2008, he did not experience any similar shoulder problems until March 4, 2008. On that date, while lifting a 300 pound cart up a flight of stairs, he felt a sharp pain [*7] in his left shoulder. That same day, he was sent to Coca Cola's industrial clinic, Concentra Medical Services (Concentra).

On March 11, 2008, Concentra's Dr. Morisetty examined Scharnitzke. Dr. Morisetty recorded left shoulder pain and a chronic shoulder problem. Scharnitzke's medical records from Concentra noted that he "was disabled from work due to the condition of his left shoulder." Concentra then referred Scharnitzke to his orthopedic surgeon, Dr. Milia.

On March 18, 2008, Sedgwick mailed a Notice of Dispute to the WDCA and to Scharnitzke asserting its belief that Scharnitzke's injury was not work-related but, instead, derived from chronic arthritis. Plaintiffs allege that "Sedgwick did not have information from which it could honestly and fairly conclude that [Scharnitzke's] disability in March 2008 was due to ... arthritis, and was not work related. Instead it had information from Concentra stating 'minor work aggravation.' ... Furthermore, it did not have information that the ... arthritis which preceded the work injury of March 4, 2008, was not work-related."

On July 22, 2008, Coca Cola and Sedgwick mailed a Carrier's Response to Scharnitzke and the WDCA denying that Scharnitzke was [*8] disabled or that his disability was work-related. Plaintiffs allege that such a denial was fraudulent "in that defendants possessed information that [Scharnitzke] was disabled, and no information that [he] was not disabled."

Since March 18, 2008, Plaintiffs allege that Sedgwick and Coca Cola have repeatedly denied workers' compensation benefits to Scharnitzke despite having received proof that he had suffered a work-related injury. [5] Plaintiffs claim that Coca Cola "and Sedgwick's actions [we]re part of a scheme to fraudulently deprive [him] of his workers['] compensation benefits regardless of facts, and without regard to the duties imposed on it by Michigan law." As a result, Scharnitzke suffered damages in the form of medical and related expenses, attorney fees and deprivation of workers' compensation benefits. (Am. Compl. P 31B.)

> 5   Plaintiffs claim that Coca Cola and Sedgwick received the following: (1) an office note from Dr. Milia on May 8, 2008 which noted an "MRI demonstrate[d] posterior shoulder labral tear;" (2) an IME report in November 2008 from "Dr. [*9] Michael Holda, which stated plaintiff was disabled due to a shoulder injury and did not say that the disability was not work-related;" (3) another note from Dr. Milia, dated March 29, 2009, which stated "I am the orthopedic surgeon who has treated Mr. Scharnitzke's left shoulder since 2007. His current shoulder disability (from March 3, 2008 to April 2009) was caused by the 13 years of repetitive heavy lifting and pulling required by Mr. Scharnitzke's job at Coca Cola, and was also caused by the injury at work on 3/3/08."

**c. Lulek [6]**

> 6   Proposed additional Plaintiff. (*See* Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. at 10-13 [Docket Text # 31].)

Proposed Plaintiff Paul Lulek, a driver for Coca Cola, alleges that he injured his right knee while delivering product on March 12, 2007. Lulek admits to having previously injured that knee, and tearing his ACL, in a sports-related injury dating back to 1975, but contends that the prior injury did not affect his employment at Coca Cola.

Business Health Services (BHS), Coca Cola's industrial clinic, treated Lulek for a sprain and a torn meniscus in his right knee and imposed work restrictions of "no lifting more than 10-20 lbs., no squatting [*10] and no kneeling."

Upon receipt of the report from BHS, LaTara Lewis, an employee of Sedgwick, allegedly contacted Drouillard to schedule an IME with Lulek. On April 17, 2007, Drouillard sent Lulek a letter notifying him that an IME had been scheduled. Plaintiffs also allege that Lewis mailed Lulek a similar notice to appear for the IME to be conducted by Drouillard. [7]

7  Plaintiffs claim that these letters were fraudulent in that no IME was to be conducted because Drouillard was not "independent." Again, Plaintiffs allege that Drouillard was hired by Sedgwick for this evaluation--like many others he performed for Sedgwick in which Drouillard was paid hundreds of thousands of dollars--to fraudulently and dishonestly deprive Lulek, and the other workers' compensation claimants, of their entitlement to benefits. Plaintiffs conclude that Drouillard was financially dependent on the IMEs and the related dispositions and, thus, was not "independent."

Drouillard conducted the IME and mailed his report, dated April 23, 2007, to Sedgwick stating "at this time [Lulek] can return to work in his former capacity without restriction [and] no other treatment is necessary in regards to any work injury." [*11] Drouillard, thus, concluded that Jackson could return to work unrestricted.

On May 7, 2007, Sedgwick mailed Lulek and the WDCA a Notice of Dispute which stated "per IME of 4-23-2007 Dr. Drouillard has stated that Mr. Lulek has reached MMI for his 3-12-2007 [sic] as it was a minor strain. Any further treatment should be directed to his private doctor. Benefits terminated as of 5-3-07."

Lulek disputed Drouillard's medical conclusions and sought an evaluation by Dr. Farjo, an orthopedic surgeon. Dr. Farjo determined that Lulek's injury was work-related and required surgery, which Dr. Farjo performed on May 30, 2007.

Lulek claims that, despite receiving reports and other information regarding Lulek's injury and related surgery, "Sedgwick continued to refuse to reinstate workers compensation ... and did not fairly and fully review all medical documents." Lulek claims that Sedgwick and Drouillard, in setting up a fraudulent IME and in denying him benefits, conspired to deny him of workers' compensation benefits to which he was entitled. Lulek also alleges that "[t]he fraudulent scheme and conspiracy by Sedgwick and ... Drouillard proximately caused [him] to lose workers compensation benefits." [*12] Like the other named Plaintiffs, Lulek seeks treble damages, plus attorney fees and costs. Unlike the other named Plaintiffs, Lulek seeks such damages only against Sedgwick and Drouillard, jointly and severally, but not against Coca Cola. (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. at 10-13 [Docket Text # 31].)

**B. Plaintiffs' Allegations**

Plaintiffs claim that Defendants, in setting up fraudulent IMEs and in denying workers' compensation benefits to eligible claimants, fraudulently schemed and illegally conspired to deny them of, or cut them off from, the benefits to which they were entitled--for reasons known to be false--breaching duties owed under state law in violation of federal law.

**1. State Law Duties Breached**

Plaintiffs claim that Defendants violated duties owed to Plaintiffs under the WDCA, *Mich. Comp. Laws § 418.101 et seq.*, and the Michigan Uniform Trade Practices Act (MUTPA), *Mich. Comp. Laws § 500.2001 et seq.*, that required Defendants to give due consideration to the treating doctors' evaluations in making their decisions. (Am. Coml. PP 16-17A.)

Plaintiffs allege that Coca Cola, Sedgwick and "other defendants" violated their duties under the WDCA to be honest in the [*13] administration of workers' compensation claims, and not to "unreasonably fail to pay promptly claims for compensation for which it shall become liable." *Mich. Comp. Laws § 418.631*. These duties "required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability." (Am. Compl. P 16.) According to Plaintiffs, Defendants--in using the mails and wires to further their fraudulent scheme--failed to perform their duties under the WDCA.

Plaintiffs also allege that Coca Cola, Sedgwick and "other defendants" violated the MUTPA: (1) in failing to promptly pay eligible claims; (2) by using unfair or deceptive acts or practices in the business of insurance; and (3) in issuing false reports. *See Mich. Comp. Laws §§ 500.2006, .2026, .2062.*

Plaintiffs allege that Defendants may be held liable for their breaches of these Michigan statutory duties [8] under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C. § 1961 et seq.*

8  Plaintiffs' have not asserted any state law claims in this action, only [*14] federal RICO claims.

**2. RICO Claims**

According to Plaintiffs, Defendants conspired to violate, and also violated, RICO. Specifically, Plaintiffs allege that Defendants' conduct violated *18 U.S.C. §§ 1962(c)* and *(d)*. [9] Plaintiffs claim that Defendants comprise an enterprise(s) that intended, conspired, and implemented a scheme to fraudulently deny Plaintiffs, and others similarly situated, of workers' compensation benefits to which they were entitled.

9   Plaintiffs also alleged in their First Amended Complaint violations of *18 U.S.C. §§ 1962(a)* and *(b)*. Plaintiffs, however, in their Amended Motion for Leave to File Second Amended Complaint Second Revision (Amended Motion) proposed to withdraw those counts. (Pls.' Am. Mot. [Docket Text # 44.].)

Plaintiffs allege that the corporate Defendants (Coca Cola and Sedgwick) specifically selected "cut-off" doctors, like Drouillard, to conduct IMEs which they knew would not be independent, as represented to the claimants, but would be biased toward finding no work-related injury. [10] That is, the corporate Defendants knew these cut-off doctors "would reliably write them a report stating a claimant did not have a work-related disability whether or not [*15] such disability actually existed," despite other medical opinions to the contrary. (Am. Comp. PP 13, 15, 18.) Plaintiffs also allege that Defendants communicated with each other their desire to obtain such a biased report so the corporate Defendants "could [then] ... cut off or deny workers compensation benefits, or ... defeat litigation claiming benefits." (*Id.* P 13.)

10   According to Plaintiffs, in Michigan alone, there are "perhaps a dozen" doctors who fraudulently perform IMEs. Plaintiffs allege that these doctors are "corrupt in that they lie in their reports and find no work-related disability at a rate much, much higher than that found by treating doctors or even by their fellow IME doctors. (An IME doctor who finds work-related disability too often is no longer hired by insurers and claims adjusters.)" (Am. RICO Case Statement at 4 [Docket Text # 8].)

In particular, Plaintiffs claim that "Drouillard is a cut off doctor par excellence." Plaintiffs allege that Drouillard performs approximately 1,100 IMEs per year, (Am. Compl. P 22), and "earns $ 600,000 or more per year doing IMEs. He always or nearly always finds no work-related disability. He finds no work-related disability far more [*16] often than any other IME doctor hired by the insurance companies. He finds no work-related disability far, far more often than a claimant's treating surgeon (who don't do IMEs for insurers) ... On information and belief, he finds no work-related [disability] in 98% of his examinations, whereas treating physicians find disability in 100% of claimants (by definition; claimants are people who have been cut off or denied workers compensations, but do have a work-related disability according to their treating doctors). Other IME doctors find disability or work-related disability in 30-50% of claimants."

(Am. RICO Case Statement at 3 [Docket Text # 8].)

In this case, Plaintiffs allege that Drouillard "committed fraud for Coke and Sedgwick and upon ... Jackson and ... upon other Coke employees ... by writing ... [*17] reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating a claimant failed to disclose a fact which the claimant did disclose, and or (4) stating dishonestly and without reasonable medical basis that a claimant did not have a work-related disability." (Am. Compl. P 19.)

Once the IME was completed, the corporate Defendants exclusively relied on it--and disregarded conflicting reports and records from a claimant's treating doctor--as grounds to deny or cut off workers' compensation benefits and to justify filing Notices of Dispute with the WDCA. (*Id.* PP 13-14.) The "[d]ecisions regarding paying or denying Michigan workers compensation claims, and selecting doctors to do medical examinations of claimants, were made by Sedgwick and[/]or Coke, [with the assistance of attorneys]." [11] (*Id.* P 8.)

11   Plaintiffs also contend that "[o]n information and belief, discovery will reveal that Michigan workers compensation defense counsel assisted their clients, Coke and Sedgwick, in identifying and recommending for their clients cut off doctors such as Drouillard [*18] ... These attorneys recommended or hired Drouillard ... in many other cases for other clients, for many years; they knew Drouillard ... and other doctors would write cut off reports. They knew Drouillard ... [was] dishonest, or so biased toward finding no work-related disability that their clients could not fulfill their duties under Michigan law to fairly, honestly, and in good faith decide the claims of Coke employees." (Am. RICO Statement at 5 [Docket Text # 8].) "[T]hose attorneys communicated by mail and wire with Coke and Sedgwick the tactic of using doctors who could be relied on [with extreme confidence] to write a report that would state a worker did not have a work-related disability regardless of the facts, and the attorneys gave to Coke and Sedgwick the name and contact information for such doctors, such as ... Drouillard." (Am. Compl. P 20C.) Plaintiffs, however, have not named a single "John Doe" attorney as a Defendant in this matter.

Plaintiffs conclude that Defendants' fraudulent scheme was accomplished through the use of the United States mails and by electronic communications, thereby violating RICO. (Am. Compl. P 23.) Plaintiffs, in support, allege that Defendants

> committed [*19] mail fraud, wire fraud and or conspiracy to defraud, in a repeated and continuing pattern extending over years applicable to plaintiffs and other Mi[chigan] employee[s] of Coke, by fraudulently terminating or denying benefits, by writing fraudulent medical reports and giving fraudulent deposition testimony, by hiring a doctor such a ... Drouillard who defendants knew would frequently give false testimony and or write false medical reports, by failing to honestly and in good faith review a claim as required by Michigan statute before denying the claim, and or by fraudulently terminating benefits because a person refused to settle for the amount offered by Coke and Sedgwick. Defendants used the mails and wires in furtherance of this scheme, by mailing, emailing and or faxing Notices of Dispute and other communications.

(Am. Compl. P 12.) Some of the acts of mail and wire fraud allegedly

> consisted of communications between defendants, or between defendants and the IME "cut off" doctors whose reports defendants relied upon in terminating or denying plaintiffs' benefits, or between defendants and their workers compensation defense attorneys ... In their communications, Coke and Sedgwick [*20] and perhaps their attorneys discussed means--such as using cut off doctors like Drouillard--of cutting off plaintiffs' benefits or forcing them to take settlements at less than true value, even though Coke and Sedgwick and their workers compensation defense attorneys possessed medical reports from treating doctors and doctors chosen by defendants stating plaintiffs did have work-related disabilities.

(Am. Compl. P 20C.) [12] Plaintiffs also allege that Drouillard--in performing IMEs, in giving related depositions, and in issuing fraudulent IME reports--"violated duties arising under his medical licenses, oaths and standards,

under the WDCA, ... under Michigan common law," and used the "mails and wires in furtherance of this scheme." (Proposed Sec. Am. Compl. P 18A; Pls.' Renewed Mot. at 4-5 [Docket Text # 31].)

> 12   These allegations, like many of the allegations contained in the Complaint, are based on "information and belief," as "plaintiffs do not have these communications." (Am. Compl. P 20C.)

### 3. Damages

Plaintiffs seek treble damages, costs and attorney fees, and injunctive relief "(1) forbidding ... Drouillard from doing IMEs for Coke and Sedgwick; (2) forbidding Coke and Sedgwick from using [*21] a doctor for IMEs who in the overwhelming number of exams does not find a work-related injury; (3) requiring Coke and Sedgwick to keep detailed and public records of all deliberation and communications regarding every decision (a) to pay or deny workers compensation benefits, and (b) to select a doctor for an examination of a M[ichigan] workers compensation claimant, and (4) requiring Liberty and UPS [sic] to adjust and handle claims as required by the Michigan Insurance Code and the Workers Disability Compensation Act." (Am. Compl. PP 31-32.)

## II. Leave to Amend the Pleadings

### A. Plaintiffs' Motions for Leave to Amend the Pleadings

This matter is before the Court on Plaintiffs' second and fifth motions [13] to amend their First Amended Complaint. [14] Plaintiffs seek to add a count of conspiracy and an aiding and abetting theory, a claim by a new plaintiff, and additional factual allegations against Defendants. Defendants filed several responses to Plaintiffs' motions to amend arguing that Plaintiffs' motions should be denied because the amendments would be futile because, inter alia, the Complaint as amended could not survive a motion to dismiss. Defendants also contend that Plaintiffs' practice [*22] of "testing" the strength of their claims in the face of Defendants' motions to dismiss is in bad faith--particularly where Plaintiffs had knowledge of the facts underlying their requested amendments when they filed the original Complaint. Alternatively, Defendants argue that Plaintiffs' motions to amend should be denied, at least for the time being, under the Burford abstention doctrine as at least one Plaintiff has a claim for workers' compensation benefits currently pending before the Workers Compensation Disability Board (WDCB). [15]

13   Plaintiffs' Renewed Motion for Leave to File Second Amended Complaint (Renewed Motion) was filed on July 23, 2009. [Docket Text # 31.] Plaintiffs' Amended Motion for Leave to File Second Amended Complaint Second Revision (Amended Motion) was filed on August 17, 2009. [Docket Text # 44.] Plaintiffs had previously filed a motion to amend on July 17, 2009 and Judge Lawson, to whom this case was previously assigned, dismissed it without prejudice for failure to seek concurrence. (*See* Order denying Motion for leave to file second Amended Complaint [Docket Text # 27].) Between the filing dates of the two motions to amend at issue here, Plaintiff filed two  [*23] other motions to amend that were both dismissed, again, for failure to seek concurrence. (*See* Order denying Motions 35 and 38 for Leave to File Second Amended Complaint [Docket Text # 43].)

14   The Complaint was originally filed on April 23, 2009. [Docket Text # 1.] Plaintiffs filed a First Amended Complaint on April 29, 2009 correcting the spelling of Plaintiffs' name. [Docket Text # 2.]

15   Jackson's claim is currently pending before the WDCB. Per oral argument at the February 23, 2010 hearing on this motion, the Court was informed that Scharnitzke also has a claim currently pending before the WDCB.

## 1. Renewed Motion [Docket Text # 31]

In their Renewed Motion, Plaintiffs seek leave to amend the First Amended Complaint to: (1) correct the spelling of Sedgwick's name in the case caption; (2) add the medical practice of Drouillard as an enterprise; (3) describe the alleged enterprises as "associating in fact," in response to the recent Supreme Court decision in *Boyle v. United States, 556 U.S.    , 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)*; (4) allege additional predicate acts by Drouillard; (5) allege that certain communications between Drouillard and Sedgwick employee LaTara Lewis constituted efforts to conspire  [*24] to conduct fraudulent IMEs; (6) allege that Drouillard committed wire fraud during his treatment of Jackson; (7) allege a conspiracy count under *18 U.S.C. § 1962(d)* against all Defendants; (8) allege an aiding and abetting theory against Coca Cola and Drouillard; and (9) add another plaintiff, Paul Lulek, with claims against Sedgwick and Drouillard only. (Pls.' Renewed Mot. at 3-13 [Docket Text # 31].)

In their brief accompanying the Renewed Motion, Plaintiffs argue that Defendants "will not be handicapped in any way by an amendment taking place even before they have filed their answer." (Pls.' Renewed Mot. at 17

[Docket Text # 31].) Plaintiffs also argue that the added count of conspiracy should not be considered prejudicial because the RICO statute itself creates liability for conspiracy. (*Id.* citing *Salinas v. United States, 522 U.S. 52, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997), Smith v. Berg, 247 F.3d 532 (3rd Cir. 2001)*, and *18 U.S.C. § 1962(d)*).) Plaintiffs, however, offer no substantive arguments to support their other proposed amendments.

Coca Cola was the only Defendant to file a response to Plaintiffs' Renewed Motion. (Def. Coca Cola's Resp. to Pls.' Renewed Mot. [Docket Text # 32].)

Coca Cola argues that Plaintiffs  [*25] "should not be permitted to amend its Complaint to add claims that could not survive a motion to dismiss." (*Id.* at 2.) Coca Cola claims that its pending motion to dismiss demonstrates that each of Plaintiffs' RICO claims--*18 U.S.C. §§ 1962(a), (b)*, and *(c)*--fail as a matter of law. (See Def. Coca Cola's Mot. to Dismiss [Docket Text # 21].) Coca Cola also contends that Plaintiffs are now, through their Renewed Motion, merely attempting to "side-step" both Coca Cola and Drouillard's previously filed motions to dismiss by adding a new claim--conspiracy to commit a RICO offense in violation of *18 U.S.C. § 1962(d)*--and by adding allegations of aiding and abetting to bolster Plaintiffs' previously filed 1962(c) claims. [16] Coca Cola concludes that, notwithstanding the proposed amendments, Plaintiffs' claims still fail as a matter of law and, thus, such amendments are futile. (Def. Coca Cola's Resp. to Pls.' Renewed Mot. at 4-10 [Docket Text # 32].)

16   Coca Cola argues that Plaintiffs' 1962(d) conspiracy claim fails as a matter of law because, *inter alia*, the conduct that Coca Cola allegedly conspired to commit does not amount to a RICO violation.

Regarding Plaintiffs attempt to bolster their  [*26] 1962(c) claim by adding allegations that Coca Cola aided and abetted other Defendants in the commission of predicate acts, Coca Cola argues that--even with the addition of these aiding and abetting allegations--Plaintiffs' claims still fail as a matter of law for two reasons. First, a defendant is only liable under *section 1962(c)* if it actually commits the predicate acts itself, as civil liability under that statute may not rest upon an aiding and abetting theory. Second, the proposed aiding and abetting allegations are insufficient on their face. (Def. Coca Cola's Resp. to Pls.' Renewed Mot. at 7-10 [Docket Text # 32].)

Plaintiffs did not file a reply to Coca Cola's response. Instead, Plaintiffs filed another motion for leave to amend.

## 2. Amended Motion [Docket Text # 44]

In their Amended Motion, Plaintiffs seek leave to amend the proposed Second Amended Complaint to include additional allegations to support the count of conspiracy and the aiding and abetting theory that were introduced in the Renewed Motion. Plaintiffs also seek to withdraw Paragraph 24 from the Complaint, which alleged violations of *18 U.S.C. §§ 1962(a)* and *(b)*. (Pls.' Am. Mot. at 2-5 [Docket Text # 44].)

In their [*27] brief accompanying the Amended Motion, Plaintiffs argue that they propose to add this language in response to Coca Cola's response to their Renewed Motion, in which Coca Cola argued that the proposed Second Amended Complaint failed to plead the existence of an agreement to engage in conduct that would amount to a RICO violation and, thus, failed to plead a conspiracy. (*See* Def. Coca Cola's Resp. to Pls.' Renewed Mot. at 7 [Docket Text # 32].) Plaintiffs conclude that this version of the Complaint "sufficiently alleges a conspiracy" because it now alleges an agreement to defraud, which is "the essence of a conspiracy." (Pls.' Am. Mot. at 8-9 [Docket Text # 44] (citing *United States v. Phillips, 664 F.2d 971 (5th Cir. 1981)*.) Plaintiffs further argue that

> the conspiracy allegations in the earlier versions of the Second Amended Complaint were sufficient to allege a RICO conspiracy. Plaintiffs need not have made the additional allegations in second revision of the Second Amended Complaint. However, rather than argue the sufficiency of the earlier conspiracy language, plaintiffs now add allegations in response to Coca Cola's brief--adding suspenders even though they believe the belt was [*28] sufficient to hold up the conspiracy claim.

(Pls.' Am. Mot. at 10 [Docket Text # 44].) Plaintiffs similarly argue that their pleading as to the aiding and abetting theory, which was also challenged by Coca Cola in its response to the Renewed Motion, was sufficient to meet the relevant legal standard. (*See* Def. Coca Cola's Resp. to Pls.' Renewed Mot. at 9 [Docket Text # 32].) Nevertheless, "[i]n case this court believe these allegations are insufficient, plaintiffs seek to add" factual allegations. (Pls.' Am. Mot. at 11 [Docket Text # 44].)

Each Defendant individually filed a response to Plaintiffs' Amended Motion. Plaintiff, however, only replied to Coca Cola's response.

Coca Cola, in its response, argues that Plaintiffs' Amended Motion should be denied for three reasons. First, Coca Cola contends that

> Plaintiffs' latest motion to amend stretches the liberal standards for amending pleadings far beyond their breaking point. The Federal Rules of Civil Procedure simply do not allow a plaintiff to file an unending stream of proposed amendments every time one defendant in a multi-defendant case points out a flaw in the then-operative Complaint. Yet that is exactly what the Plaintiffs here have [*29] done. They have filed and/or proposed to file several amended Complaints--all before the Court has had an opportunity to assess the viability of the claims (i) in the First Amended Complaint (which is the currently-operative Complaint) and/or (ii) in the other amended Complaints proposed by Plaintiffs. And every time that one of the Defendants highlights the flaws in the Plaintiffs' pleadings, Plaintiffs simply "go back to the drawing board" and gin up another version of the Complaint.

(Def. Coca Cola's Resp. to Pls.' Am. Mot. at 6 [Docket Text # 46].) Second, Coca Cola argues that Plaintiffs' proposed amendments are futile, as they would not cure the deficiencies in the pleadings to survive a motion to dismiss.

> For instance, the latest proposed revision purports to cure defects in Plaintiffs' conspiracy and aiding and abetting claims against Coke. But the proposed revisions actually perpetuate the flaws in these claims. Even with the proposed revisions, the conspiracy claim still fails to allege that Coke agreed to commit acts that violate the RICO statute, and the aiding and abetting claim contains no allegations that Coke actively supported or encouraged mail or wire fraud. Simply [*30] put, the proposed amendments are futile and should not be permitted because--for the reasons explained in all three Defendants' motions to dismiss--all of Plaintiffs' claims would be subject to dismissal even if the latest amendments were allowed.

(*Id.*) Finally, Coca Cola argues that "the proposed amendments are futile because even with the amendments, the proper course of action here (if the Court choose not to dismiss) would be to abstain under the *Burford* abstention doctrine." (Def. Coca Cola's Resp. to Pls.' Am. Mot. at 6 [Docket Text # 46].)

Plaintiffs replied to Coca Cola's response arguing that they should be permitted to amend the pleadings because "[t]he proposed Second Amended Complaint (Second Revision) adds 'insurance' against dismissal in the form of additional predicate acts by all defendants; a new plaintiff; and new allegations (conspiracy and aiding and abetting)." (Pls.' Reply at 5 [Docket Text # 48].) Plaintiffs conclude that the pleadings, as amended, state a RICO claim sufficient to defeat Defendants' multiple motions to dismiss. Plaintiffs also contend that *Burford* is inappropriate here. (*Id.* at 11-12.)

Drouillard, in his response, argues that Plaintiffs' Amended [*31] Motion should be denied for four reasons.

> First, [the Medical Malpractice Act], the Witness Immunity Doctrine, the *Morgan* and *Dryer* cases and all of the public policy that supports the doctrine and cases preclude liability against ... Drouillard for the conclusions he reached in conducting an IME. The proposed amended complaint does nothing to change that.

> Second, for a number of reasons the proposed amended complaint still fails to state a valid RICO claim against ... Drouillard, and if leave to amend the complaint were granted he would still be entitled to dismissal.

(Def. Drouillard's Resp. to Pls.' Am. Mot. at 6 [Docket Text # 50].) Third, Drouillard argues that the pleadings, not only fail to meet the particularity required under *Federal Rules of Civil Procedure 9(b)*, but also fail to meet the standard established in *Ashcroft v. Iqbal, U.S.    , 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. (*Id.* at 12-14.) Finally, Drouillard argues that "Plaintiffs should not be allowed to repeatedly add and change alleged facts to survive [Defendants] motions [to dismiss], particularly where the alleged facts upon which the proposed amendments are based were all known to plaintiffs when the original Complaint was filed. [*32] If this latest amendment is allowed, it will not only be futile, but it will require the defendants to spend additional money to file new motions to dismiss." (*Id.* at 12.)

Sedgwick, in its response to Plaintiffs' Amended Motion, argues that "[t]he proposed amendments ... would be futile because (1) Plaintiffs cannot state a claim for violations of *18 U.S.C. § 1962(d)* when they fail to state a cause of action under *18 U.S.C. § 1962(a), (b)*, or *(c)*; and (2) the allegations regarding ... Lulek further underscore Plaintiffs' inability to plead facts that establish a pattern of racketeering activity." (Def. Sedgwick's Resp. to Pls.' Am. Mot. at 4 [Docket Text # 51].)

**B. Standard: Amend the Pleadings**

Pursuant to *Federal Rule of Civil Procedure 15(a)*, leave to amend is freely granted where justice so requires. However, a motion to amend should be denied if the amendment is brought in bad faith or for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile. *See Foman v. Davis, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*.

**C. Analysis: Plaintiffs' Motions for Leave to Amend the Pleading**

Defendants argue that both proposed amendments, Plaintiffs' Renewed Motion and Amended Motion, should [*33] be denied under two alternate grounds: (1) undue delay; and (2) futility. The Court will address each in turn.

**1. Undue Delay and Prejudice**

Delay alone is not sufficient to deny a motion to amend the complaint, there must also be prejudice to the defendant. *See, e.g., Security Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc., 64 F.3d 1001, 1009 (6th Cir. 1995)* ("Delay alone, however, does not justify the denial of leave to amend. Rather, the party opposing a motion to amend must make some significant showing of prejudice to prevail."). Prejudice may result from delay, but "[d]elay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Brooks v. Celeste, 39 F.3d 125, 130 (6th Cir. 1994)* (citing *Head v. Jellico Hous. Auth., 870 F.2d 1117, 1123 (6th Cir. 1989)* (quoting *Hageman v. Signal L.P. Gas, Inc., 486 F.2d 479, 484 (6th Cir. 1973)*)); *see also Security Ins. Co. of Hartford, Inc., 64 F.3d at 1009* ("Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment [*34] of a pleading.") (internal quotations and citations omitted). Thus, the Court considers Defendants' arguments regarding delay in conjunction with its claims of prejudice.

"Although *Rule 15(a)* indicates that leave to amend shall be freely granted, a party must act with due dili-

gence if it intends to take advantage of the Rule's liberality." *United States v. Midwest Suspension and Brake, 49 F.3d 1197, 1202 (6th Cir. 1995)*. Thus, where an "amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utilities Bd., 259 F.3d 452, 459 (6th Cir. 2001)*. Failure to plead an available claim in a timely manner deprives an opposing party of "notice that it would have to defend" against the new claim. *Id.* This is not a situation where leave to amend is sought on the eve of trial after the discovery period has long passed. Here, Plaintiffs have filed their motions to amend before Defendants filed an answer and within five months of the initial filing. Although Defendants began to file motions to dismiss prior to Plaintiffs filing their motions to amend, the proceeding is in its early stages--as discovery [*35] has not yet begun. [17]

> 17 The Court does, however, recognize the merit in Defendants' argument that Plaintiffs appear to be using Defendants' motions to dismiss as an opportunity to test the strength of their claims at Defendants' expense--suggesting that the motions to amend are made in bad faith.

Leave to amend may also be withheld "if the moving party knew the facts on which the claim or defense sought to be added were based at the time the original pleading was filed and there is no excuse for his failure to plead them." 6 Charles A. Wright *et al.*, Federal Practice and Procedure, § 1487, at 651 (2d ed. 1990); *see also Wade, 259 F.3d at 459* (finding undue delay, in part, where the plaintiff knew the facts forming the basis of the amended claims but failed to plead the claims in the original complaint). The Court finds Defendants' argument--that Plaintiffs knew of the additional facts, including Lulek's allegations, proposed in the amendments at the time of their initial filing--unpersuasive. The record does not support such a conclusion.

As the Sixth Circuit has observed, it would be error to deny leave to amend when "the rejection would preclude plaintiff's opportunity to be heard [*36] on the merits of facts which are well known to the parties and which were pleaded at the outset." *Moore v. City of Paducah, 790 F.2d 557, 562 (6th Cir. 1986)*. *Accord, Hageman, 486 F.2d at 484* (affirming grant of leave to amend where the defendant "was aware of the fact situation upon which the amended complaint was based"). Here, Defendants were aware of the fact situation upon which the conspiracy count and the aiding and abetting theory are based. Defendants--as they were on notice of the RICO claims alleged against them--will not be unfairly prejudiced even if such an amendment would require Defendants to modify their defense strategy.

Other factors to consider include whether the amendments will require the party to expend additional resources to defend against new claims and this stage of the proceeding. [18] Here, Defendants complain that they will be prejudiced by the increased burden and costs associated with defending these additional claims. Other courts have rejected similar arguments, observing that "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.'" *Midwest Suspension, 49 F.3d at 1202* [*37] (quoting *United States v. Continental Ill. Nat'l. Bank & Trust Co. of Chicago, 889 F.2d 1248, 1255 (2d Cir. 1989)*. Defendants have not shown that they must expend significant additional resources to adequately respond to Plaintiffs' pending motions or to defend against the additional claims nor have they shown that the amendment, if allowed, would significantly delay the resolution of this dispute.

> 18 *See Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 306-07 (6th Cir. 2000)* (upholding the denial of leave to amend where the "motion to amend ... came almost nine months after he filed his first amended complaint and well over a year after he filed his original complaint. Moreover, at the time Plaintiff filed his motion to amend, the district court had granted summary judgment to Defendants two and one-half months earlier as well as denied Plaintiff's motion for reconsideration"); *Wade, 259 F.3d at 459* (upholding the denial of leave to amend where "the amendments proposed by plaintiff would result in significant prejudice to the defendant, [t]he dispositive motion deadline ha[d] already past, ... defendant has filed a motion for summary judgment on all claims alleged in the original [*38] complaint, [and where] ... significant discovery ha[d] been completed including more than 20 depositions"); *Midwest Suspension and Brake, 49 F.3d at 1202* (affirming the denial of the defendant's motion to amend its answer because the defendant's undue delay in filing its motion one month before trial and 18 months after discovery had been completed would unduly prejudice the plaintiff who had relied on the defendant's previous answer and would have to undertake a "new and expensive round of discovery" to rebut the new claim shortly before trial).

The Court concludes, upon its review of the record, that Plaintiffs' motions to amend were not filed with undue delay and that Defendants have not demonstrated sufficient prejudice that would result from these amendments. Accordingly, this Court declines to deny Plain-

tiffs' motions to amend on undue delay or prejudice grounds.

## 2. Futility

The question of futility, on the other hand, demands a different result. "A proposed amendment is futile if the amendment could not withstand a *Rule 12(b)(6)* motion to dismiss." *Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417, 420 (6th Cir. 2000)*. Thus, whether the proposed amendments would be futile depends [*39] on whether the additional allegations in the motions to amend could defeat Defendants' motions to dismiss.

Defendants argue that the proposed amendments would be futile for two reasons: (1) the proposed amendments would not cure the deficiencies in the pleadings to survive a motion to dismiss; and (2) because at least one of the Plaintiffs has a claim for workers' compensation benefits currently pending before the WDCB, the proper course of action would be to abstain under the *Burford* abstention doctrine and stay the proceeding.

As discussed below, this Court finds that--because the additional allegations in the motions to amend could not defeat Defendants' motions to dismiss--the amendments would be futile. Accordingly, Plaintiffs' motions for leave to amend the pleadings are denied.

## III. Motion to Dismiss

This matter is also before the Court on Defendants' motions to dismiss under *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*. The Court assumes that Plaintiffs' factual allegations, including those proposed in their motions to amend, are true. And, in viewing such allegations in a light most favorable to Plaintiffs, the Court finds that these allegations would not withstand Defendants' [*40] motions to dismiss.

## A. Defendants' Motions to Dismiss

Each Defendant individually filed a motion to dismiss. [19] The three motions to dismiss and the multiple responses to Plaintiffs' motions to amend contain similar and overlapping arguments. This Court first summarizes the Defendants' motions, then addresses the various arguments contained therein.

> 19   Def. Drouillard's Mot. to Dismiss [Docket Text # 15]; Def. Coca Cola's Mot. to Dismiss [Docket Text # 21]; and Def. Sedgwick's Mot. to Dismiss [Docket Text # 39].

## 1. Drouillard [Docket Text # 15]

Drouillard, in his motion to dismiss, presents three main arguments to support dismissal of the claims alleged against him. (Def. Drouillard's Mot. to Dismiss at 14 [Docket Text # 15].)

First, Drouillard claims that the witness immunity doctrine "renders him immune from liability for his medical reports, examinations [IMEs] and anticipated testimony." (Def. Drouillard's Mot. to Dismiss at 2 [Docket Text # 15].) Drouillard admits that he performed an IME on one of the named Plaintiffs, Jackson. [20] It is also alleged that Drouillard performed an IME on one of the proposed Plaintiffs, Lulek. Drouillard also states that he will offer testimony as to his [*41] medical conclusions in the pending state administrative proceedings before the WDCB. (*Id.* at 14.) Because Plaintiffs "are seeking to impose liability against ... Drouillard for an expert report and future testimony in an underlying WDCA action," Drouillard concludes that he is "immune from liability related to his medical examination and future testimony" under the witness immunity doctrine. (*Id.* at 23.)

> 20   Drouillard performed the IME on "Jackson on January 14, 2009, and opined that he could return to work. ... Drouillard's opinion came after other physicians had released him to return to work and after ... Jackson admitted to playing basketball on a fairly regular basis." (Def. Drouillard's Mot. to Dismiss at 14 [Docket Text # 15].)

Drouillard next argues that Plaintiffs have failed to allege a RICO cause of action. He contends that dismissal is appropriate because Plaintiffs have failed to plead: (1) that Drouillard committed two predicate acts; (2) that an enterprise existed separate and distinct from the pattern of racketeering activity alleged; (3) that Drouillard engaged in a pattern of racketeering activity; or (4) that his conduct was connected to the operation or management of the [*42] alleged enterprise or that he had control over it. (*Id.* at 2.)

Third, Drouillard argues that jurisdiction is not proper in this Court, under either the primary jurisdiction doctrine or the *Burford* abstention doctrine because Plaintiffs' RICO claims depend, in part, on whether they are actually entitled to workers' compensation benefits--a determination that has not yet been made. As one of the Plaintiffs, Jackson, is currently involved in a proceeding under the WDCA to determine his entitlement to workers' disability benefits, [21] Drouillard argues that these doctrines operate to dismiss Plaintiffs' claims, or alternatively demand a stay pending final resolution of the state administrative proceedings.

21   Jackson's "WDCA claim is still at a preliminary stage. The WDCA magistrate has not yet made a determination as to whether or not Jackson is entitled to benefits." (Def. Drouillard's Mot. to Dismiss at 14 [Docket Text # 15].) "Jackson has not exhausted the worker's disability compensation process. His attorney is only in the discovery stage of his proceeding. He has not yet proceeded to trial before a worker's compensation magistrate. Therefore, it is not known yet who all the witnesses  [*43] will be in that matter, how the trial will progress or what decision the magistrate will ultimately make. If the magistrate finds that ... Jackson is not entitle d to benefits, he has the right to appeal that decision to the Appellate Commission. If the Appellate Commission also concludes that he is not entitled to benefits, that decision can be appealed to the Michigan Court of Appeals or the Michigan Supreme Court. In short, there is a well ordered process to determine if plaintiffs are disabled such as to be entitled to WDCA benefits, to challenge ... Drouillard's ... medical conclusions, and to appeal any adverse finding." (*Id.* at 16-17.)

## 2. Coca Cola [Docket Text # 21]

Coca Cola, in its motion to dismiss, adopts Drouillard's arguments and also raises several additional arguments. The additional arguments to support its motion to dismiss include:

a. No plaintiff may assert a RICO claim based upon the allegedly fraudulent violation of a statutory duty where the statute that creates the duty also (I) establishes a specialized administrative scheme to enforce and regulate the duty and (ii) prescribes the exclusive remedy for any breach of the duty. Here, Michigan's Workers Disability Compensation  [*44] Act (I) establishes a specialized administrative scheme to enforce and regulate the duty to pay benefits to injured employees under the Act and (ii) prescribes the exclusive remedy for an injured employee and for an employee whose claim for benefits has been disputed--even if disputed in bad faith. Plaintiffs cannot use their RICO claim as an "end run" around the WDCA;

b. The breach of statutory duties created under certain comprehensive administrative statutes--even when fraudulent--does not give rise to a RICO claim.

The duties created under the WDCA to pay benefits to injured employees and to do so on a timely basis are just such duties; even the fraudulent breach of these duties cannot support a RICO claim; ...

e. Plaintiffs assert a claim against Coke for violating *18 U.S.C. § 1962(c)* ... Plaintiffs failed to sufficiently allege the existence of any enterprise, failed to sufficiently allege that Coke participated in the affairs of the enterprise, and failed to allege that Coke committed any predicate acts.

(Def. Coca Cola's Mot. to Dismiss at 2-3 [Docket Text # 21].)

## 3. Sedgwick [Docket Text # 39]

In its motion to dismiss, Sedgwick joins the arguments raised by Drouillard and Coca Cola.  [*45] Sedgwick also argues that its motion should be granted for two additional reasons.

First, Sedgwick argues that Plaintiffs' claims fail as a matter of law because Plaintiffs do not have standing under RICO, as their claims are not ripe. Sedgwick claims that "Plaintiffs are trying to 'fit a square peg into a round hole' by squeezing a dispute over entitlement to workers compensation benefits into a civil RICO action." (Def. Sedgwick's Mot. to Dismiss at 14 [Docket Text # 39].)

Second, Sedgwick argues that Plaintiffs have failed to state a claim because: (1) the allegations do not support a violation of either the federal wire or mail fraud statutes; (2) the alleged violations of statutory rights under the WDCA will not support a predicate act of mail or wire fraud; and (3) the allegations fail to demonstrate a pattern of racketeering activity.

Sedgwick, in its reply, also argues that Plaintiffs have failed to meet the pleading requirements set forth under *Ashcroft v. Iqbal,      U.S.     , 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).*

## B. Standards: Motions to Dismiss

### 1. *Rule 12(b)(1)* Standard

Subject matter jurisdiction is governed by *Fed. R. Civ. P. 12(b)(1)*. A motion to dismiss pursuant to *Rule 12(b)(1)* may either  [*46] attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction. *Golden v. Gorno Bros., Inc., 410 F.3d 879, 881 (6th Cir. 2005)*. When a defendant challenges subject

matter jurisdiction on a factual basis, the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Regional Transit Authority, 895 F.2d 266, 269 (6th Cir. 1990).*

## 2. *Rule 12(b)(6) Motion to Dismiss Standard*

A motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994); Bower v. Fed. Express Corp., 96 F.3d 200, 203 (6th Cir. 1996).* To survive a *Rule 12(b)(6)* motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal citations and emphasis omitted). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007).* [*47] "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal, U.S.     , 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id. at 1950* (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Id.* (internal quotation marks and citation omitted). Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While [*48] legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id . at 1949* (internal quotation marks and citation omitted).

## C. Analysis: Defendants' Motions to Dismiss

### 1. Applicability of Abstention Doctrines

Defendants contend that Plaintiffs' RICO claims depend, in part, on whether they are actually entitled to workers' compensation benefits--a determination that has not yet been made, as at least one of the Plaintiffs has a claim for workers' compensation benefits currently pending before the WDCB. Defendants conclude that because the WDCB has exclusive jurisdiction over the issue of entitlement to workers' compensation benefits, this Court should stay the action pending resolution of the state administrative proceedings under two abstention doctrines: primary jurisdiction and *Burford* abstention.

Judge [*49] Borman, in two RICO cases [22] factually similar to this matter, addressed the applicability of primary jurisdiction [23] and the *Burford* abstention doctrine. [24] The Court finds Judge Borman's reasoning and analysis persuasive. The Michigan legislature has established a comprehensive state administrative framework to determine eligibility for workers' compensation benefits and to administer workers' compensation claims, and such a scheme is precisely the sort of state system that *Burford* protects from federal interference. The WDCB and the WDCA appellate process is in the best position to determine a claimant's entitlement to workers' compensation benefits, and--as Plaintiffs' RICO claims depend, in part, on whether they are actually entitled to workers' compensation benefits--this Court finds that a stay would be appropriate here to avoid interfering with the ongoing state administrative process, to promote comity, and to avoid unnecessarily deciding or complicating the issues in the present case. [25]

> 22      *Brown v. Cassens Transp. Co., 409 F.Supp.2d 793 (E.D. Mich. 2005)* (rev'd in part on other grounds by *Brown v. Cassens Transp. Co., 546 F.3d 347 (6th Cir. 2008)*) and *Moon v. Harrison Piping Supply, 375 F.Supp.2d 577 (E.D. Mich. 2005)* [*50] (rev'd in part on other grounds by *Moon v. Harrison Piping Supply, 465 F.3d 719 (6th Cir. 2006)*).
> 23      Although the *Moon* and *Brown* court held that "[t]he threshold requirements for the applicability of the primary-jurisdiction doctrine [we]re met here [and that] [t]he primary-jurisdiction doctrine's twin rationales [we]re also met," it was unclear to the court "whether the primary-jurisdiction doctrine may apply in favor of a state administrative agency where the claim at issue arises under federal law and there are no competing federal forums." *Brown, 409 F.Supp.2d at 799-800. Accord, Moon, 375*

*F.Supp.2d at 586-587.* Ultimately, Judge Borman did not rule on the issue of primary jurisdiction, because he determined that the *Burford* abstention doctrine "would compel the stay of Plaintiffs' RICO claims pending the WDCB's determination of Plaintiffs' entitlements to workers' compensation benefits." *Id. at 801.*

24   Regarding the *Burford* abstention, the *Moon* and *Brown* court held that the doctrine applied to stay the plaintiffs' RICO claims until there was a final determination by the WDCB as to the plaintiffs' entitlement to workers' compensation benefits.

> Comparatively-speaking, in contrast to its [*51] substantial interest in resolving the federal-law issues of Plaintiff's RICO claims, this federal forum would have minimal interest in determining Plaintiff's entitlement to workers' compensation benefits. Thus, the Court would stay Plaintiff's RICO claims if they survived the instant motion, based on Plaintiff's claim of entitlement to workers' compensation benefits, pending a final determination of Plaintiff's entitlement to those benefits via Michigan's workers' compensation scheme.

*Moon, 375 F.Supp.2d at 590. Accord, Brown, 409 F.Supp.2d at 803.*

25   Plaintiffs, on the other hand, argue that the Sixth Circuit determined, on remand in *Brown, 546 F.3d 347*, that the *Burford* abstention doctrine did not apply. However, the section of the opinion quoted by Plaintiffs addressed the issue of preemption under the McCarran-Ferguson Act and by its own language does not discuss the abstention issue. *See Brown, 546 F.3d at 361-63.* The Court disagrees with Plaintiffs' over-broad interpretation that "the Sixth Circuit's reasoning in *Brown* [regarding reverse preemption under the McCarran Ferguson Act] ... applies here to knock out the *Burford* abstention doctrine." (Pls.' Resp. to Def. Drouillard's Mot. [*52] to Dismiss at 30 [Docket Text # 30].) The Sixth Circuit did not address the question of whether *Burford* applies to stay a proceeding pending final determination of a previously filed, and currently pending, workers' compensation benefit claim under the WDCA.

Accordingly, the Court would stay Plaintiffs' RICO claims--if they survive the instant motions to dismiss--pending a final determination of Plaintiffs' eligibility for workers' compensation benefits under the WDCA. [26]

> 26   Plaintiffs do not dispute that the WDCB should determine the question of entitlement to workers' compensation benefits. In response to Drouillard's motion to dismiss Plaintiffs state: "Whether plaintiff has a claim for benefits should be decided by the Bureau of Workers Disability Compensation. But whether defendants have *fraudulently conspired to deprive him of benefits in violation of RICO* may only be decided by this court. The Bureau has no jurisdiction over such a [fraud] claim." (Pls.' Resp. to Def. Drouillard's Mot. to Dismiss at 33 [Docket Text # 30] (emphasis in original).)

## 2. RICO Claims Cannot Survive Motion to Dismiss

The Court finds that Plaintiffs' RICO claims, inclusive of the allegations contained in [*53] the Amended Complaint and all proposed amendments, cannot survive the instant motions to dismiss. As discussed below, Plaintiffs' RICO claims are dismissed under three alternate grounds: (1) RICO does not provide a remedy for the fraudulent denial of benefits because an injured worker may not use RICO as an "end run" around the exclusive procedures and remedies prescribed by the WDCA, or alternatively because a violation of the administrative duties created by statute under the WDCA, even when fraudulent, does not amount to mail or wire fraud sufficient to give rise to RICO liability; (2) Plaintiffs' claims are not ripe; and (3) Plaintiffs have failed to state a claim for relief under RICO. [27]

> 27   As the Court is dismissing Plaintiffs' RICO claims on other grounds, it need not reach the merits of Defendants other arguments supporting dismissal including: (1) that the witness immunity doctrine bars all claims against Drouillard; (2) that the McCarran-Ferguson Act preempts Plaintiffs' RICO claims; (3) the remedy that Plaintiffs seek--compensation for personal injuries--is not recognized under RICO; and (4) that Plaintiffs' have failed to plead mail fraud, as Plaintiffs have not demonstrated [*54] that anyone was "deceived" by Defendants actions.

### a. RICO Does Not Provide Remedy for the Fraudulent Denial of Benefits

Plaintiffs allege that they are entitled to workers' compensation benefits, and some Plaintiffs have challenged the denial of their claims under the administrative

scheme established by the WDCA and also in this matter. Here, Plaintiffs claim that Defendants fraudulently breached their duties under the WDCA [28] "to be honest in the administration of a workers compensation claim" and "not to unreasonably fail to pay promptly claims for compensation for which [they] shall become liable." (Am. Compl. PP 16-17.) But, according to Defendants, federal courts have consistently rejected RICO claims arising out of alleged fraudulent violations of duties created by statutes like the WDCA under two alternate rationales.

> [F]irst, that a plaintiff may not assert a RICO claim based upon the violation of a statutory duty where the statute that creates the duty also (a) establishes a specialized administrative scheme to enforce and regulate the duty and (b) prescribes an exclusive administrative remedy for breach of the duty, *see, e.g., Miller v. Norfolk Southern Railway, 183 F.Supp.2d 996, 1000 (N.D. Ohio 2002)* [*55] (dismissing RICO claim based upon allegedly fraudulent violation of employees' rights under Railway Labor Act); and, second, that the breach of administrative duties created by statutes like the WDCA--even when fraudulent--does not amount to mail or wire fraud sufficient to give rise to RICO liability. *See, e.g., Ayres v. General Motors Corp., 234 F.3d 514, 521-22 (11th Cir. 2000)* (dismissing RICO claim based upon allegedly fraudulent violation of the National Traffic and Motor Vehicle Safety Act).

(Def. Coca Cola's Mot. to Dismiss at 14-15 [Docket Text # 21].) Defendants conclude that--because both alternate rationales are present here--the Court should, therefore, dismiss Plaintiffs' RICO claims. The Court agrees, and discusses each in turn.

> 28   Plaintiffs allege that Defendants violated duties owed to them "under the Michigan Workers Disability Compensation Act" and "under the Michigan Uniform Trade Practices Act." (Am. Compl. PP 16-17.) Defendants contend, and Plaintiffs do not argue to the contrary, that they did not owe Plaintiffs any duties under the MUTPA. *See Blackwell v. Citizens Ins. Co., 457 Mich. 662, 579 N.W.2d 889, 894 (1998)* ("the duties outlined in the UTPA run to [an] employer rather [*56] than [to an] employee."). Moreover, Plaintiffs appear to concur with Defendants' posi-

tion. (*See* Pls.' Resp. to Def. Sedgwick's Mot. to Dismiss at 13 [Docket Text # 47] ("Sedgwick claims the [MUTAPA] creates not [sic] duties applicable here. True, the UTPA may not create a duty ...").) Thus, the only duties on which Plaintiffs' claims can possibly be based are those duties created by the WDCA.

**(1) RICO May Not be Used as an "End Run" Around WDCA**

As to Defendants' first argument--that an injured worker may not use RICO as an "end run" around the exclusive procedures and remedies prescribed by the WDCA--Defendants contend that Plaintiffs

> have filed this action in an attempt to convert their workers compensation disputes into a federal RICO case--the basis of which is the Defendants' allegedly-fraudulent violation of the WDCA. Plaintiffs' effort to convert their disputes over benefits into RICO claims, while creative, must be rejected. Plaintiffs' RICO claims seek to expand RICO far beyond its intended reach. As the federal courts have repeatedly held, a plaintiff may not use a RICO claim as an "end run" around a comprehensive, specialized, and exclusive administrative scheme like the scheme [*57] established by the WDCA. Yet that is precisely what these Plaintiffs seek to do.

(Def. Coca Cola's Mot. to Dismiss at 10 [Docket Text # 21].) The holding in *Danielsen v. Burnside-Ott Aviation, 746 F.Supp. 170 (D. D.C. 1990), aff'd 941 F.2d 1220, 291 U.S. App. D.C. 303 (D.C. Cir. 1991)*, is representative of federal court decisions to dismiss RICO claims that attempt to bypass comprehensive and exclusive administrative schemes like the WDCA. *See id. at 176.* ("[C]ourts have held that RICO is preempted by a variety of statutes that establish comprehensive administrative schemes.").

The plaintiffs in *Danielsen* alleged that the defendants "engaged in a scheme to defraud employees of the minimum wages and fringe benefits to which they were entitled" under the McNamara-O'Hara Services Contract Act, *41 U.S.C. 351, et seq.* (SCA), "in violation of the civil provisions of ... RICO." *Danielsen, 746 F.Supp. at 171.* Notwithstanding the fact that the plaintiffs had no private right of action under the SCA and even though federal law assigned exclusive authority to address violations of the SCA to the Department of Labor, the plaintiffs brought a RICO claim based upon the alleged SCA

violations. The court rejected the plaintiffs' [*58] effort to convert SCA violations into a RICO claim:

> Here, the fraudulent scheme alleged by the plaintiffs is an underpayment of wages and fringe benefits due them pursuant to the SCA. Plaintiffs' RICO claims are all premised on alleged violations of the SCA. However, the SCA expressly assigns the responsibility for determining and enforcing wage levels and other employee benefits to DOL. Allowing plaintiffs to proceed with their RICO claims would not only upset the careful blend of administrative and judicial powers that Congress has created under the SCA, but also overturn well-established precedent that employees have no private right of action under the Act.

*Id. at 176.* The district court held that the facts alleged in the purported RICO action fell within the SCA and that the administrative remedy provided by that Act was an exclusive one, barring any private civil action. *See id. at 174* ("The Court concludes that to permit plaintiffs to enforce the SCA through a RICO suit such as this would destroy the administrative scheme established by the SCA.").

On appeal, the D.C. Circuit affirmed. *See Danielsen, 941 F.2d 1227* ("We agree with the District Court that the statutory scheme for [*59] administrative relief set forth ... in the SCA leaves no room for a RICO action on the present allegations."). The D.C. Circuit held:

> We agree ... that the implication of a private right under the SCA would undercut the specific remedy [it] prescribed ... [W]hat plaintiff will pursue his administrative remedies under the Act where more direct and expeditious relief is available in a private suit? How much more the case where plaintiffs couch their complaint in terms of RICO to give them, not a remedy equal to that provided under the SCA, but three times that remedy? How much more still where their attorneys would be extracting their fees not from their clients but from the other side? Thus, the ingenious pleading of the action in RICO terms rather than in straight SCA language cuts against the implication of the right of action rather than in its favor.
> ...

> To call the violation of the SCA "a pattern of racketeering" does nothing to persuade this Court that Congress intended the SCA to create a private cause of action. ... In short, by all authority and reason, it is plain that the SCA creates no private remedy.

> To frame the action for such remedy in terms of RICO adds nothing. ... RICO, in fact, [*60] does recite a list of statutes the breach of which will constitute racketeering. *See 18 U.S.C. § 1961(1).* Conspicuously, however, the SCA is not one of those statutes. Thus, we conclude that the District Court was correct in holding that the private civil action, even couched in RICO terms, will not lie for an alleged breach of the SCA.

*Id. at 1228-29* (internal quotations and citations omitted).

Similarly the district court in *Livingston v. Shore Slurry Seal, Inc., 98 F.Supp.2d 594 (D. N.J. 2000)*, dismissed a RICO claim based upon violations of another comprehensive statute that created exclusive administrative procedures to remedy violations. The plaintiffs in *Livingston* alleged that the defendants had violated, and conspired to violate, the Davis-Bacon Act, *40 U.S.C. § 276a et seq.*, by fraudulently failing to pay employees the prevailing wage on public contracts. *Livingston, 98 F.Supp.2d at 596.* Even though the Davis-Bacon "Act sets forth a detailed administrative scheme to enforce violations of its provisions," the plaintiffs brought a RICO action. *Id.* The district court rejected the plaintiffs' attempt to convert their Davis-Bacon Act dispute into a civil RICO case: "Plaintiffs' [*61] claim under the Davis-Bacon Act must be dismissed because there is no private right of action under the Act." *Id.* The court held that the plaintiffs "could not base their RICO claims on defendants' alleged violation of the Davis-Bacon Act" because "[t]he detailed administrative scheme created by the Act is the exclusive remedy for the alleged underpayment of wages for work performed on federal construction projects." *Id. at 600.* The court further explained that the "plaintiffs' sole remedy ... is the administrative remedy set forth" under the Davis-Bacon Act--not a RICO cause of action. *Id. at 601. See also id. at 600* ("At its core, plaintiffs' Amended Complaint alleges that defendants paid plaintiffs less than the prevailing wage. However, a violation of a state or federal prevailing wage statute is not a predicate act for purposes of RICO liability. Absent specific allegations of fraud or deceit, plaintiffs cannot transform their claims into a federal

RICO claim through the creative invocation of the wire and mail fraud statutes.").

The courts' reasoning in *Danielsen* and *Livingston* is applicable here and likewise requires dismissal of Plaintiffs' RICO claims. [29] Like the statutes at [*62] issue in those cases, the WDCA establishes a comprehensive and exclusive administrative scheme that governs workers' compensation benefits, including the adjudication of whether a claimant is entitled to such benefits. [30] Not only does the WDCA provide the exclusive remedy for an employee seeking benefits, it also provides the exclusive remedy for an employee claiming that his employer failed to pay benefits in bad faith. [31]

29    Moreover, Congress has expressed its intention to limit federal jurisdiction over claims related to alleged violations of state workers' compensation statutes in *28 U.S.C. § 1445(c)*, which prohibits removal of any civil action "arising under the workmen's compensation laws" of the states. "Although styled as RICO claims, Plaintiffs' claims arise under the WDCA because (1) Plaintiffs' entitlement to relief depends upon their allegation that they qualified for benefits under the WDCA, (2) the primary relief Plaintiffs seek is an award of benefits allegedly owing under the WDCA, and (3) as noted above, the WDCA provides a specific remedy for the alleged wrongful denial of benefits that Plaintiffs challenge here. Plaintiffs' claims are thus precisely the type of [*63] claims that Congress intended to keep out of the federal courts." (Def. Coca Cola's Mot. at 20 [Docket Text # 21].) Defendants recognize that this action, however, is not subject to *28 U.S.C. § 1445(c)* because it was not removed to this Court, but argue that *§ 1445(c)* "should guide this Court's interpretation and application of the RICO statute." (*Id.*)

30    The WDCA provides for review of a disputed claim by a mediator or at a hearing before workers compensation magistrate, *Mich. Comp. Laws § 418.847*, and then allows for review of the magistrate's decision by the Workers Compensation Appellate Commission, *Mich. Comp. Laws § 418.859(a)*, and also provides for subsequent judicial review of that decision, *Mich. Comp. Laws § 418.861(a)*.

31    The WDCA provides that a disability insurer must pay a penalty $ 50.00 per day if, in the absence of a dispute over the claimant's entitlement to benefits, it fails to pay benefits within 30 days of when they become due and owing and limits the total penalty to $ 1500.00. *Mich. Comp. Laws § 418.801(2)*. The WDCA also provides that a self-insurer, like Coca Cola, can lose its privilege if it "repeatedly or unreasonably fails to pay promptly claims for compensation [*64] for which it shall become liable." *Mich. Comp. Laws § 418.631*.

On at least two occasions, the Michigan Court of Appeals has addressed this very issue: that the WDCA provides the exclusive remedy for an employee claiming that his employer failed to pay benefits in bad faith. Twice it held that an employee may not recover more than the statutory limit--even where an employer disputes a claim for benefits in bad faith. *See Warner v. Collavino Bros., 133 Mich. App. 230, 347 N.W.2d 787, 790 (Mich. Ct. App. 1984)* (affirming administrative ruling that "an employer [who] disputed a claim in bad faith will not justify the assessing of a penalty [beyond the limited penalty set forth in the WDCA] against the employer"); *Couture v. General Motors Corp., 125 Mich. App. 174, 335 N.W.2d 668, 670 (Mich. Ct. App. 1983)* (reversing administrative award of penalty damages above the statutory limit because it determined that the Legislature intended to limit an employer's liability for all failures to pay benefits--even those in "bad faith"). An injured employee seeking workers' compensation benefits, therefore, must utilize the comprehensive administrative process established by the WDCA and has no private right of action to recover benefits: [*65] the WDCA is his "exclusive remedy." *Mich. Comp. Laws § 418.131* ("The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort.").

Plaintiffs argue that the Sixth Circuit's discussion of the McCarran-Ferguson reverse-preemption in *Brown* forecloses Defendants' argument here. *See Brown, 546 F.3d at 362-63*. The Court finds Plaintiffs' reliance on *Brown* misplaced for two reasons. First, the portion of the opinion upon which Plaintiffs rely is *dicta*: the Sixth Circuit prefaced that section of its Opinion by noting that it had already "dispose[d] of" the matter. *Id. at 361-62*. As the Sixth Circuit has repeatedly acknowledged, its *dicta* is not binding. *See, e.g., Hinchman v. Moore, 312 F.3d 198, 204 (6th Cir. 2003)*. Second, there is no indication that the Sixth Circuit considered the Michigan Court of Appeal cases which held that the WDCA strictly limits an employer's liability for disputing a workers' compensation claim--even those made in bad faith. *See Couture, 125 Mich. App. 174, 335 N.W.2d 668; Warner, 133 Mich. App. 230, 347 N.W.2d 787*. As the Michigan [*66] Court of Appeals explained in those cases, the Michigan Legislature made a policy decision to circumscribe an employer's liability--even when they contest or deny claims in bad faith. *See Warner, 347 N.W.2d at 790* ("From our reading of similar statutes, we infer that the

Legislature was aware that prompt payment of compensation benefits could be encouraged by imposing a penalty for bad faith denial of payments," but the Legislature nonetheless chose to preclude the assessment of a penalty for bad faith denials). [32] Thus, allowing Plaintiffs here to proceed with their RICO claims based upon Defendants' alleged fraud in disputing their workers' compensation benefit claims would frustrate legislative intent. Moreover, the *Brown* court did not address the question of whether an injured worker may use RICO as an "end run" around the procedures and remedies prescribed by the WDCA. Instead, the Sixth Circuit addressed the narrow issue of whether, under the McCarran-Ferguson Act, the WDCA "reverse preempted" the plaintiffs' RICO claims, and analyzed specific objections to the manner in which the plaintiffs pleaded their RICO claims.

> 32   Michigan courts have also rejected attempts by plaintiffs [*67] to bring an action for tortious denial of workers' compensation benefits. *See, e.g., Wright v. DaimlerChrysler Corp., 220 F.Supp.2d 832, 845 (E.D. Mich 2002)* ("Additionally, the denial of workers' compensation benefits, even in bad faith, is not tortious. Other lawsuits against employers and insurance companies for canceling or refusing to pay insurance benefits are brought as intentional infliction of emotional distress claims. In that context, courts hold that wrongful, bad faith termination of benefits is not sufficiently outrageous to support a claim for intentional infliction of emotional distress. Therefore, wrongful, even bad faith refusal to offer benefits to which Plaintiff is entitled is not tortious.") (internal quotations and citations omitted).

Plaintiffs also contend "that the WDCA is not 'comprehensive' and 'exclusive,' and does not prevent the bringing of a RICO claim for *fraudulent* denial of benefits." (Pls.' Resp. to Def. Coca Cola's Mot. to Dismiss at 7 [Docket Text # 34] (emphasis in original).) Federal courts, however, have specifically rejected the artificial distinction Plaintiffs attempt to draw between a wrongful denial of statutory benefits and a "fraudulent" [*68] denial of benefits: with respect to both types of denials, the essence of the harm to the claimant is the deprivation of benefits to which he is allegedly entitled. *See, e.g., Butchers Union Local No. 498 v. SDC Inv., Inc., 631 F. Supp. 1001, 1011 (E.D. Cal.1986)* ("Bluntly put, no matter how you cut the complaint, the only conceivable 'fraud' is the deprivation of plaintiffs' rights under the labor law. Since defendants' liability, under the mail and wire fraud statutes, if any, is wholly dependent on the labor laws, judgement of defendants' conduct ... lies exclusively with the [National Labor Relations Board]."); *Danielsen, 941 F.2d at 1229* ("To frame the action for

such a remedy [an award of statutory benefits] in terms of RICO [fraud] adds nothing."). Courts have consistently concluded that where a comprehensive and exclusive administrative scheme exists to address the denial of benefits--whether the denial was fraudulent or otherwise wrongful--that scheme provides an appropriate and sufficient remedy to the claimant. *See id.* Here, the gravamen of Plaintiffs' claims is that they did not receive the workers' compensation benefits to which they were allegedly entitled. Plaintiffs' use [*69] of the label "fraudulent" does not change the fact that they are simply claiming that Coca Cola or Sedgwick should have paid their benefits. The WDCA creates both an administrative forum for the adjudication of Plaintiffs' claimed entitlement to benefits and a remedy for the denial of those benefits. Plaintiffs, therefore, may not avoid the WDCA's comprehensive procedures and exclusive remedies simply by characterizing a denial of benefits as "fraudulent."

RICO was never intended to create a path into courts for litigants who would otherwise be limited to exclusive administrative remedies and procedures, and subject to strict damages limitations. The Court finds that Plaintiffs may not use their RICO claim to reform Michigan's workers' compensation law--allowing them to do so would be an unwarranted intrusion into Michigan state law and procedure. Because Plaintiffs' sole remedies are those set forth under the WDCA, Plaintiffs' RICO claims are dismissed.

### (2) Violation of WDCA Does Not Amount to Mail or Wire Fraud

As to the second argument--that a violation of the administrative duties created by statute under the WDCA, even when fraudulent, does not amount to mail or wire fraud sufficient [*70] to give rise to RICO liability--Defendants contend that Plaintiffs' RICO claims rest upon two erroneous assumptions. First, that Defendants fraudulently breached duties owed to Plaintiffs under the WDCA (i.e., the duties to fairly and honestly evaluate their claims) and second, that Defendants' fraudulent breach of those duties amounts to mail and wire fraud sufficient to trigger RICO liability.

> The first assumption is wrong as a matter of fact, but, more importantly for purposes of this motion, the second assumption is wrong as a matter of law.

(Def. Coca Cola's Mot. to Dismiss at 20-21 [Docket Text # 21].) According to Defendants, the breach of a legal duty, even when fraudulent, does not amount to mail or wire fraud where: (1) the breached duty is wholly a creature of statute; (2) the statute creating the duty estab-

lishes a comprehensive and exclusive administrative scheme to enforce the duty; and (3) the statute does not provide for a private right of action or criminal penalties. This Court agrees: even if Defendants fraudulently violated the WDCA, such a violation does not amount to mail or wire fraud sufficient to give rise to RICO liability.

The Eleventh Circuit's decision in *Ayres v. General Motors Corp., 234 F.3d 514 (11th Cir. 2000)*, [*71] makes this very point. The plaintiffs in Ayres brought a claim against General Motors under the Georgia civil RICO statute. The plaintiffs alleged that General Motors violated RICO through a pattern of mail and wire fraud by fraudulently failing to disclose information that it was required to disclose under the National Traffic and Motor Vehicle Safety Act, *49 U.S.C. § 30118, et seq.* The Eleventh Circuit assumed that General Motors had violated the statute as alleged by plaintiffs. But the court held that such a violation did not amount to mail fraud because the Safety Act "was not meant to create the kind of duty, a breach of which would create criminal liability or civil liability under RICO statutes." *Ayres , 234 F.3d at 521-22.* The court explained:

> The Safety Act establishes its own extensive array of administrative remedies for a violation of its notification obligations ... [and] the Safety Act does not make violation of the notification requirements criminal. In light of this extensive administrative scheme, we think it clear that Congress did not intend to equate a violation of the Safety Act's notification requirements in and of itself with the felony of mail or wire fraud. Moreover, [*72] given the limits on the civil penalties, the absence of a private right of action, and the option of private parties to petition for administrative action, it is also clear that Congress did not intend for a violation of the Safety Act's notification requirements to be the basis for a private civil RICO action, which would permit unlimited, treble damages. ...
>
> To permit plaintiffs to convert non-compliance with the notification requirement found in the Safety Act, a regulatory statute with its own administrative remedies, into mail and wire fraud and thereby to maintain a civil RICO action would upset the purposes and contradict the intent of the statute.

*Id. at 522-25. Cf. Danielsen, 941 F.2d at 1229* (expressing "doubt" that an allegedly fraudulent violation of the SCA could amount to mail fraud sufficient to trigger RICO liability, the court stated "[t]he very fact that Congress enacted the SCA with its complex framework for administrative recovery suggests that Congress did not contemplate that violation of SCA constituted the criminal felony of mail fraud").

The WDCA, like the statute in *Ayres*, "was not meant to create the kind of duty, a breach of which would create criminal liability [*73] or civil liability under RICO statutes." *Ayres, 234 F.3d at 522.* As discussed above, the WDCA "establishes its own extensive array of administrative remedies for a violation" of the duty to pay claims. *Id.* An injured employee does not have a private right of action under the WDCA; on the contrary, the WDCA abolished an employee's right to sue and required them to exclusively pursue its administrative remedies. *See Mich. Comp. Laws § 418.131.* Furthermore, the WDCA does not provide for criminal penalties for violations of the duties it imposes; on the contrary, the WDCA contains a strict limitation of liability that applies even where an employer disputes a claim in bad faith. The WDCA--and the duties and remedies it creates--are directly analogous to those in *Ayres*, the violation of which does not give rise to RICO liability.

Plaintiffs contend that this argument, too, was addressed in--and foreclosed by--the Sixth Circuit in *Brown*. (*See* Pls.' Resp. to Def. Coca Cola's Mot. to Dismiss at 11 [Docket Text # 34] ("None of the cases Coke cites in support of its argument apply specifically to a RICO claim asserting fraudulent denial of benefits due under the ... WDCA. *Brown* does. ... Most critically, [*74] the arguments Coke makes are akin to the arguments for McCarran-Ferguson reverse preemption and *Brown* rejected those arguments. Coke cites to *Ayres* to argue that RICO would impair or impede the WDCA and would provide remedies not provided in the WDCA, and this argument is foreclosed by *Brown*.").) Again, Plaintiffs reliance on *dicta* in *Brown* is unpersuasive: the Sixth Circuit simply did not address, in its analysis of McCarran-Ferguson reverse-preemption, the question of whether a violation of administrative duties created by the WDCA--even if fraudulent--amounts to mail or wire fraud sufficient to give rise to liability under the RICO. And, this Court holds that it does not. Accordingly, Plaintiffs' RICO claims are dismissed.

**b. Plaintiffs' Claim are Not Ripe**

Defendants also contend that Plaintiffs' claims are not ripe because their injuries have not been established--as Plaintiffs' eligibility for workers' compensation benefits has not yet been determined.

Plaintiffs' injuries and alleged damages are not "clear and definite" (let alone established or likely) and their RICO claims therefore remain premature. ...

A RICO defendant cannot be liable for all potential damages, but only those actually [*75] suffered by the plaintiff. Those damages can only be measured after the plaintiff has exhausted all remedies available to redress the alleged fraud.

Plaintiffs ... cannot allege their pecuniary loss with the requisite certainty because the [WDCB] has not determined whether Plaintiffs are entitled to benefits under the WDCA, let alone the amount of benefits to which they are entitled. ... Plaintiffs cannot plead the amount of "out of pocket loss" or even that they have suffered any out of pocket loss. ... Until Plaintiffs have exhausted the administrative and legal process, ... they cannot plead either injury or damages with the certainty necessary to establish standing under RICO.

(Def. Sedgwick's Mot. to Dismiss at 15-16 [Docket Text # 39].) This Court agrees: to the extent Plaintiffs' RICO claims are predicated on an entitlement to workers' compensation benefits—a determination that has not yet been made, as at least one of the Plaintiffs has a claim for workers' compensation benefits currently pending before the WDCB—their claims are not ripe for adjudication because it is uncertain whether they will sustain any injury cognizable under RICO.

RICO provides a private civil cause of action:

Any [*76] person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

*18 U.S.C. § 1964(c)*. From this language, courts have extracted the elements that a plaintiff must allege to satisfy *§ 1964(c)*: (1) a violation of *section 1962*; (2) an injury to business or property; and (3) causation of the injury by the violation. *See, e.g., O'Malley v. O'Neill, 887 F.2d 1557, 1561 (11th Cir. 1989); Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990).*

Thus, a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).* Here, Plaintiffs are unable to establish an "injury to business or property," as their entitlement to workers' compensation benefits has not yet been determined, and their RICO claims are therefore premature.

Plaintiffs contend that their RICO claims were ripe for suit the moment Defendants denied [*77] them of, or cut off them off from, workers' compensation benefits, regardless of whether their entitlement to those benefits had been adjudicated in the first instance. Plaintiffs acknowledge that a determination has not yet been made as to their entitlement to the underlying benefits, however, they assert an injury based on the allegedly fraudulent denial of those benefits. The Court finds Plaintiffs' attempt to assert a RICO claim prior to a determination of eligibility for workers' compensation benefits to be insufficient to support an allegation of injury under RICO. Until such time as a determination is made as to Plaintiffs' eligibility for workers' compensation benefits, they are unable to sufficiently establish an injury. [33]

[33] Moreover, their injury is not "concrete and particularized" nor is it "actual or imminent"--it is simply conjectural and hypothetical. "In *Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992),* the Supreme Court set forth the elements inescapably necessary to confer standing under Article III of the Constitution's 'case or controversy' requirement:

[T]he irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have [*78] suffered an 'injury in fact'-an invasion of a legally-protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical.... Second, there must be a causal connection between the injury and the conduct complained of. ... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id. at 560-61." Adult Video Ass'n v. U.S. Dept. of Justice, 71 F.3d 563, 565-66 (6th Cir. 1995).*

2010 U.S. Dist. LEXIS 22792, *

The proposition that a plaintiff's claims are not ripe until an injury is establish is exemplified in *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994). See id.* ("[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite."). In *Gelt*, the plaintiff-bank brought a RICO claim alleging that the defendant-borrowers misrepresented the value of property that secured certain loans. Specifically, the plaintiff alleged damages in the form of "excess loan loss" measured by the difference between what it actually lost on the loans in default and the amount it would have lost, had it originally loaned the defendants money based on the [*79] true value of the collateralized property. The district court dismissed the plaintiff's claims and the Second Circuit affirmed holding that, because not all of the loans at issue had been foreclosed, the plaintiffs could not sufficiently allege their injury under RICO. *See id. at 767-68.* In reaching this holding, the *Gelt* court dismissed the plaintiff's argument that its RICO claims were ripe as soon as it closed the loan based on the false valuations submitted by the defendants. *See id. at 768* ("Thus, a plaintiff who claims that a debt is uncollectible because of the defendant's [fraudulent] conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated."). The court also refused to accept the plaintiff's contention that any amounts it collected upon foreclosure could be deducted from their damages as mitigation and, therefore, their damages could be calculated at trial. *See id.* ("Because the fraud defendant is not liable for all losses that may occur, but only for those actually suffered, only after the lender has exhausted the bargained-for remedies available to it can the lender assert that it was damaged by the fraud, and then [*80] only to the extent of the deficiency."). The *Gelt* court concluded that the plaintiff had "not allege[d] actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud ... [and it] reject[ed] [the plaintiff's] novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined." *Id.*

In this case, like *Gelt*, the injury Plaintiffs may suffer in the denial of workers' compensation benefits--that have not been established--cannot yet be determined. Only when Plaintiffs' are able to establish an injury (i.e., after their eligibility for benefits has been determined) will their claims be ripe for suit. [34] Thus, Plaintiffs' RICO claims are dismissed.

34   The Court is not persuaded by Plaintiffs' contention that they have sufficiently alleged an injury in the form of attorney fees and expenses incurred in pursuit of their alleged entitlement to

workers' compensation benefits. It is unclear how such damages would be recoverable if the Plaintiffs cannot first establish an entitlement to those underlying benefits. Unless and until it is determined [*81] that Plaintiffs are entitled to workers' compensation benefits, Plaintiffs cannot sufficiently allege an injury.

**c. Failure to State a Claim under *Fed. R. Civ. P. 12(b)(6)***

Defendants, in their motions to dismiss, make numerous arguments that Plaintiffs have failed to state a claim under RICO.

**(1) *18 U.S.C. § 1962(c)* [35]**

35   Notwithstanding Plaintiffs' attempt to dismiss their *18 U.S.C. §§ 1962(a) and (b)* claims in their Amended Motion, (Pls.' Am. Mot. [Docket Text # 44.]), the Amended Complaint nevertheless fails to state a claim.

To state a claim for violation of *18 U.S.C. § 1962(a)*, a plaintiff must allege "injuries stemming directly from the defendant's alleged use or investment of their illegally obtained income." *Craighead v. E. F. Hutton Co., Inc., 899 F.2d 485, 494 (6th Cir. 1990)*. The alleged injuries necessary to support a claim under *§ 1962(a)* must be "separate" from the "injuries traceable to the alleged predicate acts." *Id.* Here, Plaintiffs allege that their injuries were caused by the alleged predicate acts of fraud (i.e., from the alleged bad faith denial of the Plaintiffs' claims for workers' compensation benefits), and Plaintiffs do not identify any non-conclusory facts to [*82] establish an injury that flowed from any alleged use or investment of the fraud proceeds. Thus, Plaintiffs' claim under *§ 1962(a)* fails as a matter of law. Although Plaintiffs allege that "monies received from the pattern of racketeering activity alleged herein ... were used or invested in the operation of the RICO enterprise ... which proximately injured plaintiffs as alleged herein," (Am. Compl. at P 24), such a conclusory allegation is insufficient to survive a motion to dismiss brought under *Fed. R. Civ. P. 12(b)(6). See Ass'n of Cleveland Fire Fighters, 502 F.3d at 548* (quoting *Twombly, 550 U.S. at 555*); *Iqbal, 129 S. Ct. at 1949.*

To state a claim for violation of *18 U.S.C. § 1962(b)*, a plaintiff must allege that the defendant "acquire[d] or maintain[ed] an interest in, or control of, an enterprise *through* (or by way of) the pattern of racketeering activity." *Advocacy Org. for Patients v. Auto Club Ins. Co., 176 F.3d 315,*

*328 (6th Cir. 1999)* (emphasis in original). It is not enough to allege that the defendants "associated together *in order to* engage in the pattern of racketeering activity." *Id.* (emphasis in original.) Moreover, a plaintiff must specifically allege how the defendants [*83] "acquired or maintained an interest in or control of the enterprise ... through the alleged racketeering activity." *Id. at 329.* Plaintiffs' Complaint provides only conclusory allegations, (*see, e.g.*, Am. Compl. P 24), to support its *§ 1962(b)* claims and these are insufficient to survive a motion to dismiss brought under *Fed. R. Civ. P. 12(b)(6)*. *See Ass'n of Cleveland Fire Fighters, 502 F.3d at 548* (quoting *Twombly, 550 U.S. at 555*); *Iqbal, 129 S. Ct. at 1949.*

The RICO Act provides a civil remedy to "[a]ny person injured in his business or property by reason of a violation of [*18 U.S.C. § 1962*]." *18 U.S.C. § 1964(c)*. Under RICO, it is

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962(c)*. Thus, to state a claim under *section 1962(c)*, Plaintiffs "must plead the following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon, 465 F.3d at 723* (internal quotations [*84] and citations omitted).

**(a) Enterprise**

**i) Existence of an Enterprise**

The Supreme Court recently addressed RICO's "enterprise" requirement in *Boyle v. United States, U.S. ,129 S.Ct. 2237, 173 L. Ed. 2d 1265 (2009)*. The Court held that an enterprise must have a "structure," but "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages" was not necessary. *Id. at 2241.*

> This [statutory] enumeration of included enterprises is obviously broad, encompassing any group of individuals associated in fact. The term "any" ensures that the definition has a wide reach, and the very concept of an association in fact is expansive. In addition, the RICO statute

provides that its terms are to be liberally construed to effectuate its remedial purposes. ...

> [A]n enterprise includes any union or group of individuals associated in fact and ... RICO reaches a group of persons associated together for a common purpose of engaging in a course of conduct. Such an enterprise ... is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

*Id. at 2243* (internal quotations and citations omitted). "From the [*85] terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id. at 2244.* Further, "the existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other." *Id. at 2245* (internal quotation and citation omitted).

Here, Plaintiffs allege the existence of six separate enterprises, where "[t]wo or more ? may have acted together to defraud one or more plaintiffs of their workers compensation benefits." (Am. Compl. P 11.)

> The predicate acts and violations of RICO alleged herein were committed by one or more of the following enterprises. ... Drouillard participated in the conduct and management of the RICO enterprise of ... Drouillard, and or participated in the conduct of one of the following enterprises, and or conspired with an enterprise in violation of *18 USC 1962(d)*.

> (1) The workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation [*86] claims and associating in fact, formed an "enterprise" for purposes of ... RICO claims in this case. These persons included, *inter alia*, La Tara Lewis. Because they worked together regularly in adjusting and handling workers compensation claims for Coke Michigan workers, they formed an organization. The personnel at Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan de-

fense attorneys who worked with Sedg-wick on those claims, also handled Michigan workers compensation claims for other employers, such as DHL Holdings. The names of other persons in the enterprise are not known to plaintiffs. Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2) the workers compensation claims personnel at Sedgwick who handled Michigan claims;

(3) the workers compensation claims personnel at Sedgwick who handled Michigan claims, plus Dr. Drouillard, associating in fact;

(4) the workers compensation claim personnel at Coke and Sedgwick handling Michigan claims, plus Dr. Paul Drouillard, associating in fact;

(5) the medical business and practice of Dr. Paul Drouillard, which [*87] treats patients and which also generates what Dr. Drouillard fraudulently call "independent medical examinations;' for years Dr. Drouillard, by means of this enterprise, has supplied hundreds or thousands of fraudulent IME reports to Coca Cola, Sedgwick, UPS, Liberty Mutual, Ajax Paving, and to other Michigan employers and workers compensation insurers.

(6) the workers compensation defense attorneys may be and may have been part of the enterprise.

(Proposed Sec. Am. Compl. (Sec. Rev.) P 9; Pls.' Am. Mot. [Docket Text # 44].) Plaintiffs also allege that these enterprises "existed not only for the purpose of defrauding plaintiffs of their workers compensation benefits; the enterprise engaged in other activities, such as the administration of workers compensation claims and the examination of individuals claiming workers compensation and other benefits." (Am. Compl. P 10.)

Although the Complaint provides a recessitation of the elements of an enterprise, it is questionable whether Plaintiffs have plead the existence of an enterprise sufficient to survive Defendants' motions to dismiss. The six different enterprises alleged is illustrative of Plaintiffs' inability to plead non-conclusory allegations, [*88]

allegations that are "enough to raise a right to relief above the speculative level." *Ass'n of Cleveland Fire Fighters, 502 F.3d at 548* (quoting *Twombly, 550 U.S. at 555*). The notion--that "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"--is further supported by Plaintiffs' allegation that: "[t]wo or more enterprises *may* have acted together to defraud one or more plaintiffs of their workers compensation benefits." (Am. Compl. P 11 (emphasis added).) Although Plaintiffs allege a number of different possible enterprises, they have not arguably alleged one plausible enterprise. *See Iqbal, 129 S. Ct. at 1950* ("Only a complaint that states a plausible claim for relief survives a motion to dismiss."). Assuming *arguendo* Plaintiffs have sufficiently alleged the existence of an enterprise, they have not established conduct connected to the operation, management or control over the enterprise for each participant.

### ii) Operations, Management or Control

In *Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*, the Supreme Court adopted the "operation or management test." The Court held that, to have "conducted or participated, directly or indirectly, [*89] in the conduct of [an] enterprise's affairs" for the purposes of *§ 1962(c)*, a person must have had an operational or management role in the enterprise. *Id. at 178*. Plaintiffs contend that each Defendant "conducted or participated, directly or indirect, in the conduct of [an] enterprise's affairs." The Court finds that, regarding Coca Cola and Drouillard, Plaintiffs have failed to allege non-conclusory facts to establish conduct connected to the operations or management of the enterprise or control over the enterprise.

### a) Coca Cola's Participation

Coca Cola contends that Plaintiffs have failed to sufficiently plead its participation in the operational or management affairs of the enterprise, or control over it. This Court agrees.

Plaintiffs allege that the enterprise "existed ... for the purpose of defrauding plaintiffs of their workers compensation benefits," (Am. Compl. P 10), however, Plaintiffs concede that Coca Cola did not handle the administration of their claims--Sedgwick did. Moreover, Plaintiffs have not alleged non-conclusory facts to demonstrate that Coca Cola participated in the denial of those claims. Plaintiffs' allegations--that "[d]ecisions regarding paying or denying Michigan [*90] workers compensation claims, and selecting doctors to do medical examinations of claimants, were made by Sedgwick and or Coke, or by Sedgwick after consulting with Coke and with workers compensation defense attorneys, or were ratified by Coke after being made by Sedgwick in consultation with its workers compensation defense attor-

neys"--are conclusory at best. (Am. Compl. P 8.) Such speculative allegations are insufficient to survive a motion to dismiss brought under *Fed. R. Civ. P. 12(b)(6)*. *See Ass'n of Cleveland Fire Fighters, 502 F.3d at 548* (quoting *Twombly, 550 U.S. at 555*); *Iqbal, 129 S. Ct. at 1949*.

**b) Drouillard's Participation** [36]

36   Plaintiffs' proposed addition of Drouillard's medical practice and business as a defendant does not alter the Court's analysis here.

Drouillard contends, and this Court agrees, that Plaintiffs have failed to sufficiently allege its participation in the operation and management of the enterprise. In *Reves*, the Supreme Court noted that the term "participate" in *§ 1962(c)* had a narrower meaning than merely to "aid and abet." *Reves, 507 U.S. at 178*. To participate, a defendant must have "conducted or participated in the conduct of the '*enterprise's affairs*,' [*91] not just their *own* affairs." *Id. at 185* (emphasis in original).

Plaintiffs have not alleged that Drouillard had any involvement in the actual decision to deny or cut off workers' compensation benefits--there are only allegations that Coca Cola and Sedgwick made such decisions. (*See* Am. Compl. PP 8, 16.) It is alleged that Drouillard was hired by the corporate Defendants to perform "fraudulent" IMEs and provide corresponding reports and testimony--he had no part in the alleged decisions to deny or cut off benefits nor was he even informed what decision would be made. (*See* Am. Compl. PP 12-13.) Such conduct is demonstrative, not of an enterprise's affairs, but of his own affairs. Plaintiffs' allegations that Drouillard was involved in the communications regarding the decision to write fraudulent IME reports that would favor Coca Cola [37] are simply insufficient to establish that Drouillard had any operational or management role in the enterprise or control over it.

37   *See, e.g.*, Am. Compl. P 18 ("Drouillard and Sedgwick misrepresented to the claimants in this case, and to workers compensation claimants ...that ... Drouillard was conducting an "independent" medical examination of the claimants. [*92] ... Drouillard and Sedgwick knew this representation to be false because they intended ... Drouillard to write reports favoring Coke, Sedgwick and other employers and insurers; they knew he was not "independent" but biased towards the employer and insurer in that he almost always found that a claimant did not have a work-related disability and that he was paid hundreds of thousands of dollars a year by workers compensation insurers, defendants and claims administrators."). *See also* Am. Compl. PP 19,

25, 31A; (Proposed Sec. Am. Compl. (Sec. Rev.) PP 9, 30A; Pls.' Am. Mot. [Docket Text # 44].)

The allegations show little more than that the corporate Defendants sought out and relied on Drouillard to perform individual IMEs and that Drouillard often returned reports favorable to the corporate Defendants. The Court finds that Plaintiffs' allegations regarding Drouillard's participation in the alleged enterprise are conclusory and speculative, and insufficient to survive a motion to dismiss brought under *Fed. R. Civ. P. 12(b)(6)*. *See Ass'n of Cleveland Fire Fighters, 502 F.3d at 548* (quoting *Twombly, 550 U.S. at 555*); *Iqbal, 129 S. Ct. at 1949*.

**(b) Through a Pattern of Racketeering Activity**

"Racketeering [*93] activity" is defined as acts that constitute a violation of enumerated criminal laws. The enumerated acts include "any act which is indictable under any of the following provisions of title 18, United States Code: ... *section 1341 [18 U.S.C. § 1341]* (relating to mail fraud), *section 1343 [18 U.S.C. § 1343]* (relating to wire fraud)." *18 U.S.C. § 1961(1)*.

**i) Predicate Acts**

RICO also provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *18 U.S.C. § 1961(5)*.

**a) Alleged Predicate Acts of Mail and Wire Fraud** [38]

38   As discussed above, the Court determined that the conduct Defendants allegedly committed is not actionable under RICO because: (1) Plaintiffs cannot use the RICO statute as an "end run" around the exclusive and comprehensive procedures and remedies established by the WDCA; (2) Defendants' alleged violation of the duties created by the WDCA--even if fraudulent--does not amount to mail or wire fraud sufficient to give rise to RICO liability; [*94] and (3) Plaintiffs' claims are not ripe. Notwithstanding those determinations, and for the sole purpose of evaluating Plaintiffs' *§ 1962(c)* RICO claim, the Court assumes, without so holding, that Plaintiffs have plead predicate acts of wire or mail fraud.

Plaintiffs attempt to establish a pattern of racketeering activity by alleging predicate acts of mail and wire fraud. The alleged acts of mail and wire fraud, identifiable from the pleadings, are as follows:

**1) Coca Cola** [39]

39   Plaintiffs also allege that Coca Cola "aided and abetted the predicate acts committed by the other defendants, because (1) Sedgwick acted as agent for Coke, and the actions of its agent are attributable to Coke, and (2) on information and belief, employees of Coke knew of the predicate acts planned by the defendants on behalf of Coke and permitted them to take place by silent or express approval, and by failing to stop the pattern of racketeering though it had knowledge of same. Coca Cola and Sedgwick, through the actions of their employees involved in the handling of Michigan workers compensation claims, and Dr. Drouillard, agreed to participate in the commission of the predicate acts which are alleged in this [*95] complaint. These employees of Coca Cola and Sedgwick knew Dr. Drouillard and other 'independent medical examiners' wrote reports which were used to deny or cut off workers compensation benefits, and knew Dr. Drouillard and other 'independent medical examiners' were doctors who could be relied on to write a fraudulent report - finding a workers compensation claimant had no work-related disability regardless of the truth - yet these employees agreed to the use of Dr. Drouillard and others as 'independent medical examiners,' and to the use of their report to cut off or deny benefits, or to settle a claim for less than its true value due to the fraudulent reports of Dr. Drouillard and other fraudulent independent medical examiners, knowing that the mails and wires would be used in furtherance of this fraudulent scheme. The identities of the Coke employees and the dates of their actions and the dates they learned of the planned predicate acts are not known to plaintiff. Dr. Drouillard aided and abetted the predicate acts committed by LaTara Lewis and other employees of Sedgwick by (1) communicating with them personally or through agents to set up the so-called 'independent medical examinations,' [*96] and (these communications, if by mail or wire, are also acts of mail and wire fraud by Dr. Drouillard), and (2) by doing those exams to aid Sedgwick's goal of cutting off or denying benefits. The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery." (Proposed Sec. Am. Compl. (Sec. Rev.) P 32; (Pls.' Am. Mot. [Docket Text # 44 ].)

1. "On or about May 1, 2009, it mailed, by and through the agency of its attorney T. F. Felker, Jr, to the Workers Compensation Agency in Lansing MI, a Carrier's Response and Defendant's Answer." (Proposed Sec. Am. Compl. (Sec. Rev.) P 31A; Pls.' Am. Mot. [Docket Text # 44].)

2. "On or about May 1, 2009, it mailed to Marshall Lasser, workers compensation attorney for Mr. Jackson, a Carrier's Response and Defendant's Answer." (Proposed Sec. Am. Compl. (Sec. Rev.) P 31A; Pls.' Am. Mot. [Docket Text # 44].)

3. "On or about July 22, 2008, Coke and Sedgwick mailed to the Agency and to plaintiff or his counsel a Carrier's Response, which denied that plaintiff was disabled; that denial was false, in that defendants possessed information that plaintiff [*97] was disabled, and no information that plaintiff was not disabled. The Response also denied that the disability was work related, and that denial was false, in that defendants had sufficient proof from plaintiff's medical records of a work related disability, and no proof the disability was not work related." (Am. Compl. P 31B.)

**2) Sedgwick**

4. "[O]n Jan. 6, 2009, LaTara Lewis of Sedgwick mailed plaintiff a letter stating, 'I have scheduled an Independent Medical Evaluation for you with Dr. Drouillard on Jan. 14, 2009.' The letter was fraudulent in that Dr. Drouillard was not an "independent" doctor but was hired and paid by Segwick, not by a person or entity with no financial stake in the outcome of plaintiff's claim." (Am. Compl. P 31A.)

5. "Sedgwick mailed to the Agency and to plaintiff on March 18, 2008 a Notice of Dispute stating 'medical treatment not related to injury....IW [injured worker] has been diagnosed with acromioclavicular arthritis.' Sedgwick did not have information from which it could honestly and fairly conclude that plaintiff's disability in March 2008 was due to acromioclavicular arthritis, and was not work-related." (Proposed Sec. Am. Compl. (Sec. Rev.) P 31B; Pls.' [*98] Am. Mot. [Docket Text # 44].)

6. "On or about July 22, 2008, Coke and Sedgwick mailed to the Agency and to plaintiff or his counsel a Carrier's Response, which denied that plaintiff was disabled; that denial was false, in that defendants possessed information that plaintiff was disabled, and no information that plaintiff was not disabled. The Response also denied that the disability was work related, and that denial was false, in that defendants had sufficient proof from plaintiff's medical records of a work related disability, and no proof the disability was not work related." (Proposed Sec. Am. Compl. (Sec. Rev.) P 31B; Pls.' Am. Mot. [Docket Text # 44].)

7. "Upon receipt of the Discharge Report, LaTara Lewis of Sedgwick conspired with Dr. Drouillard and perhaps with others to cut off Mr. Lulek's worker's compensation, and acted in furtherance of that conspiracy. ...

[O]n or about April 17, 2007, when they communicated by mail or wire to set up an 'independent medical exam' by Dr. Drouillard; Dr. Drouillard, or the person at MES Soluations [sic] who acted as agent for him who handled the communication." (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. [Docket Text # 31].)

8. "April [*99] 17, 2007, when LaTara Lewis mailed to Lulek a notice to appear for Drouillard's examination." (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. [Docket Text # 31].)

9. "May 7, 2007, when LaTara Lewis of Sedgwick mailed to Lulek ... and to the Workers Compensation Agency in Lansing, MI, a Notice of Dispute, which stated, 'per IME of 4-23-2007 Dr. Drouillard has stated that Mr. Lulek has reached MMI for his 3-12-2007 [sic] as it was a minor strain. Any further treatment should be directed to his private doctor. Benefits terminated as of 5-3-07.'" (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. [Docket Text # 31].)

**3) Drouillard**

10. "On or about Jan. 6, 2009, Dr. Drouillard violated *18 USC 1343* (wire fraud) when in a phone conversation and or a facsimile communication from his office in Garden City Michigan with LaTara Lewis of Segwick CMS at her office in Chicago, IL, he conspired to conduct a fraudulent examination of Clifton Jackson, in which he would conclude, regardless of the facts, that Mr. Jackson had no work related disability." (Proposed Sec. Am. Compl. P 31A; Pls.' Renewed Mot. [Docket Text # 31].)

11. "Dr. Drouillard mailed a report of his examination dated Jan. 14, 2009 to [*100] Sedgwick, and Sedgwick mailed or emailed a copy to plaintiff. The report contained lies." (Am. Compl. P 31A.)

12. "Upon receipt of the Discharge Report, LaTara Lewis of Sedgwick conspired with Dr. Drouillard and perhaps with others to cut off Mr. Lulek's worker's compensation, and acted in furtherance of that conspiracy. ... [O]n or about April 17, 2007, when they communicated by mail or wire to set up an 'independent medical exam' by Dr. Drouillard; Dr. Drouillard, or the person at MES Soluations [sic] who acted as agent for him who handled the communication." (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. [Docket Text # 31].)

13. "[O]n or about April 17, 2007, when Dr. Drouillard mailed or directed to be mailed from MES Solutions ... a notice for appear for examination. The notice was part of the scheme to defraud plaintiff, and also fraudulently stated, 'I am an independent doctor.' This statement was fraud." (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. [Docket Text # 31].)

14. "April 23, 2007, when Dr. Drouillard mailed to Sedgwick CMS in Chicago a report fraudulently stating, inter alia, (1) 'at this time he [Lulek] can return to work in his former capacity without restrictions,' [*101] and (2) 'no other treatment is necessary in regards to any work injury.' In fact. Mr. Lulek did not return to work without restriction and did need treatment for a work injury." (Proposed Sec. Am. Compl. P 31C; Pls.' Renewed Mot. [Docket Text # 31].)

**b) Pleading Mail and Wire Fraud with Particularity** For a civil action under RICO to lie, Plaintiffs must also prove each element of the predicate act or "racketeering activity." *Central Distributors of Beer, Inc. v. Conn, 5 F.3d 181, 183-84 (6th Cir. 1993)*. "To allege a violation of the mail fraud statute, it is necessary to show that: 1) the defendants formed a scheme or artifice to defraud; 2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and 3) the defendants did so with the specific intent to deceive or to defraud." *Id. at 184* (citing *Schreiber Distributing v. Serv-Well Furniture, 806 F.2d 1393, 1399 (9th Cir. 1988)*). Moreover, where a plaintiff relies upon mail or wire fraud to constitute a predicate act, *Federal Rule of Civil Procedure 9(b)* requires the party to allege--at a minimum--the time, place, and contents of the fraudulent communications. *Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir. 1984)*.

Defendants, [*102] in their motions to dismiss, contend that the Complaint fails to plead the predicate acts of wire or mail fraud underlying the RICO claims with the particularity that *Federal Rule of Civil Procedure 9(b)* requires. [40] Specifically, Defendants contend that the Complaint fails to plead the time, place, and contents of the communications underlying the alleged predicate acts of mail and wire fraud.

40    *Federal Rule of Civil Procedure 9(b)* states:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

To meet the particularity requirements of *Rule 9(b)*, Plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp., 547 F.3d 564, 569-70 (6th Cir. 2008)*

(quoting *Gupta v. Terra Nitrogen Corp., 10 F.Supp.2d 879, 883 (N.D. Ohio 1998)*. At a minimum, Plaintiff "must allege the time, place and contents of the misrepresentations upon which they relied." *Id.*

The Complaint [*103] pleads the time, place, and contents of the communications that underlie at least nine alleged predicate acts of mail fraud, per paragraphs numbered 1-5, 8-9, 13-14 above. For each, the Complaint alleges the time of each mailing, the sender and recipient of each mailing, and the contents of each mailing underlying the alleged predicate acts of mail or wire fraud. (*See* Proposed Sec. Am. Compl. PP 4, 7-8, 31, 31A-C.) Thus, Plaintiffs have pleaded with sufficient particularity at least nine

> predicate acts, which are comprised of allegedly fraudulent communications by mail and wire, including communications among the defendants and communications from the defendants to the plaintiffs relating to each of the plaintiffs' injuries and claims for benefits under the WCDA. Therefore, plaintiffs have met the predicate acts requirement. *See 18 U.S.C. § 1961(5); H.J. Inc., 492 U.S. at 237.*

*Brown, 546 F.3d at 354-55.*

**ii) Pattern**

Predicate acts standing alone, however, do not necessarily constitute a pattern.

> [T]he Supreme Court held that while two predicate acts are necessary, they may not be sufficient. Beyond setting forth the minimum number of predicate acts required to establish a pattern, *§ 1961(5)* [*104] assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved. Congress intended to take a flexible approach to satisfying whatever is required beyond the minimum number of predicate acts, and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set. Within the numerous sorts of relationships that can constitute a pattern, two elements must be shown: that the racketeering predicates are *related, and* that they amount to or pose a threat of *continued* criminal activity.

*Brown, 546 F.3d at 353* (internal quotations and citations omitted) (emphasis in original).

**a) Relatedness**

Predicate acts are considered related "when they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Brown, 546 F.3d at 354* (internal quotations and citations omitted). The relatedness of the predicate acts alleged by Plaintiffs is a close call.

The predicate acts have the same purpose: to reduce or eliminate Coca Cola's payment obligations [*105] for workers' compensation benefits by fraudulently denying workers' compensation benefits to which the employees are allegedly entitled. They also have the same result: to deny or cut-off workers' compensation benefits to certain Coca Cola employees. And, they have the same victims: alleged in the complaint are certain Coca Cola employees who are eligible for workers' compensation benefits. *See Brown, 546 F.3d at 355.*

On the other hand, as discussed below, the predicate acts do not involve the same participants for each individual Plaintiff: the predicate acts, as to each Plaintiff, were committed by a different set of participants. Further, the methods of commission vary from Plaintiff to Plaintiff: some were denied benefits following an IME while others were denied benefits on the basis that the injury was not work-related. Each Plaintiff, however, alleges that Defendants fraudulently misapplied the legal standards set forth in the WDCA in denying or cutting off workers' compensation benefits to Coca Cola's employees.

Even if Plaintiffs could establish relatedness, Plaintiffs are unable to demonstrate a pattern as the Complaint fails to establish continuity.

**b) Continuity**

In addition [*106] to relatedness, Plaintiffs must also allege that the predicate acts amount to or pose a threat of continued criminal activity.

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. Continuity may be demonstrated in a number of ways. Closed-ended continuity can be shown by proving a series of related predicates extending over a substantial period of time. Determining whether

open-ended continuity has been established requires a court to probe the specific facts of each case. A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Even when the number of related predicates involved may be small and they may occur close together in time, if the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, this supplies the requisite threat of continuity. A threat of continuity may also be established by showing that the predicate acts or offenses are part of an ongoing entity's regular [*107] way of doing business. Therefore, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. In addition, the continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Brown*, 546 F.3d at 354 (internal quotations and citations omitted). The Court finds that Plaintiffs have failed to allege sufficient facts to establish continuity under either an open or closed-ended theory.

### 1) Closed

"Plaintiffs may prove closed continuity by showing a series of past related predicates occurring more over an extended period of time, generally more than a few months." *Brown*, 546 F.3d at 355 (internal quotations and citation omitted). "Although there are no rigid rules regarding what amounts to 'a substantial period of time,' racketeering activity lasting only 'a few weeks or months and threatening no future criminal conduct' is insufficient." [*108] *Moon*, 465 F.3d at 725 (quoting *H.J. Inc., 492 U.S. at 242*); *see also Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994), cert. denied, 513 U.S. 1017, 115 S. Ct. 579, 130 L. Ed. 2d 495 (1994) (holding that predicate acts alleged over 17 months did not satisfy the closed period analysis); *Gotham Print, Inc. v. American Speedy Printing Centers, Inc.*, 863 F.Supp. 447 (E.D. Mich. 1994) (holding that "isolated acts of alleged wire/mail fraud which occurred,

at the longest, over an 18-month period" did not satisfy pattern element of RICO).

> In any event, even if the racketeering activity lasted for two-and-a-half years, as Moon insists, facts establishing a closed period of continuity are still lacking. Moon has pleaded that the Defendants embarked upon a coordinated scheme to wrongfully terminate his workers' compensation benefits. All of the predicate acts--the mailing of the Notice and Second Notice cutting off his benefits and the mailing of Dr. Ray's fraudulent medical report--were keyed to Defendants' single objective of depriving Moon of his benefits. No other schemes, purposes, or injuries are alleged, and there are no facts suggesting that the scheme would continue beyond the Defendants accomplishing their [*109] goal of terminating Moon's benefits. In circumstances such as these, the purported racketeering activity does not bear the markings of the "long-term criminal conduct" about which "Congress was concerned" when it enacted RICO. *H.J., Inc., 492 U.S. at 242*.

*Moon*, 465 F.3d at 725-26.

Here, Plaintiffs have alleged predicate acts spread over a nineteen-month period--between May 2007 and January 2009, the dates that Plaintiffs claim their workers' compensation benefits were either denied or cut-off. The predicate acts, however, do not establish closed-ended continuity. Like *Moon*, "[n]o other schemes, purposes, or injuries are alleged, and there are no facts suggesting that the scheme would continue beyond the Defendants accomplishing their goal of terminating [Plaintiffs'] benefits." *Moon*, 465 F.3d at 726. In other words, once the individual cases of each Plaintiff is resolved, there is no evidence that Defendants will continue the alleged scheme. The purported racketeering activity, here, "does not bear the markings of the long-term criminal conduct about which Congress was concerned when it enacted RICO." *Moon*, 465 F.3d at 726 (internal quotations and citation omitted).

The Court's conclusion [*110] that Plaintiffs have failed to demonstrated a closed period of continuity is further supported by the fact that each Plaintiff has allegedly been injured by separate and distinct enterprises. For example, Jackson claims that he was denied benefits as part of a scheme to defraud involving Coca Cola, Sedgwick and Drouillard; Scharnitzke's claims involve

only Coca Cola and Sedgwick; and Lulek's pertain only to Sedgwick and Drouillard. The predicate acts alleged by each individual Plaintiff involve different participants employing dissimilar methods to accomplish the alleged fraudulent activities. These disparate allegations do not establish a pattern of racketeering activity. In this regard, Plaintiffs' allegations are also distinguishable from those in *Brown*, where the plaintiffs alleged that the same participants involved in a single conspiracy used the same *modus operandi* to fraudulently deny the plaintiffs of workers' compensation benefits to which they were entitled. *Brown, 546 F.3d at 355*.

**2) Open**

Plaintiffs' allegations do not give rise to a finding of open-ended continuity either. An open period of continuity "turns on whether the plaintiff has pleaded facts suggesting the threat [*111] of continued racketeering activities projecting into the future." *Moon, 465 F.3d at 726*. Open-ended continuity may be plead through facts showing that "the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc., 492 U.S. at 243*.

Plaintiffs have not alleged sufficient facts (i.e., non-conclusory allegations) to demonstrate that the legitimate business of Defendants--addressing its employees workers' compensation claims for Coca Cola, workers' compensation claim administration on behalf of Coca Cola for Sedgwick, and offering IME and medical opinions and reports on workers' compensation claims for Drouillard--is regularly conducted by fraudulently denying benefits to which employees are entitled. Although Plaintiffs' claim, "based on information and belief ... [that is] likely to have evidentiary support after a reasonable opportunity for investigation and discovery, ... [that the] allegations describe a pattern of racketeering spread over several years, continuing in the present and likely to continue into the future"; such conclusory allegations are insufficient to survive a motion to dismiss. *See Ass'n of Cleveland Fire Fighters, 502 F.3d at 548* [*112] (quoting *Twombly, 550 U.S. at 555*); *Iqbal, 129 S. Ct. at 1949*.

The Sixth Circuit, in *Moon*, held that similar allegations plead by one plaintiff were insufficient to support an inference that the defendants' regular way of doing business was to fraudulently deny workers' compensation claims.

> Moon has not pleaded any allegations to the effect that the fraudulent termination of workers' compensation benefits is Defendants' regular way of doing business. True, Moon pleads that "Dr. Ray was known to defendants, through their attorney Thaddeus Felker, as a doctor who could be relied upon to write 'cut off' reports in workers compensation cases; defendants and/or their attorney had relied upon him in the past to issue 'cut off' reports." Moon also pleads that "[o]n information and belief, one or more members of the enterprise engaged in similar acts to defraud other persons of their workers' compensation benefits." These allegations do not reasonably support the notion that the alleged fraud of which Moon complains is Defendants' regular way of doing business. ... Moon's allegations regarding open-ended continuity amount to the following: (1) Moon-the only plaintiff in this case-was denied workers' [*113] compensation benefits as a result of Defendants' scheme to use Dr. Ray to fraudulently deny benefits; (2) Defendants had used Dr. Ray for this purpose in the past; and (3) at some point, Defendants treated some other people similarly to Moon. Moon does not allege the sort of longstanding relationship that would give rise to a threat of continued racketeering activity. Drawing all reasonable inferences in Moon's favor may lead us to conclude that several instances of similar conduct have occurred, but they do not support a systematic threat of ongoing fraud. In short, the leap from Moon's allegations to the conclusion that Defendants customarily bilked employees out of workers' compensation benefits is too great, even drawing all reasonable inferences in favor of Moon.

*Moon, 465 F.3d at 727-28*. Here, although there are three Plaintiffs who have allegedly been defrauded of benefits, there is insufficient evidence to demonstrate that such fraudulent activity is Defendants regular way of doing business. As discussed above, each denial of benefits was based on independent reasons, involving different participants, using dissimilar methods. Plaintiffs simply have not provided any non-conclusory [*114] allegations that such fraudulent conduct was the normal business practice of Defendants or a threat that such conduct would continue.

**(2) 18 U.S.C. § 1962(d)**

RICO also provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of *subsection (a), (b)*, or *(c)* of this section." *18 U.S.C. §*

1962(d). To demonstrate a conspiracy to violate *18 U.S.C. § 1962(c)*, Plaintiffs allege:

> By means of the actions described in the complaint, each of the defendants conspired to violate *18 U.S.C. 1962* (a through c), and conspired with one or more of the other defendants, and or the employees of Coca Cola and Sedgwick, and or with other persons, to violate *18 U.S.C. 1962* (a through c). Coca Cola and Sedgwick, through the actions of their employees involved in the handling of Michigan workers compensation claims, and ... Drouillard, agreed to participate in the commission of the predicate acts which are alleged in this complaint. These employees of Coca Cola and Sedgwick knew ... Drouillard and other independent medical examiners" wrote reports which were used to deny or cut off workers compensation benefits, and knew ... Drouillard and other "independent medical examiners" [*115] were doctors who could be relied on to write a fraudulent report--finding a workers compensation claimant had no work-related disability regardless of the truth--yet these employees agreed to the use of ... Drouillard and others as "independent medical examiners," and to the use of their report to cut off or deny benefits, or to settle a claim for less than its true value due to the fraudulent reports of ... Drouillard and other fraudulent independent medical examiners, knowing that the mails and wires would be used in furtherance of this fraudulent scheme.

(Proposed Sec. Am. Compl. (Sec. Rev.) P 30A; Pls.' Am. Mot. [Docket Text # 44].)

As this Court has already determined, Plaintiffs have not adequately plead the substantive elements of their RICO claims--for example Plaintiffs have not established, for each participant, conduct connected to the operations or management of the enterprise, or control over the enterprise; and Plaintiffs have failed to sufficiently allege a pattern of racketeering activity--and those pleading failures "dooms any claim [Plaintiffs] might assert arising under *§ 1962(d)*." *Katzman v. Victoria's Secret, 167 F.R.D. 649, 658 (S.D. N.Y. 1996)* (dismissing claim under [*116] *§ 1962(d)* because plaintiff "fail[ed] to adequately plead facts that would satisfy the pleading requirements of *§§ 1962(a), 1962(b)*, or *1962(c)*"); *see also Griffin v. NBD Bank, 43 F.Supp.2d 780, 794 (W.D. Mich. 1999)* ("Because Plaintiffs have failed to allege a 'pattern of racketeering,' they have also failed to prove a claim under *§ 1962(d)*.").

> Plaintiffs' final RICO claim alleges the existence of a conspiracy, in violation of *section 1962(d)*. Plaintiffs' conspiracy claim cannot stand in light of the dismissal of their other RICO counts. We note that this claim also fails to plead the existence of an agreement to engage in conduct that would amount to a RICO violation. Thus, while plaintiffs have pleaded the conclusory allegation that the defendants "conspired," they have failed to plead the elements of a conspiracy.

*Craighead v. E.F. Hutton & Co., 899 F.2d 485, 496 (6th Cir. 1990)*. Because the misconduct that Defendants allegedly agreed to commit does not amount to a RICO violation, Plaintiffs' RICO conspiracy claim fails as a matter of law.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motions for leave to amend are DENIED and Defendants' motions to dismiss are GRANTED.

/s/   [*117] Nancy G. Edmunds

Nancy G. Edmunds

United States District Judge

Dated: March 11, 2010