# EXHIBIT 4



**AIU INSURANCE COMPANY., EAGLE INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY., LION INSURANCE COMPANY and NEWARK INSURANCE COMPANY, Plaintiffs, -against- OLMECS MEDICAL SUPPLY, INC., VEGA MEDICAL SUPPLIES, INC., ELIC BURSHTEIN, ERIC BURSHTEIN, EDUARD GURSHEVICH, 138 MEDICAL SUPPLIES INC., E.M. INTERNATIONAL TRADING, INC., TAH'S DISTRIBUTOR'S INC., JEAN PRATT DANIEL, M.D., GARY FRIEDMAN, M.D., SHAHLA MALLICK, M.D., ALEKSADR MATRISOV, M.D., BRIAN MEACHAM, D.C., BORRIS RAPOPORT, D.C., ROBERT ROOK, D.C., CHRIS STEIDINGER, D.C., VADIUM SURIKOV, M.D., and IGOR YUKELIS, M.D., Defendants.**

CV-04-2934 (ERK)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2005 U.S. Dist. LEXIS 29666*

**February 22, 2005, Decided
February 22, 2005, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**COUNSEL:** For AIU Insurance Company, Eagle Insurance Company, American Home Assurance Company, Lion Insurance Company, Plaintiffs: , Elan Raviv Kandel, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York, NY; Jay Shapiro, LEAD ATTORNEY, Anthony L. Paccione, Michael Francis Gallagher, Katten Muchin Zavin Rosenman, New York, NY.

For Newark Insurance Company, Plaintiff: Anthony L. Paccione, LEAD ATTORNEY, James Tampellini, LEAD ATTORNEY, Jay Shapiro, LEAD ATTORNEY, Michael Francis Gallagher, LEAD ATTORNEY, Katen Muchin Zavis Rosenman, New York, NY; Elan Raviv Kandel, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York, NY.

For Olmecs Medical Supply, Inc., Vega Medical Supplies, Inc., Elik Burshtein, Eric Burshtein, Eduard Gurshevich, (collectivelym the "Retail Defendants and Their Owners"), Defendants: Philip C. Chronakis, Garfunkel, Wild & Travis PC, Great Neck, NY.

For E.M. International Trading, Inc., Defendant: Robert N. Lerner, Robert N. Lerner, Esq., Brooklyn, NY.

For Jean Pratt Daniel, M.D., Defendant: Vladimir J. Rodney, LEAD ATTORNEY, Law Office of Feder & Rodney, PLLC, Brooklyn, NY.

For Gary Friedman, M.D., Defendant: Anthony G. Piscionere, LEAD ATTORNEY, Katten Muchin Zavis Rosenman, Esqs., New York, NY.

For Brian Meacham, D.C., Defendant: [*2] Larry H. Weiss, LEAD ATTORNEY, Weiss & Cohen, Esqs., East Meadow, NY.

For Borris Rook, D.C., Defendant: Matthew J. Conroy, Belesi & Donovan, P.C., Garden City, NY.

For Chris Steininger, D.C., Defendant: Robert H. Cohen, LEAD ATTORNEY. Lamb & Barnosky, LLP, Melville, NY.

For Vadium Surikov, M.D., Defendant: Anthony K. Dilimetin, LEAD ATTORNEY, Dilimetin & Dilimetin, New York, NY.

For Igor Yukelis, M.D. (collectively, the "Prescribing Doctor Defendants"), Defendant: Maranda E. Fritz,

LEAD ATTORNEY, Hinshaw & Culbertson LLP, New York, NY US.

For Elik Burshtein, Eric Burshtein, Eduard Gurshevich, (collectivelym the "Retail Defendants and Their Owners"), Olmecs Medical Supply, Inc., Vega Medical Supplies, Inc., Counter Claimants: Roy W. Breitenbach, Garfunkel, Wild & Travis, P.C., Great Neck, NY.

For AIU Insurance Company, Eagle Insurance Company, American Home Assurance Company, Lion Insurance Company, Newark Insurance Company, Counter Defendants: Elan Raviv Kandel, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York, NY.

**JUDGES:** Edward R. Korman, United States Chief District Judge.

**OPINION BY:** Edward R. Korman

**OPINION**

*MEMORANDUM & ORDER*

KORMAN, Chief [*3] Judge.

Plaintiffs are insurance companies who allege that defendants engaged in a scheme to exploit the payment formulas in New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. *§ 5101, et seq.*), and the regulations promulgated pursuant thereto (*11 N.Y.C.R.R. § 65, et seq.*). Specifically, plaintiffs allege that defendants have stolen money by submitting and causing to be submitted thousands of fraudulent charges for medically unnecessary durable medical equipment and orthotic devices ("Supplies") on behalf of individuals injured in automobile accidents and eligible for No-Fault benefits under policies issued by plaintiffs ("Insureds"). Plaintiffs assert five causes of action. Plaintiffs seek damages for (1) racketeering activity pursuant to *18 U.S.C. § 1962(c)*; (2) racketeering conspiracy pursuant to *18 U.S.C. 1962(d)*; (3) common law fraud; and (4) unjust enrichment. Plaintiffs additionally seek (5) a declaratory judgment that they are not obligated to pay any outstanding fraudulent claims. Defendant Robert Rook moves to dismiss the complaint on the grounds that plaintiffs have [*4] failed to sufficiently allege violations of Civil RICO under *18 U.S.C. § 1962*; have failed to adequately plead the elements of common law fraud; and have failed to sufficiently plead unjust enrichment. Defendant Vadium Surikov joins in the motion.

*BACKGROUND*

Plaintiffs AIU Insurance Co., Eagle Insurance Co., American Home Assurance Co., Lion Insurance Co., and Newark Insurance Co., (collectively "Plaintiffs"), are insurance companies. Defendants fall into three catagories: (1) doctors and chiropractors Jean Pratt Daniel, M.D., Gary Friedman, M.D., Shahla Mallick, M.D., Aleksandr Martirisov, M.D., Brian Meacham, D.C., Borris Rapoport, D.C., Robert Rook, D.C., Chris Steindinger, Vadium Surikov, M.D. and Igor Yukelis, M.D. ("Prescribing Doctors"); (2) retailers of medical supplies Olmecs Medical Supply, Inc., and Vega Medical Supply, Inc., and their owners Elic Burshtein, Eric Burshtein, and Eduard Gurshevich ("Retail Defendants"); and (3) wholesalers of medical supplies 138 Medical Supplies, Inc., E.M. International Trading Inc., Tah's Distributor's Inc. ("Wholesale Defendants"). Complaint P2, Opposition to Defendant Robert Rook's Motion to Dismiss [*5] ("Opposition"), at 2.

Plaintiffs describe the distinct roles of each category of defendant as follows: Prescribing Doctors treat large volumes of Insureds at several clinics, at which time they knowingly prescribe medically unnecessary Supplies and falsely represent that such Supplies are medically necessary. Complaint PP8-12. Retail Defendants, who purport to provide the actual Supplies to Insureds, then submit fraudulent claims via mail to plaintiffs. These submissions include the misleading prescriptions and letters of medical necessity from Prescribing Doctors, as well as fraudulent wholesale invoices from Wholesale Defendants (who purport to sell Supplies to Retail Defendants). *Id.* P13-17. The scheme is designed to exploit the payment formulas in the No-Fault laws.

Under the No-Fault laws in New York, automobile insurers are required to reimburse individual Insureds injured in automobile accidents for "basic economic loss" ("No-Fault Benefits") of up to $ 50,000 for health care goods and services, including medically necessary durable medical equipment [1] and orthotic devices. Insureds may assign their No-Fault Benefits to providers of Supplies, such as the Retail Defendants, [*6] who may then submit claims for payment directly to plaintiffs. *Id.* P5-7. Eligible providers of durable medical equipment are entitled to up to 150% of the "documented cost" of the equipment. *11 N.Y.C.R.R. (Appendix 17-C, Part E(b)(1))*. *Id.* P21. For example, a retailer of a bed board who purchases that item legitimately for the documented cost of $ 10 may submit a claim to an insurance company for $ 15. Eligible providers of orthotic devices can charge up to 155% of prices listed in New York's Medicaid Fee Schedule. *11 N.Y.C.R.R. (Appendix 17-C, Part F(a)-(c))*. *Id.* P25. Thus, if the maximum price for a basic cervical collar in the Medicaid Fee Schedule is $ 10, a retailer may submit a claim to plaintiffs for $ 15.50.

1 Durable medical equipment includes bed boards, cervical pillows, egg crate mattresses, electrical muscle stimulators, hot/cold packs, in-

frared lamps, lumbar cushions, massagers, orthopedic car seats, transcutaneous electric nerve stimulators, thermophores (electric moist heating pads), over-the-door cervical traction units, and whirlpool baths. Complaint P19.

[*7] To exploit the reimbursement formula for durable medical equipment, defendants are alleged to routinely seek 150% of "documented costs" reflected in wholesale invoices from Wholesale Defendants which are 2 to 20 times the price of equivalent items from legitimate sources in the marketplace. *Id.* P22. For example, plaintiffs allege that defendants' documented costs for egg-crate mattresses, cervical traction sets, and hot-cold packs are $ 78-80, $ 80, and $ 29-45, respectively, when such items are readily available for less than $ 11, $ 10, and $ 2. *Id.*

To exploit the formula for reimbursement for orthotic devices, Retail Defendants allegedly submit claims for 155% of expensive versions of specific Supplies when basic versions are what has actually been prescribed, and/or is medically necessary, and/or is provided to the Insureds. *Id.* PP24-44. To illustrate, the Medicaid Fee Schedule for lumbar-sacral supports ("LSOs") ranges from $ 85 to $ 1,150 for ten different types of supports. *Id.* P35. According to plaintiffs, without an express indication that a sophisticated LSO is necessary, prescriptions for LSOs should be filled with a flexible or basic LSO, the maximum permissible [*8] charge for which is $ 95. Yet, Retail Defendants purport to fill prescriptions which lack any indication that anything other than a basic LSO is necessary with custom-fabricated LSOs, for which they bill plaintiffs $ 269. *Id.* P37. Moreover, while custom-fabricated LSO's take several weeks to construct based on the individual measurements of an Insured, defendants here claim to provide them within a day or two, suggesting that they are not actually provided to the Insureds. *Id.*

Cervical collars are among the most commonly prescribed orthotic devices by the Prescribing Doctors. *Id.* P29. The Medical Fee Schedule establishes prices for cervical collars from $ 6.47 to $ 357 for eight types of collars identified by code. Plaintiffs assert that when no code is indicated, a prescription for a cervical collar should be filled with the most basic collar, the maximum charge for which is between $ 5.78 to $ 6.47. *Id.* P30. Yet, plaintiffs allege that in almost every instance where a prescription for a basic cervical collar has been submitted, defendants have instead filled it with a semi-rigid, thermoplastic foam two-piece cervical collar, for which the maximum permissible fee [*9] is $ 75, for which plaintiffs are billed $ 119. ($ 75 multiplied by 1.55). *Id.* PP31-32.

Thoracic lumbar-sacral supports (lower and middle back supports) ("TLSOs") are another device purportedly provided by Retail Defendants. *Id.* P39. The Medicaid Fee Schedule for these devices ranges from $ 144 to $ 353 for four specific types of basic, flexible TLSOs (code L0300 to L0317). *Id.* P40. Nonetheless, Prescribing Doctors are alleged to have uniformly prescribed TLSOs with anterior, posterior and lateral control ("TLSOs with APL"). *Id.* P41. The Medicaid Fee Schedule for TLSOs with APL is $ 900. *Id.* P43. Retail Defendants thus submit bills for 155% of $ 900, or $ 1,395. Plaintiffs allege that the TLSOs with APL are medically unnecessary for several reasons. Plaintiffs aver that TLSOs with APL, which severely restrict the movement of the user, are normally prescribed to victims of trauma immediately following the trauma to reduce pain and promote healing. Here, however, the TLSOs with APL were typically prescribed 30 to 60 days after each Insured's motor vehicle accident. *Id.* P42. Plaintiffs note that there is no indication in defendants' paperwork that they had the [*10] necessary measurements for each individual Insured, or performed the necessary fittings or adjustments for the TLSOs with APL that they purportedly provided to patients. *Id.* P44.

According to plaintiffs, the documentation provided by Prescribing Doctors and Wholesale Defendants is fraudulent in numerous respects. Prescribing Doctors prescribe unnecessary Supplies with prescriptions intentionally omitting necessary details such as reference to specific models, and the medical condition for which the Supply is necessary to facilitate -- as described above -- Retail Defendants ability to submit bills for more expensive versions when only the basic versions, if anything, are medically necessary. Prescribing Doctors also provide letters of medical necessity that omit the actual medical condition for which the prescribed item is purportedly necessary. The letters are also unusual, according to plaintiffs, because they only reference the Insureds once. *Id.* P46. Plaintiffs aver that the signatures of the Prescribing Doctors on the prescription forms often do not match the signatures for the same doctors on the letters of medical necessity. *Id.* P45. (Plaintiffs attach copies of [*11] the non-matching signatures. *See* Complaint, Ex. C.). Similarly, Wholesale Defendants allegedly provide wholesale invoices which intentionally omit necessary details such as the make, model, size, features or functions of the Supplies. *Id.* P47.

Plaintiffs allege that in each and every claim submitted to plaintiffs, defendants have knowingly made some or all of the following misrepresentations:

> (A) Made material misrepresentations that the Supplies prescribed by the Pre-

scribing Doctors were medically necessary when, in fact, they were not;

(B) Omitted basic material facts regarding the kind and quality of the durable medical equipment and orthotic devices for which they have sought payment, and/or provided information that is completely meaningless in determining the true kind and quality of any specific item, the medical necessity of that item, or appropriate charges;

(C) Made material misrepresentations that the costs that the Retail Defendants purportedly incurred in purchasing those items from the Wholesale Defendants were legitimate when, in fact, those costs either: (i) were incurred pursuant to illegitimate, undisclosed collusive arrangements between [*12] the Retail Defendants and the Wholesale Defendants for the sole purpose of collecting fraudulent charges from the plaintiffs; or (ii) were not actually incurred;

(D) Made the following material misrepresentations regarding cervical collars purportedly provided to Insureds: (i) that the cervical collars prescribed by the Prescribing Doctors were medically necessary when, in fact, they were not, (ii) that a 2 piece semi-rigid thermoplastic foam cervical collar (L0172) was medically necessary when, in fact, a flexible non-adjustable foam cervical collar (L0120) was prescribed, (iii) that they were entitled to collect $ 119 for 2 piece semi-rigid thermoplastic foam cervical collar (L0172) when, in fact, at most they should have been entitled to collect approximately $ 10 for a flexible non-adjustable foam cervical collar (L0120), and (iv) that any cervical coolars which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not;

(E) Made the following misrepresentations regarding LSOs purportedly provided to Insureds: (i) that the LSOs prescribed by the [*13] Prescribing Doctors were medically necessary when, in fact, they were not, (ii) that any custom fabricated LSOs (L0510) were actually provided to any Insureds when, in fact, they were not, (iii) that custom fabricated LSOs (L0510) were medically necessary when, in fact, basic LSOs (L0500) were prescribed, (iv) that they were entitled to collect $ 269 for custom fabricated LSO (L0510) when, in fact, at most they should have been entitled to collect approximately $ 142 for a basic LSO (L0500), and (v) that any LSOs which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not; and/or

(F) Made the following misrepresentations regarding TLSOs with APL purportedly provided to Insureds: (i) that custom fitted TLSOs with APL (L0430) were medically necessary when, in fact, they were not: and (ii) that any TLSOs with APL which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not.

*Id.* P51.

Plaintiffs claim that they have [*14] justifiably relied on the materials provided by defendants. Plaintiffs aver that they are statutorily and contractually obligated to promptly and fairly process claims within 30 days. Plaintiffs allege that the facially valid documents submitted to plaintiffs, along with the material misrepresentations contained within were designed to, and did, cause the plaintiffs to rely on them. Plaintiffs also aver that Retail Defendants have retained two law firms, Baker & Barshay, LLP, and the Law Office of Edward Shapiro to induce them into promptly paying the fraudulent claims submitted. According to plaintiffs, these firms submit the bills to plaintiffs along with cover letters indicating that the law firms have been hired to collect payment for Retail Defendants. To plaintiffs, this constitutes an implicit threat of litigation if the plaintiffs were to fail to promptly pay Retail Defendants' charges in full. *Id.* PP52-53.

Plaintiffs allege that defendants' scheme has resulted in the submission of 480 fraudulent claims, and that they have paid more than $ 400,000 to the Retail Defendants as a result of the fraudulent scheme. Opposition Memo. at 3, Complaint P53. Plaintiffs detail 440 [*15] claims submitted by Olmecs Medical Supply, Inc. , ("Olmecs"), each of which claim represents a single RICO violation

("RICO Event"). Opposition at 4. For each individual RICO Event, plaintiffs identify: (i) the supplies billed for; (ii) the billing codes used to identify the items; (iii) Olmecs' charges for each item; (iv) the Wholesale Defendant whose fraudulent invoice submitted by Olmecs in support of its charge; and (v) the date and nature of the mailings associated with each charge. Complaint, Exhibit G. Plaintiffs additionally provide identical categories for 40 fraudulent claims submitted by Retail Defendant Vega Medical Supplies, Inc. ("Vega"). Complaint, Exhibit H. Both Olmecs and Vega are owned and controlled by the same three individuals. Complaint, P61.

Plaintiffs also list RICO Events organized by the Prescribing Doctor whose prescription allegedly supported the submission. Complaint, Ex. A. For each RICO Event, plaintiffs identify the author, the date of the prescription, and the items prescribed. Plaintiffs identify 79 separate claims supported by prescriptions of Defendant Rook. *Id.* Plaintiffs identify 39 separate claims supported by 63 separate prescriptions [*16] of Defendant Surikov. *Id.*

### *DISCUSSION*

### I. Standard of Review

In deciding a motion to dismiss for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, the court's function is merely to assess the legal sufficiency of the complaint rather than to weigh the evidence that might be presented at a trial. *See Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)*. In applying this standard, a court must read all well pleaded allegations in the complaint in the light most favorable to the plaintiff. *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc., 271 F.3d 374, 380 (2d Cir. 2001)*. A complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. On such a motion, only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken are considered. *See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991)* [*17] .

### II. Civil RICO:

#### A. *General Requirements*

The Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961 et seq.,* provides for a civil action for treble damages for injuries sustained by any person in his business or property by reason of the defendant's use of racketeering-derived income to invest in, acquire, or control an enterprise engaged in or affecting foreign or interstate commerce. *Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985); see also Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)*. To state a claim for a violation of RICO, a plaintiff has two pleading burdens. *Moss, 719 F.2d at 17*. First, he must allege that the defendant has violated the substantive RICO statute, *18 U.S.C. 1962*, which, in pertinent part, states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's [*18] affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962(c).* In so doing, he must allege existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss, 719 F.2d at 17; see also Davis Lee Pharm., Inc. v. Manhattan Cent. Capital Corp., 327 F. Supp. 2d 159, 163-164 (E.D.N.Y. 2004)*. And, the elements of a RICO offense must be established as to each individual defendant. *See United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987)*. Second, plaintiff must allege that he was "injured in his business or property by reason of a violation of *section 1962*." *Moss, 719 F.2d at 17* (quoting *18 U.S.C. § 1964(c)*).

Defendants Rook and Surikov argue that plaintiffs have failed to adequately plead: (1) the existence of an enterprise; (2) moving [*19] defendants' participation in the conduct of the enterprise, and (3) the predicate acts underlying the pattern of racketeering activity.

#### B. *Enterprise*

Defendants argue that plaintiffs have failed to allege facts necessary to establish an "enterprise" and instead have merely alleged a "classic hub-and-spokes conspiracy" that fails RICO's requirements. "Enterprise" is defined by *18 U.S.C. § 1961(4)* to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. *See First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004)*. A RICO enterprise is thus "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, for-

2:12-cv-13500-GER-DRG Doc # 52-4 Filed 10/19/12 Pg 7 of 13 Pg ID 504

Page 6
2005 U.S. Dist. LEXIS 29666, *

mal or informal, and by evidence that the various associates function as a continuing unit." *See id.* (citing *United States v. Turkette,* 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)). The enterprise must be separate from the pattern of [*20] racketeering activity, and distinct from the person conducting the affairs of the enterprise. *See First Capital Asset Management,* 385 F.3d at 173 (citing *Turkette,* 452 U.S. at 583).

The Second Circuit has construed "enterprise" liberally, noting that RICO's "language and the history suggest that Congress sought to define the term as broadly as possible....". *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir. 1989). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital Asset Management,* 385 F.3d at 174 (internal quotation omitted). Courts in the Second Circuit look to the "hierarchy, organization, and activities" of an association-in-fact to determine whether "its members functioned as a unit." *United States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir.1991). Finally, in pleading the element of "enterprise" under RICO, a plaintiff need satisfy only the notice pleading requirements of Fed. R. Civ. Pr. 8(a) [*21] . *See In re Sumitomo Copper,* 995 F. Supp. 451, 454 (S.D.N.Y. 1998).

Defendants argue that the complaint sets forth a "classic hub-and-spokes conspiracy," and point to *New York Auto. Ins. Plan v. All Purpose Agency & Brokerage Inc.,* 1998 U.S. Dist. LEXIS 15645, No. 97 Civ. 3164 (KTD), 1998 WL 695869 (S.D.N.Y Oct. 6, 1998), where the district court rejected a purportedly analogous hub-and-spokes conspiracy. *New York Auto Ins.,* however, was decided on a motion for summary judgment, which tested plaintiffs' *proof* that defendants had acted together with a common purpose, not plaintiffs' allegations. *See United States Fire Ins. Co. v. United Limousine Service, Inc.,* 303 F. Supp. 2d 432, 447 n.4 (S.D.N.Y 2004). Moreover, the facts of *New York Auto Ins.* are easily distinguished. There, plaintiffs alleged that 127 fraudulent insurance applications were submitted through one insurance broker on behalf of numerous unrelated Insureds. The court held that this conspiracy could not satisfy the requirement that the participants joined together as a group to perpetuate fraud, as each Insured had instead committed similar but independent [*22] frauds, and each Insured had acted on a particular occasion to benefit himself or herself and not to benefit any other insured. Unlike a series of "single two-party conspiracies," plaintiffs here allege a group of individuals sharing a common purpose to engage in a fraudulent course of conduct, namely to defraud plaintiffs' of money by exploiting the payment formulas of the No-Fault laws. Plaintiffs describe in detail each defendant's necessary and symbiotic contribution to the overall scheme. *Cf. Moll v. U.S. Life Title Ins. Co.,* 654 F. Supp. 1012, 1031-32 (S.D.N.Y.1987) (dismissing complaint containing allegations that members of enterprise provided settlement services to purchasers of real estate and received kickbacks, because it failed to "specify how these members joined together as a group to achieve these purposes," and lacked "factual allegations regarding the continuity of structure or personnel of this group."). Moreover, unlike the group of unrelated Insureds in *New York Auto Ins. Plan,* the Prescribing Doctors in the case are alleged to work at the same clinics, and, at least in some cases, to prescribe Supplies to the same patients at different [*23] stages of treatment. Complaint PP77-78.

Defendants also argue that there is no basis for finding an "enterprise" on the grounds that the complaint raises "no possible inference that...Rook benefitted financially or in any other way from this arrangement...[nor] that he was aware of any of the other 'spokes' in the alleged scheme." However, as moving defendants appear to concede, neither showing is necessary. *See National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 262, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994) (finding no economic motive requirement for a RICO enterprise.); *United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir. 1989) (noting that proof that RICO conspirator agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of the conspiracy was unnecessary. Rather, "it is sufficient that defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role."). At this stage, plaintiffs have sufficiently alleged facts allowing the inference that defendants were on notice of the general nature of the enterprise. *See Zito v. Leasecomm Corp.,* 2004 U.S. Dist. LEXIS 19778, No. 02 Civ. 8074 (GEL), 2004 WL 2211650 *9 (S.D.N.Y. Sept. 30, 2004) [*24] . For example, defendants Rook and Surikov are alleged to have written misleading prescriptions for the same patients at different stages of their treatment. Complaint PP77-78.

As alleged, defendants shared the common purpose to defraud plaintiffs by exploiting the payment formulas of the No-Fault laws, and they worked together to achieve such purposes. At this stage, plaintiffs' allegations of enterprise are adequate.

### C. *Participation*

Defendants argue that plaintiffs have not adequately plead that defendants Rook and Surikov participated in the conduct of an enterprise. The Supreme Court has interpreted the phrase "to participate ... in the conduct of [the] enterprise's affairs" to mean participation in the operation or management of the enterprise. *De Falco v. Bernas,* 244 F.3d 286, 309 (2d Cir. 2001) (citing *Reves*

*v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993))*. Under the "operation or management" test, to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs, "one must have some part in directing those affairs." *Id.* (citing *Reves 507 U.S. at 179* [*25] ). RICO liability is not limited to those with primary responsibility, nor to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. *Id.* (citing *Reves, 507 U.S. at 179*).

In this Circuit, the "operation or management" test is rigorously applied. *See United States Fire Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 451-452 (S.D.N.Y. 2004)*. Thus, "it is not enough to merely take directions and perform tasks that are necessary and helpful to the enterprise...or provide goods and services that ultimately benefit the enterprise." *Id.* Rather, the key question is "whether the provision of these services allows the defendant to direct the affairs of the enterprise." *Id.* (citing *Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, at 346*); *see also United States v. Workman, 80 F.3d 688, 696 (2d Cir.1996)* ("A defendant might well have performed helpful acts without playing any part in directing the enterprise's affairs.")(internal citation omitted). It must be noted, however, that *Reves*, which adopted the operation and management test, was [*26] decided on summary judgment. *See generally Reves, 507 U.S. at 170*. It is not always reasonable, however, to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a defendant was merely "substantially involved" in the RICO enterprise or participated in the "operation or management" of the enterprise. *Friedman v. Hartmann, 1994 U.S. Dist. LEXIS 9727, No. 91 Civ. 1523 (PKL), 1994 WL 376058, *2 (S.D.N.Y. July 15, 1994)*. Thus, where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question. *See id.*

Defendants provide no argument as to why plaintiffs' allegations fail to suggest that Rook or Surikov played some role in directing of the affairs of the enterprise, save for the unhelpful claim that "plaintiffs' allegations only demonstrate that Rook [and Surikov] wrote prescriptions as part of [their] routine and legitimate business operations." Casting the Prescribing Doctors' conduct in this light, defendants hope to invoke the line [*27] of cases cited by *United States Fire, 303 F. Supp. 2d 4 at 451-452*, dismissing Civil RICO claims against professional services providers such as lawyers and accountants on the basis that these outsiders merely performed services which in no way could suffice to suggest that they were involved in the direction of the enterprise. *See, e.g., Azrielli v. Cohen Law Offices, 21 F.3d 512, 521-22 (2d Cir. 1994)* (dismissing RICO claim against attorneys on the ground that the provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison, 955 F. Supp. 248, 254 (S.D.N.Y.1997)* ("The provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself"); *Industrial Bank of Latvia v. Baltic Fin. Corp., 1994 U.S. Dist. LEXIS 8580, 1994 WL 286162, *3 (S.D.N.Y. June 24, 1994)* (dismissing RICO claim against bank and individual officers on the [*28] ground that "providing banking services-- even with knowledge of the fraud--is not enough to state a claim").

In contrast to the above-cited cases, however, the complaint here suggests that moving defendants were vital actors who enabled the scheme by treating the Insureds and providing misleading prescriptions which facilitated the submission of fraudulent claims to plaintiffs, not that they were merely used for their "services" by, or were merely acting at the direction of, the RICO enterprise. *United States Fire*, the case on which defendants rely, held that *Reves* was satisfied by pleadings alleging that defendants "were key participants, by making critical misrepresentations, creating false documents and,...serving as the point of communication." *United States Fire, 303 F. Supp. 2d at 453*. Viewed in a light most favorable to plaintiffs, the Prescribing Doctors here were also "key participants" who made "critical misrepresentations," "created false documents" and served as the point of contact with plaintiffs' clients, the Insureds. Given the early stage of the proceedings, plaintiffs may not yet have had the opportunity to fully understand the nature of [*29] the roles of each category of defendant with regarding to their respective management or operation capacity. Any future doubts involving moving defendants' relative level of participation should be resolved on summary judgment.

### D. *Pattern of Racketeering Activity: Mail Fraud*

According to defendants, plaintiffs have failed to establish a "pattern of racketeering activity" because they have failed to adequately allege two predicate acts of mail fraud pursuant to *18 U.S.C. 1341*.

To establish a "pattern of racketeering activity," a plaintiff must plead at least two predicate acts, and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity. *GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 465-466 (2d Cir. 1995)* (citing *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989))*. "Predicate acts are re-

2:12-cv-13500-GER-DRG Doc # 52-4 Filed 10/19/12 Pg 9 of 13 Pg ID 506

Page 8
2005 U.S. Dist. LEXIS 29666, *

lated if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. [*30] "' *Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp., 327 F. Supp. 2d 159, 163-164 (E.D.N.Y. 2004)* (citing *Northwestern Bell Tel. Co., 492 U.S. at 240*). To satisfy the requirement of a threat of continuing criminal activity, "[a] plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 180 (2d Cir. 2004)* (internal citation omitted).

The elements of a claim of mail fraud are (1) the existence of a scheme to defraud involving money or property, and (2) the use of the mails or wires in furtherance of the scheme. *See United States v. Trapilo, 130 F.3d 547, 551-52 (2d Cir.1997)*. Moreover, a plaintiff must allege (3) a specific intent to defraud, either by devising, participating in, or abetting the scheme. *See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993)* [*31] ; *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996)*.

The term "scheme to defraud" is measured by a non-technical standard reflecting fundamental notions of honesty, fair play and right dealing. *See Trapilo, 130 F.3d at 550*. It has been described as a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *See United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000)* (citing *McNally v. United States, 483 U.S. 350, 358, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987))*. To demonstrate the use of the mails in furtherance of the scheme, a plaintiff must show: "1) that the defendants caused the mailing or use of the wires, namely that they must have acted 'with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, and 2) that the mailing... was for the purpose of executing the scheme or, in other words, incidental to an essential part of the scheme."' *In re Sumitomo Copper Litig., 995 F. Supp. 451, 455-56 (S.D.N.Y. 1998)* [*32] (internal citations omitted).

In pleading a violation of mail fraud, *Rule 9(b) of the Federal Rules of Civil Procedure* must be satisfied. *In re Sumitomo Copper, 995 F. Supp at 455*. According to *Fed. R. Civ. P. 9(b)*, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." The purpose of *Rule 9(b)*'s stricter requirements are threefold: (1) to provide the defendant with fair notice of the claims against her; (2) to protect the defendant from harm to her reputation or goodwill as a result of unfounded allegations of fraud; and (3) to reduce the number of strike suits. *Wood v. Incorporated Village of Patchogue of New York, 311 F. Supp. 2d 344, 351 (E.D.N.Y. 2004)* (citing *DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.1987))*.

Pleading fraud with particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify [*33] the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir.1999)* (internal citation omitted). Where there are multiple defendants, the plaintiff must allege facts specifying each defendant's contribution to the fraud. *DiVittorio, 822 F.2d at 1247*. However, while *Rule 9(b)* is to be strictly construed in the context of Civil RICO cases, "it should not be applied in a manner which would, in effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions." *In re Sumitomo Copper Litig., 995 F. Supp at 456* (internal quotation omitted). And, it must still be read together with *Fed. R. Civ. P. 8(a)*, which requires a plaintiff to plead only a short, plain statement upon which he is entitled to relief. *Id.*

Courts have held that where a plaintiff claims that specific statements or mailings were themselves fraudulent, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and state [*34] where and when the fraud occurred. *Id.* (citing *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)*. On the other hand, in cases in which the mail was used simply used in furtherance of a master plan to defraud, the mailings need not contain fraudulent information, and a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy *Rule 9(b)*. *See In re Sumitomo Copper, 995 F. Supp. at 456* (citing *Schmuck v. United States, 489 U.S. 705, 715, 109 S. Ct. 1443, 103 L. Ed. 2d 734 (1989))*; *see also Brewer v. Village of Old Field, 311 F. Supp. 2d 390, 396-397 (E.D.N.Y. 2004)*. In complex civil RICO actions involving multiple defendants, *Rule 9(b)* does not to require that the "temporal or geographic particulars of each mailing made in furtherance of the fraudulent scheme be stated with particularity," but only that the "plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme. [*35] " *In re Sumitomo Copper, 995 F. Supp. at 456* (internal citations omitted); *see also Calabrese v. CSC Holdings, Inc., 283 F. Supp. 2d 797, 2003 WL 22052824, *6 (E.D.N.Y. 2003)*.

By alleging a complex scheme whereby moving defendants provided misleading prescriptions in order to facilitate the submission of fraudulent bills to plaintiffs, plaintiffs have undoubtedly described a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *McNally, 483 U.S. at 358.* It is likewise evident from the pleadings that moving defendants either intended or could have reasonably foreseen that the use of the mails would follow from their actions. Without any argument from defendants to the contrary, and given the that the mailings at issue were ultimately the very communication by which defendants defrauded plaintiffs, it is fair to accept both that defendants either foresaw or could have foreseen the use of the mails, and that the mailings were undertaken for the purpose of executing the scheme.

A slightly more complex question involves whether plaintiffs should be held to the tougher standard because the mailings [*36] in this case are alleged to be *per se* fraudulent, requiring them to specify the fraud, identify the parties responsible, and state where and when the fraud occurred, or whether, given the complexity of the scheme, a detailed description of the underlying scheme and the connection therewith of the communications is sufficient. As the court stated in *In re Sumitomo Copper,*

> It is difficult to see any useful purpose in requiring that a RICO complaint specifically allege each mailing in furtherance of a complex commercial scheme, at least where, as here, the complaint alleges that numerous mailings of particular kinds were made in furtherance of the scheme. Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by *Rule 9(b)* would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.

*In re Sumitomo Copper, 995 F. Supp. at 456.*

This purpose-based rationale would appear to apply with equal force to the allegations here, despite the fact that the mailings themselves [*37] are alleged to be *per se* fraudulent. Thus, given the complexity of the scheme alleged, and the numerous actors involved therein, plaintiffs should be held to the more lenient standard. *Sterling Nat. Bank v. A-1 Hotels Intern., Inc., 2001 U.S. Dist. LEXIS 2997, 2001 WL 282687, *1 (S.D.N.Y. Mar. 22, 2001),* is instructive. In that case, plaintiff bank entered into an agreement to provide credit card services to A-1 hotels, a booking agent for hotels. Under the agreement, A-1 would accept customer charges, reserve rooms, and pay the hotel, and Sterling would then purchase and process the debt resulting from customer charges. Moreover, A-1 guaranteed the validity of all charges presented to Sterling. Plaintiffs alleged that defendants committed RICO violations by knowingly submitting (via mail and through the wires) more than two hundred charges over a two year period for unauthorized or non-existent reservations, for amounts in excess of valid charges, or for services not provided by the hotel, or already paid for by customers. In denying a *Rule 12(b)(6)* motion to dismiss, Judge Lynch found defendants' assertion that the complaint [*38] lacked specificity without merit. Without distinguishing between communications alleged to contain fraudulent information, and those merely part of a greater scheme, Judge Lynch quoted *In re Sumitomo Copper,* for the proposition that "in civil RICO cases, *Rule 9(b)* requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Sterling, 2001 U.S. Dist. LEXIS 2997, 2001 WL 282687 at *3* (quoting *In re Sumitomo Copper Litig., 104 F. Supp. 2d 314, at 319*). The requirements of *Rule 9(b),* in turn, were held to be satisfied at the pleading stage because the complaint "alleged over two-hundred fraudulent transactions spread over a two year period, established a pattern of the fraud by way of nine specific examples in an attached exhibit..., and alleged the participation of each member in the scheme." *Sterling, 2001 U.S. Dist. LEXIS 2997, 2001 WL 282687 at *3.* Moreover, "the use of mail [was] also alleged and [was] otherwise self-evident from the face of the Complaint. [*39] " *Id. 2001 U.S. Dist. LEXIS 2997, at [WL] *3; but see Mezzonen, S.A., v. Wright, 1999 U.S. Dist. LEXIS 17625, No. 97 CIV. 9380 (LMM), 1999 WL 1037866, *7 (S.D.N.Y. Nov. 16, 1999)* (in addressing complex scheme involving numerous communications, some which were *per se* fraudulent and others merely 'in furtherance of the scheme', court noted its obligation to classify each and assess it under the "proper" standard).

Regardless, the pleadings in this case include sufficient detail to satisfy the particularity requirements of *Rule 9(b)* under either standard. As noted above, plaintiffs include a detailed chart of 480 separate RICO events, including the Retail Defendant who submitted the claim, the claim number, the Supplies billed for, the prices charged, the dates of the submissions, and the wholesale defendant who purportedly provided the Supplies. For example, the first RICO Event details a submission by Retail Defendant Olmecs Medical Supplies (the author of the communication) on July 26, 2000 (the date of the mailing) for numerous items including a cervical collar, an LSO, and TLSO with APL, purportedly purchased [*40] from Wholesale Defendant 138 Medical Supply. The Exhibit provides the prices charged for

each Supply. By reference to the complaint, it is also evident that defendants charged the maximum amount allowable under the Medicaid Fee Schedule for each of these items. Although plaintiffs do not specify the fraud involved for each submission, when viewed in conjunction with the conduct described in the complaint (i.e., how defendants routinely submit claims for unnecessary, expensive cervical collars, LSOs, and TLSOs with APL, see Complaint PP24-44), the specific fraud is evident. Plaintiffs additionally list 79 and 39 respective claims supported by prescriptions written by moving defendants Rook and Surikov. For each claim, plaintiffs include the date upon which the relevant prescriptions were written and the items prescribed. Considered in conjunction with the list of RICO Events, it is possible to determine, for example, that RICO Event 30 was submitted on February 26, 2001 by Olmecs and included charges for an LSO at the maximum rate under the Fee Schedule, and was supported by a prescription written by defendant Rook on September 28, 2000, and, by reference to the complaint, that [*41] this submission was fraudulent because the LSO was not medically necessary, and, in turn, because plaintiffs were overcharged for it. Thus, plaintiffs have adequately demonstrated those statements they contend are fraudulent, the source of those statements (and, by inference, where the statements were made), when the statements were made, and why the statements are fraudulent. Nothing more is required.

The final issue involves scienter. While *Rule 9(b)* allows for scienter to be plead generally, "a plaintiff must provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent," either by (1) alleging a motive for committing fraud and a clear opportunity for doing so, or (2) where the motive is not apparent, by identifying circumstances indicating conscious behavior by the defendant, though the strength of the allegations must be correspondingly greater." *Powers v. British Vita P.L.C., 57 F.3d 176, 184 (2d Cir.1995)* (internal citations and quotations omitted). Plaintiffs have not alleged any particular motive with regard to defendants Rook and Surikov. Moreover, "when courts [*42] speak of clear opportunity to commit fraud, they do not envision the kind of elaborate plot that is alleged to have unfolded in this case." *Powers, 57 F.3d at 185*. Thus, the adequacy of the pleadings depends on whether plaintiffs have identified ("correspondingly greater") circumstances indicating conscious behavior by the defendants. *Id.*

Prescribing Doctors are alleged to participate in the scheme by treating the Insureds and then knowingly prescribing unnecessary medical equipment. Plaintiffs allege that the use generic, non-specific terms in the prescription forms and letters of medical necessity (as well as the wholesale invoices) is intentional, and designed to conceal from plaintiffs the particulars of the Supplies, thereby preventing plaintiffs from determining the kind of quality of the Supplies, the medical necessity of the Supplies, and the appropriate charges for the Supplies. (Id. P50). Plaintiffs aver that Prescribing Doctors provide a vital link between the enterprise and the Insureds. Complaint P10. Moreover, plaintiffs aver that Prescribing Doctors "consistently prescribe[] virtually the same combination of durable medical equipment [*43] and orthotic devices for all Insureds at the same stages of their particular treatment programs..." Id. P11; Exhibit A. Plaintiffs describe how the intentionally misleading prescription forms are essential to the exploitation of the payment formulas in the Medicaid Fee Schedule. Moving defendants are alleged to have written prescriptions for unnecessary medical supplies for the same patients at different stages of their treatment. Complaint PP77-78. Plaintiffs include substantial factual detail in the complaint, including that Prescribing Doctors prescribe the highly restrictive TLSOs with APL 30 to 60 days after the Insureds accident dates, when such items are "typically appropriate post-surgery or immediately following trauma." Viewed collectively, and in a light most favorable to the plaintiffs, the above constitutes circumstances which indicate conscious behavior.

It should be noted, however, that in describing how Retail Defendants exploit the payment formula for cervical collars, plaintiffs detail a scheme which relies on "generic prescriptions which lack any indication that any kind of cervical collar other than a basic cervical collar is (L0120) is necessary. [*44] " Complaint P31. Retail Defendants are also alleged to fill sophisticated LSOs based on "generic prescriptions which lack any indication that any type of LSO other than a basic LSO is necessary." Complaint P36. The generic nature of the forms as described may well indicate conscious behavior by the Prescribing Doctors, but it also gives rise to a competing inference that the Prescribing Doctors, in writing "generic" prescription forms, were in fact intending to prescribe the basic items that a generic prescription would normally call for, but the forms were then misused by the Retail Defendants. That the signatures of the Prescribing Doctors on "generic" letters of medical necessity do not match the signatures for the same doctors on the prescription forms indicates conscious behavior on the part of someone, but it is not clear why it should point to the Prescribing Doctors. (After all, only one of the forms has presumably by been signed by the Prescribing Doctors, and there is an innocent explanation for that signature.) Nonetheless, plaintiffs have set out circumstances indicating conscious behavior by the moving defendants.

**III. Common Law Fraud**

Defendants allege that [*45] plaintiffs have failed to sufficiently plead common law fraud because they have failed to plead reliance and scienter. Reply at 6. Defendants additionally argue that any reliance was unreasonable given the adversarial nature of the insurance claim process, and the availability to plaintiffs of a "plethora" of tools with which to deny claims.

To state a claim for common law fraud under New York law, a plaintiff must allege (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) that the plaintiff suffered damage as a result of such reliance. *See Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999).* As noted above, in federal court, fraud must be plead with particularity in accordance with *Fed.R.Civ.P. 9(b)* 's requirement that "the circumstances constituting fraud ... shall be stated with particularity ...malice, intent, knowledge, and other condition of the mind of a person may be averred generally." *See Amalgamated Bank of New York v. Ash, 823 F. Supp. 209 (1993)* [*46] .

Assuming all the facts alleged in the complaint to be true for the purposes of assessing whether plaintiff has made out a claim for common law fraud, plaintiffs have stated the facts with sufficient particularity to satisfy *Rule 9(b)*. First, as demonstrated above, plaintiffs have adequately identified those statements they contend are fraudulent, the source of the statements, when the statements were made (and, by inference, where) and through reference to the complaint, why the statements were fraudulent. Second, plaintiffs claim that defendants intentionally made material false representations and omissions regarding, *inter alia,* the medical necessity of Supplies with the intent of deceiving plaintiffs, and causing plaintiffs to make payments to Retail Defendants in the amount of inflated charges. (Complaint PP12, 18-51). And, as discussed above, plaintiffs set forth factual circumstances sufficient to indicate conscious behavior by defendants. Plaintiffs further allege to have paid Retail Defendants in reliance on the "facially valid" documents including the materially misleading prescriptions written by the Prescribing Doctors. (Id. P53 [*47] .) Finally, plaintiffs claim to have suffered damages in excess of $ 400,000 as a result of defendants' fraud. (*Id.*). These allegations are sufficient to meet the particularity requirement of *Rule 9(b)*. *See, e.g., Sterling Nat. Bank v. A-1 Hotels Intern., Inc., 2001 U.S. Dist. LEXIS 2997, 2001 WL 282687, *4 (S.D.N.Y. Mar. 22, 2001).*

The defendants' related claim that any reliance by the plaintiffs was unreasonable is a question of fact and not one to be resolved on a motion to dismiss.

**IV. Unjust Enrichment.**

Lastly, defendants argue that plaintiffs' claim for unjust enrichment must be dismissed. To state a claim for unjust enrichment under New York law, a plaintiff must establish: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001)* (citing *Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 79 (2d Cir.1986))*. An unjust enrichment [*48] claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant. *See Redtail Leasing, Inc. v. Bellezza, 1997 U.S. Dist. LEXIS 14821, No. 95 Civ. 5191 (JFK), 1997 WL 603496 *7-8 (S.D.N.Y. Sept. 30, 1997).* While the elements of the unjust enrichment claim do not explicitly spell out such a requirement, the requirements that the defendant be enriched at the plaintiff's expense and that good conscience necessitate that the defendant make restitution to the plaintiff, clearly contemplate that the defendant and the plaintiff must have had some type of direct dealing, an actual relationship or some substantive connection.

*See Redtail Leasing v. Thrasher (In re Motel 6 Sec. Litig.), 1997 U.S. Dist. LEXIS 3909, Nos. 93-2183(JFK), 93-2866(JFK), 1997 WL 154011, *7 (S.D.N.Y. Apr. 2, 1997).*

Defendants argue that plaintiffs have failed to allege that moving defendants were benefitted by the scheme. However, plaintiffs explicitly allege that the Retail Defendants were remunerated by plaintiffs as a result of fraudulent submissions, and that plaintiffs suffered damages in the amount of [*49] $ 400,000. Moreover, plaintiffs allege that defendants constitute an "enterprise" in which moving defendants are alleged to play a vital role. Thus, as plead, it may be inferred that plaintiffs allege that moving defendants shared in the benefit at the expense of plaintiffs, and that the conveyance of that benefit was unjust such that equity would compel the return of the benefit from defendants to plaintiffs. At this stage of the proceedings, plaintiffs allegations that members of the enterprise were benefitted is sufficient. If, on summary judgment, plaintiffs are unable to demonstrate that particular defendants benefitted from the scheme, dismissal of the unjust enrichment claim with regard to those defendants would be proper.

*CONCLUSION*

The motion of the defendants' Rook and Surikov to dismiss the complaint is denied.

**SO ORDERED:**

Brooklyn, New York

February 22, 2005

Edward R. Korman

United States Chief District Judge