UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; and ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>                              Plaintiffs,<br><br>vs.<br><br>GREATER LAKES AMBULATORY SURGICAL CENTER, LLC d/b/a ENDOSURGICAL CENTER AT GREAT LAKES; GREATER LAKES ANESTHESIA, PLLC; SUMMIT MEDICAL GROUP, PLLC; GREATER LAKES MEDICAL MANAGEMENT, LLC; MICHIGAN HEALTH CARE SERVICES MANAGEMENT, LLC; PACIFIC MARKETING, INC.; ELITE SURGICAL MEDIA CONSULTANTS, L.L.C.; WEINER & ASSOCIATES, PLLC; WILLIAM J. FOCAZIO, M.D.; MICHAEL ANGELO; REESE JAMES, D.O.; MICHIGAN SURGICAL GROUP, PLLC; DAVID P. JANKOWSKI, D.O.; LUCIA J. ZAMORANO, M.D; MARTIN F. QUIROGA, D.O.; and EDWARD FIROSZ,<br><br>                              Defendants. | Civil Action No. 12-CV-13500-GER-DRG<br><br>**Demand for Jury Trial** |

## AMENDED COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and Allstate

Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their

attorneys SMITH & BRINK hereby allege as follows:

## I.      __INTRODUCTION__

1.      This is a case about medical providers, a law firm, a lawyer referral entity, and the owners, agents, and representatives of the same, who worked in concert with each other to engage in a scheme to defraud Allstate by submitting, or causing to be submitted, false and fraudulent medical records, bills, and invoices (collectively, "false medical documentation") through the U.S. Mail seeking reimbursement under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3100 *et seq.,* for treatment and services that were medically unnecessary and the charges for which were not reasonable.

2.      Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes ("Endosurgical"), which is owned and operated by Greater Lakes Medical Management, LLC ("GLMM") and Michigan Health Care Services Management, LLC ("Michigan Health"); Greater Lakes Anesthesia, PLLC ("Greater Lakes Anesthesia"), its owners William J. Focazio, M.D. ("Focazio") and Michael Angelo ("Angelo"); Summit Medical Group, PLLC ("Summit"), its owner David P. Jankowski, D.O. ("Jankowski"); Elite Surgical Media Consultants, L.L.C. ("Elite Surgical"), its owners Focazio and Angelo, and Pacific Marketing, Inc. ("Pacific Marketing"), its owner Angelo, both of which have certain interests and rights in the lawyer referral service 800-US-LAWYER and 1800uslawyer.com; Weiner & Associates, PLLC ("Weiner & Associates"); Edward Firosz ("Firosz"), an agent of Endosurgical and a representative of 800-US-LAWYER; and Reese James, D.O. ("James"), the medical director of Endosurgical and member of Michigan Surgical Group, PLLC ("Michigan Surgical Group"); conspired to, and did in fact, defraud Allstate by perpetrating a healthcare billing fraud scheme in violation of state and federal law.

2

3.      The purpose of the fraudulent scheme perpetrated by Endosurgical, GLMM, Michigan Health, Greater Lakes Anesthesia, Focazio, Angelo, Summit, Dr. Jankowski, Elite Surgical, Pacific Marketing, Weiner & Associates, Firosz, Dr. James, and Michigan Surgical Group was to generate claims to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had been (or claimed to have been) involved in motor vehicle accidents.

4.      To achieve their fraudulent objective, the defendants identified in paragraph three (3) engaged in a comprehensive scheme involving an attorney referral service, personal injury attorneys, and medical providers, all of whom conspired to refer Allstate insureds for medical treatment that was not reasonably necessary for the patients' care, recovery, or rehabilitation, and the charges for which were not reasonable.

5.      This fraudulent scheme was fueled by referrals from personal injury attorneys, including defendant Weiner & Associates (which utilized the lawyer referral service 800-US-LAWYER), to defendants Endosurgical, Greater Lakes Anesthesia, Summit, and Michigan Surgical Group (collectively, "medical facility defendants") and Dr. James and Dr. Jankowski.

6.      The medical facility defendants, Dr. Jankowski, and Dr. James performed medically unnecessary procedures on the Weiner & Associates clients/medical patients to submit inflated bills to Allstate seeking payment to which they were not entitled under the Michigan No-Fault Act because (1) the services were not reasonably necessary for the injured person's care, recovery, or rehabilitation; (2) the charges for such services were not reasonable; and (3) the billed-for services were not actually provided.

7.      Each of the individuals and entities named in paragraph three (3) conspired with one another to accomplish and/or to further the objectives of their fraudulent scheme.

3

8.      All of the acts and omissions of the defendants identified in paragraph three (3), described throughout this Complaint, were undertaken intentionally.

9.      The insurance fraud scheme perpetrated by the defendants named in paragraph three (3) was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to, or on behalf of, those defendants.

10.     Defendants Lucia J. Zamorano, M.D. ("Zamorano"), a physician affiliated with Endosurgical, and Martin F. Quiroga, D.O. ("Quiroga"), a physician affiliated with Michigan Surgical Group who performed procedures at Endosurgical, submitted bills to Allstate for medical treatment allegedly rendered that was not medically necessary and, as such, is not compensable under Michigan's No-Fault Act.

11.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract was the platform upon which the defendants named in paragraph three (3) perpetrated their fraudulent scheme.

12.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

13.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to or on behalf of the defendants in reliance upon the defendants' false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) payments made by Allstate to or on behalf of the defendants in reliance upon the false medical documentation submitted by the defendants, (3) treble damages, (4) statutory interest, (5) costs, including, but not limited to, the costs of claims handling and the cost of investigation to uncover

4

the fraudulent scheme perpetrated by the defendants identified in paragraph three (3), and (6) attorney's fees.

14.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the medical facility defendants, Dr. Jankowski, and Dr. James have no right to receive payment for any unpaid bills whereas (1) the medical facility defendants, Dr. Jankowski, and Dr. James fraudulently billed Allstate for medical services and treatment that were not reasonably necessary; (2) the medical facility defendants, Dr. Jankowski, and Dr. James did not bill Allstate reasonable charges for the medical services purportedly rendered to patients; (3) engaged in fraudulent billing practices, including billing for services not rendered; and (4) the medical facility defendants, Dr. Jankowski, and Dr. James engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

15.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that Dr. Zamorano and Dr. Quiroga have no right to receive payment for any unpaid bills whereas the medical services and treatment on which their claims are based were not reasonably necessary.

## II.     THE PARTIES

### A.     Plaintiffs

16.     Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company are wholly-owned subsidiaries of The Allstate Corporation, a corporation duly organized and existing under the laws of the State of Delaware.

17.     Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company have their principal places of business in Northbrook, Illinois.

18.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in Michigan.

**B.     Defendants**

       **1.     Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes**

19.     Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes is a Michigan ambulatory surgical center located in Clinton Township, Michigan.

20.     It was established on November 14, 2008 and was originally owned entirely by Focazio and managed by Michigan Health, which is owned and operated by Angelo.

21.     Under the current Operating Agreement in effect, GLMM, a company owned and operated by Focazio, and Michigan Health are both members of Endosurgical.

22.     At all relevant times, Endosurgical was under the ownership and control of Focazio and Angelo and/or entities under their control.

23.     Nearly all of the patients at issue in this Complaint were treated at Endosurgical, including those patients listed in Exhibit 1.

       **2.     Greater Lakes Anesthesia, PLLC**

24.     Greater Lakes Anesthesia, PLLC is a Michigan professional limited liability company.

25.     It was established on October 9, 2009 and is owned and controlled by Focazio and Angelo.

26.     Greater Lakes Anesthesia exclusively provides anesthesia services to patients receiving treatment at the medical facility defendants.

27.     Several of the patients at issue in this Complaint were treated at Greater Lakes Anesthesia, including those patients listed in Exhibit 2.

6

### 3. Summit Medical Group, PLLC

28.    Summit Medical Group, PLLC is a Michigan professional limited liability company located in Clinton Township, Michigan that was established on April 27, 2010.

29.    Dr. Jankowski is the sole member and manager.

30.    Several of the patients at issue in this Complaint were treated at Summit, including those patients listed in Exhibit 3.

### 4. Greater Lakes Medical Management, LLC

31.    Greater Lakes Medical Management, LLC is a New Jersey limited liability company with an initial filing date of June 15, 2011.

32.    It is owned and controlled by Focazio. Pursuant to the current Operating Agreement, GLMM is a member of Endosurgical.

### 5. Michigan Health Care Services Management, LLC

33.    Michigan Health Care Services Management, LLC is a Michigan limited liability company located in Clinton Township, Michigan.

34.    It was established on December 17, 2010 and is owned and controlled by Angelo.

35.    Pursuant to the current Operating Agreement, Michigan Health is a member of Endosurgical.

### 6. Pacific Marketing, Inc.

36.    Pacific Marketing, Inc. is a New Jersey corporation based in Morris County, New Jersey with an initial filing date of February 9, 1998.

37.    Angelo is the sole listed principal of Pacific Marketing.

38.    Pacific Marketing established and owns the toll-free phone number 800-US-LAWYER and the website 1800uslawyer.com.

### 7. Elite Surgical Medical Consultants, L.L.C.

39.     Elite Surgical Medical Consultants, L.L.C. is a New Jersey limited liability company with an initial filing date of May 4, 2009.

40.     It is owned by Focazio and Angelo, and Focazio is the managing member.

41.     Focazio and Angelo formed Elite Surgical for the primary purpose of designating it the assignee of certain rights and interests in the legal referral service 800-US-LAWYER.

### 8. Weiner & Associates, PLLC

42.     Weiner & Associates, PLLC is a Michigan professional limited liability company established on June 5, 2008 that practices primarily in the area of personal injury law.

### 9. William J. Focazio, M.D.

43.     William J. Focazio, M.D. is a licensed medical doctor in Michigan and New Jersey.

44.     He is a resident and citizen of New Jersey.

45.     At all relevant times, Focazio, or a company under his control, was a co-owner of Endosurgical and Greater Lakes Anesthesia.

46.     Focazio also owns and controls GLMM and is a part owner of Elite Surgical, which has certain rights and interests in 800-US-LAWYER and 1800uslawyer.com.

47.     In addition to Endosurgical, Focazio owns additional ambulatory surgical centers in New Jersey.

### 10. Michael Angelo

48.     Michael Angelo is a resident and citizen of New Jersey.

49.     At all relevant times, Angelo, or a company under his control, co-managed and operated Endosurgical.

8

50.     Angelo is also the owner of Pacific Marketing, which owns 800-US-LAWYER and 1800uslawyer.com, and a co-owner of Elite Surgical, which has certain rights and interests in 800-US-LAWYER and 1800uslawyer.com.

**11.     Reese James, D.O.**

51.     Dr. Reese James, D.O. is an osteopathic physician licensed in Michigan.

52.     He is the medical director at Endosurgical.

53.     Dr. James is the owner of Michigan Surgical Group.

54.     He is also affiliated with Summit.

**12.     Michigan Surgical Group, PLLC**

55.     Michigan Surgical Group, PLLC is a Michigan professional limited liability company located in Clinton Township, Michigan.

56.     It was formed on September 20, 2010.

57.     Dr. James is the sole member and manager of Michigan Surgical Group.

58.     Dr. James often billed Allstate through Michigan Surgical Group for procedures he performed at or in connection with services rendered by Endosurgical and Summit.

59.     Several of the patients at issue in this Complaint were treated at Michigan Surgical Group, including those patients listed in Exhibit 4.

**13.     David P. Jankowski, D.O.**

60.     Dr. David P. Jankowski, D.O. is an osteopathic physician licensed in Michigan.

61.     He is the sole member and manager of Summit.

62.     Dr. Jankowski is also affiliated with and performed medical procedures at Endosurgical.

9

### 14.    Lucia J. Zamorano, M.D.

63.    Dr. Lucia J. Zamorano, M.D. is a medical doctor licensed in Michigan.

64.    She performed medical procedures at Endosurgical.

65.    Dr. Zamorano treated several of the patients who are at issue in this Complaint, including the following:

| Patient Initials | Claim No. |
|---|---|
| S.T. | 0167726223 |
| E.H. | 0140663634 |
| S.N. | 0181065624 |
| S.S. | 0147742571 |
| E.H. | 0158776823 |
| A.C. | 0159236595 |
| T.G. | 0162469241 |
| J.L. | 0186226692 |
| D.R. | 0186226692 |

66.    All of the patients identified in the preceding paragraph also received treatment at Endosurgical.

67.    Two-thirds of the patients identified in paragraph 65 also received treatment at Summit (specifically, patients S.T., E.H., S.N., E.H., A.C., and T.G.).

68.    Weiner & Associates represented three of the patients identified in paragraph 65 (specifically, patients S.T., S.N., and E.H.).

69.    As discussed more fully in section VIII below, including discussion of several exemplar claimants who were treated by Dr. Zamorano, Dr. Zamorano rendered medical

10

treatment to the patients identified in paragraph 64 that was medically unnecessary and/or not performed in accordance with established medical standards and guidelines.  As such, the services provided by Dr. Zamorano are not compensable under Michigan's No-Fault Act.

### 15.   Martin F. Quiroga, D.O.

70.   Dr. Martin F. Quiroga, D.O. is an osteopathic physician licensed in Michigan.

71.   Dr. Quiroga is a surgeon at Michigan Surgical Group and performed procedures at Endosurgical.

72.   Dr. Quiroga treated several patients at issue in this Complaint, including:

| Patient Initials | Claim No. |
|------------------|-----------|
| K.B. | 0100212501 |
| S.B. | 0188111892 |
| S.C. | 0151883022 |
| J.L. | 0186226692 |

73.   All of the patients treated by Dr. Quiroga were also treated at Endosurgical.

74.   All but one of the patients identified in paragraph 72 were also treated at Summit (specifically, K.B., S.B., and S.C.).

75.   As discussed more fully in section VIII below, Dr. Quiroga rendered medical treatment to the patients identified in paragraph 72 that was medically unnecessary and/or not performed in accordance with established medical standards and guidelines.  As such, the services provided by Dr. Quiroga are not compensable under Michigan's No-Fault Act.

### 16.   Edward Firosz

76.   Edward Firosz is an agent and representative of Endosurgical.

77.   Firosz acted as an assistant to Angelo in Michigan.

11

78.     He is also a representative of the legal referral service 800-US-LAWYER and marketed the service to attorneys in Michigan.

## III.   **JURISDICTION AND VENUE**

79.     Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.  Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

80.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the wrongful acts known to Allstate alleged herein with particularity were carried out within the Eastern District of Michigan.

## IV.   **MICHIGAN'S NO-FAULT ACT**

81.     Allstate underwrites automobile insurance in the State of Michigan.

82.     Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.

83.     Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107(1)(a).

84.     "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary."  Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

85. A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and that the charge for the service is reasonable. Nasser, 435 Mich. at 49.

86. Claims for personal injury benefits under the No-Fault Act are available only if the benefits are "for accidental bodily injury" and only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ." Mich. Comp. Laws § 500.3105(1).

87. Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of the motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of loss sustained." Mich. Comp. Laws § 500.3142(2).

88. The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation." Mich. Comp. Laws § 500.3148(2).

## V. SOLICITATION OF CLIENTS/PATIENTS AND USE OF 800-US-LAWYER TO GENERATE REFERRALS TO THE MEDICAL FACILITY DEFENDANTS

### A. Michigan Statutes Prohibiting the Solicitation of Legal Clients and Medical Patients

89. Michigan law prohibits the solicitation of persons "for the purpose of representing that person in making a claim for damages or prosecuting an action or causes of action arising out of a personal injury claim . . . or to employ counsel for the purpose of that solicitation . . . ." Mich. Comp. Laws § 750.410(1).

90.     It is also unlawful in Michigan for "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

91.     One who knowingly and intentionally "[e]mploys, uses, or acts as a runner, capper, or steerer with the intent to falsely or fraudulently obtain benefits under a contract of insurance or to falsely or fraudulently assert a claim against an insured or an insurer for providing services to the client, patient, or customer" has committed a "fraudulent insurance act."  Mich. Comp. Laws § 500.4503(h).

92.     As these several statutes make clear, Michigan law prohibits the solicitation of clients/patients by attorneys, physicians, and surgeons.

**B.     Weiner & Associates's Use of Runners to Solicit Clients**

93.     Weiner & Associates nonetheless utilized a "runner" to solicit persons involved in motor vehicle accidents both to retain Weiner & Associates for legal services and to refer those persons to predetermined medical providers, including the medical facility defendants, Dr. Jankowski, and Dr. James.

94.     Weiner & Associates paid Joe Barone, the husband of Endosurgical office manager Susan Barone, to obtain police reports of motor vehicle accidents and to visit victims of those accidents at their homes to solicit them to retain Weiner & Associates.

95.     Joe Barone sometimes worked out of the Endosurgical office, which his wife Susan Barone managed.

96.     Joe Barone was paid $250.00 by Weiner & Associates for each client he recruited.

C.    **Use of 800-US-LAWYER to Procure Clients for Weiner & Associates and to Generate Referrals to the Medical Facility Defendants**

97.    The fraudulent scheme implemented and enacted by Angelo, Focazio, Firosz, Weiner & Associates, the medical facility defendants, Dr. Jankowski, and Dr. James to wrongfully submit claims for reimbursement under the No-Fault Act relied in substantial part on the legal referral service 800-US-LAWYER and 1800uslawyer.com.

98.    Angelo, through his company Pacific Marketing, was the original owner and operator of 800-US-LAWYER, a legal referral service that markets specifically to automobile accident victims, including motor vehicle accident victims in Michigan.

99.    The website 1800uslawyer.com was also originally owned and operated by Angelo, through Pacific Marketing, to market to victims of automobile accidents.

100.    The website instructs visitors to call 800-US-LAWYER.

101.    On January 1, 2010, Angelo assigned all of his rights, title, and interest in and to 800-US-LAWYER and the 1800uslawyer.com website within the State of Michigan to Elite Surgical, a company formed and equally owned by Focazio and Angelo.

102.    Angelo, through Pacific Marketing, maintained sole ownership and control of the 800-US-LAWYER toll-free phone number and 1800uslawyer.com website in all geographical areas except Michigan.

103.    Despite the assignment to Elite Surgical, Angelo and Pacific Marketing continued to operate 800-US-LAWYER in Michigan.

104.    As such, both Focazio, through Elite Surgical, and Angelo, individually and through Pacific Marketing and Elite Surgical, have interests in and control 800-US-LAWYER and 1800uslawyer.com in Michigan.

15

105.     Weiner & Associates is a Michigan law firm that uses 800-US-LAWYER prominently in its advertising.

106.     Weiner & Associates received many clients from 800-US-LAWYER and Angelo.

107.     In exchange for these client referrals, Weiner & Associates paid Angelo a monthly fee.

108.     As part of its agreement with Angelo and 800-US-LAWYER, Weiner & Associates agreed to refer its clients to certain designated medical providers, including the medical facility defendants, Dr. Jankowski, and Dr. James, in exchange for client referrals generated by 800-US-LAWYER.

109.     Weiner & Associates also referred its clients to other designated medical providers who, in turn, referred the patient on to the medical facility defendants, who billed Allstate for expensive and unnecessary medical treatment.

110.     The medical facility defendants, their owners, Dr. Jankowski, and Dr. James were aware that Weiner & Associates was soliciting clients that were preordained to become their patients.

111.     The primary beneficiary of clients obtained by and through 800-US-LAWYER in Michigan was Weiner & Associates.

112.     There was a quid pro quo agreement between Angelo and Weiner & Associates pursuant to which Angelo, largely through 800-US-LAWYER, would send clients to Weiner & Associates.  Weiner & Associates would then distribute its clients to chiropractors, physical therapists, primary care physicians, pain management physicians, and surgeons, all of whom in some way benefitted Angelo and/or his companies (e.g., Endosurgical), either because Angelo

16

had an interest in the medical facility where the patients were treated or because Angelo received money directly from the facility/provider to which the Weiner & Associates client was sent.

113.    For example, Weiner & Associates referred several patients to Dr. Aria Sabit ("Sabit"), a medical doctor and neurosurgeon licensed in Michigan.

114.    Further to its agreement with Angelo, Weiner & Associates referred its clients to Dr. Sabit both because he performed procedures at Endosurgical (which Angelo co-owns) and also because Angelo had a twenty-five percent (25%) interest in Dr. Sabit's practice. Thus, Angelo directly and doubly benefitted from Weiner & Associates's referrals to Dr. Sabit.

115.    Focazio has stated under oath that 800-US-LAWYER is used to generate patient referrals to designated medical providers.

116.    Dr. Jankowski has admitted that he received referrals from 800-US-LAWYER.

117.    Dr. Jankowski has also admitted that he treated patients at the Endosurgical facility based in part on the fact that he was receiving referrals from 800-US-LAWYER.

118.    That Focazio and Angelo, both of whom control 800-US-LAWYER and 1800uslawyer.com in Michigan, would use the same to generate patients (and, therefore, billing claims) for Endosurgical and Greater Lakes Anesthesia is not surprising as Focazio, individually and through GLMM, and Angelo, individually and through Michigan Health, have financial interests in Endosurgical and Greater Lakes Anesthesia.

119.    Thus, Angelo and Focazio directly benefit from the predetermined referrals from Weiner & Associates to Endosurgical and Greater Lakes Anesthesia and/or to designated medical providers who in turn refer patients to and/or treat patients at Endosurgical and Greater Lakes Anesthesia.

17

120.    Dr. Jankowski and Summit are examples of medical providers who agreed to treat patients at Endosurgical because they received referrals from 800-US-LAWYER.

121.    The scheme to secure patients for Endosurgical by requiring law firms and attorneys who use 800-US-LAWYER to refer their clients, whether directly or indirectly, to Endosurgical was previously employed by Focazio and Angelo to great success in New Jersey.

122.    In addition to Endosurgical in Michigan, Focazio also owns an ambulatory surgical center in Clifton, New Jersey called Endo/Surgical Center of North Jersey, P.C.

123.    In the mid-2000s, Focazio hired Angelo's company Pacific Marketing, which at that time owned all interests in 800-US-LAWYER and 1800uslawyer.com, to provide marketing and networking services for his New Jersey ambulatory surgical center.

124.    As a result of his ownership and operation of 800-US-LAWYER, Angelo had relationships with many personal injury attorneys.

125.    Angelo utilized these relationships to substantially grow Focazio's business and revenue.

126.    Focazio and Angelo sought to duplicate their success in New Jersey by purchasing an ambulatory surgical center in Michigan (i.e., Endosurgical) and similarly utilizing 800-US-LAWYER to guarantee patient referrals to Endosurgical.

127.    Angelo has testified that marketing efforts for Endosurgical in Michigan were directed to both doctors and lawyers.

128.    Firosz is an agent and representative of Endosurgical.

129.    By virtue of his affiliation with Endosurgical, Firosz also benefitted from patient referrals generated by 800-US-LAWYER to Endosurgical.

130.    Firosz assisted Angelo in managing his operations in Michigan, including 800-US-LAWYER.

131.    In fact, Firosz called himself the "go-to" guy for Angelo in Michigan.

132.    Firosz met with physicians, including Dr. Sabit, to convince them to join the fraudulent scheme whereby Weiner & Associates would refer clients to them in return for referrals on to designated medical providers, including the medical facility defendants.

133.    When Dr. Sabit visited Michigan in January 2011 before establishing his practice there, Firosz told him that he (Firosz) and Angelo already had hundreds of patients that they wanted to be treated by a neurosurgeon (Dr. Sabit's specialty).

134.    During this same January 2011 visit to Michigan, Dr. Sabit met with attorneys from Weiner & Associates, including Cyril Weiner and Ronald Applebaum, who told Dr. Sabit that they could provide him with a lot of business.

135.    Attorney Cyril Weiner specifically stated to Dr. Sabit that he had a number of clients who should receive spinal surgery.

136.    Angelo confirmed to Dr. Sabit that there was a monetary value to having Weiner & Associates's clients reviewed by a surgeon who was working with him (Angelo) and Weiner & Associates, including that an indication for surgery was better to substantiate the claim and/or lawsuit against the insurance carrier.

137.    The referrals from Weiner & Associates to the medical facility defendants, Dr. Jankowski, and Dr. James were not based on the clients'/patients' individual clinical symptoms and actual medical needs, but instead were made pursuant to a predetermined protocol implemented and enacted by Angelo, Focazio, Weiner & Associates, the medical facility defendants, Dr. James, Dr. Jankowski, and Firosz to ensure that patients were ultimately treated

19

by the medical facility defendants, which then billed Allstate for unnecessary medical treatment (as discussed in section VIII below).

138.    As such, the medical treatment provided by the medical facility defendants, Dr. Jankowski, and Dr. James to the patients at issue in this Complaint was unnecessary in the first instance because it was not rendered, if at all, based on the patient's medical needs, but rather pursuant to a scheme to generate and submit to Allstate as many bills as possible.

## VI.    WEINER & ASSOCIATES DIRECTED THE COURSE OF UNNECESSARY MEDICAL TREATMENT RENDERED TO CLIENTS/PATIENTS

139.    Weiner & Associates was knowingly and intentionally involved in directing and ordering the unnecessary and excessively billed, and therefore fraudulent, medical treatment of several of the patients involved in this Complaint, including:

| Patient Initials | Claim No. |
|---|---|
| S.T. | 0167726223 |
| M.H. | 0168743235 |
| S.N. | 0181065624 |
| P.S. | 0181475161 |
| E.H. | 0158776823 |
| R.F. | 0201576295 |
| K.B. | 0100212501 |

140.    All of the Weiner & Associates clients cited in the preceding paragraph received treatment at Endosurgical.

141.    All but two of the clients identified in paragraph 139 also received treatment at Summit (specifically, S.T., M.H., S.N., E.H., and K.B.).

20

142.     The unnecessary medical treatment allegedly provided to many of these Weiner & Associates clients is further discussed as exemplar claims in section VIII below.

143.     Weiner & Associates did not merely provide legal services to the clients it received from 800-US-LAWYER and through runners and police reports.

144.     Instead, Weiner & Associates directed patients to predetermined medical providers, including the medical facility defendants, Dr. Jankowksi, Dr. James, and Dr. Sabit.

145.     Beyond simply being aware and agreeing that the medical facility defendants would submit claims via the U.S. mail to Allstate for treatment unnecessarily and excessively rendered by the medical facility defendants, Weiner & Associates also directed and ordered much of the unnecessary treatment for which Allstate was billed.  Indeed, several of Weiner & Associates's clients received unnecessary treatment from the medical facility defendants, as detailed in section VIII below.

146.     Thus, Weiner & Associates knew that the medical services for which it sent its clients to the medical facility defendants were not reasonably necessary because some were ordered by its own attorneys, not a medical professional, and all of the medical treatment was done pursuant to a predetermined protocol jointly agreed to by Weiner & Associates, the medical facility defendants, Dr. Jankowski, Dr. James, Angelo, Focazio, and Firosz that inherently failed to take into account the medical necessity of such treatment.

147.     The extent of Weiner & Associates's involvement in directing the medical treatment received by its clients is exemplified by Dr. Sabit's interactions with Weiner & Associates.

148.     When Dr. Sabit moved to Michigan in April 2011, he met with Angelo, Cyril Weiner, Ronald Applebaum, and two other Weiner & Associates attorneys at the offices of

21

Weiner & Associates to discuss how patients were to be sent to Dr. Sabit by Weiner & Associates.

149.    Before any patient was seen by Dr. Sabit, the Weiner & Associates attorney had already determined which clients he or she believed should receive surgery and other medical services from Dr. Sabit.

150.    Weiner & Associates sent to Dr. Sabit over one hundred of its client files to identify surgical candidates.

151.    Dr. Sabit objected to considering many of these files for surgical options because the client/patient had only very recently been in the motor vehicle accident and a full medical work up had not yet been done.

152.    Subsequent to the April 2011 meeting at the office of Weiner & Associates, Dr. Sabit had phone conversations with attorney Cyril Weiner regarding client/patient care.

153.    Dr. Sabit also had at least ten phone conversations with attorney Ronald Applebaum regarding client/patient care.

154.    In one instance, attorney Applebaum called Dr. Sabit and informed him that a certain client required surgery.

155.    Dr. Sabit stated that he needed to evaluate the patient first before deciding if surgery was warranted.

156.    Attorney Applebaum pressured Dr. Sabit to perform the surgery, including stating that it "sure would be good" if the client had the surgery.

157.    Dr. Sabit received similar pressure to perform procedures on other clients/patients from Cyril Weiner, Ronald Applebaum, Angelo, and Focazio.

22

158.     Angelo, for example, would enter Dr. Sabit's office, look through patient files, and recommend that patients be sent for surgery and other procedures, including epidural injections, electromyographs, and videonystagmographs, at Endosurgical.

159.     Angelo, often through his secretary who was based in New Jersey, would schedule patients for procedures with Dr. Sabit and also recommend additional surgeries and procedures that the patient should undergo.

160.     The clients sent by Weiner & Associates to Dr. Sabit for surgery often had not undergone other treatment or sufficient other treatment to warrant surgical intervention.

161.     Weiner & Associates sent clients to Dr. Sabit early so that they could bill for expensive surgical procedures, and attendant services, sooner, not because surgery was necessarily warranted.

162.     By agreeing to a predetermined protocol to refer clients to the medical facility defendants that was not and could not by its predetermined nature have been dependent on the individual needs of each client/patient, and by directing and ordering the medical treatment that its clients received, Weiner & Associates knowingly and intentionally agreed to participate in a scheme with the medical facility defendants, Dr. Jankowski, Dr. James, Firosz, Angelo, and Focazio to defraud Allstate by submitting claims for medical treatment that was not medically necessary.

## VII.   DR. JANKOWSKI AND DR. JAMES SCHEMED TO DEFRAUD ALLSTATE

163.     Dr. Jankowski, the owner of Summit, and Dr. James, the owner of Michigan Surgical Group and the medical director of Endosurgical, actively engaged in the scheme to defraud Allstate by treating and referring patients with the goal of performing and billing Allstate for as much treatment as possible without regard for patients' actual medical needs.

23

164.    Dr. Jankowski received many of his patients from Weiner & Associates.

165.    Dr. Jankowski would often refer the patients he received from Weiner & Associates to other Angelo-affiliated providers and facilities, including Endosurgical.

166.    In fact, Dr. Jankowski claimed to Dr. Sabit that he was responsible for ninety percent (90%) of the billing collections of Endosurgical.

167.    There was also an arrangement in place whereby Dr. James would receive patients from Angelo and providers working with Angelo.  Dr. James agreed to send these patients to Dr. Jankowski for orthopedic services.

168.    Angelo also helped to facilitate an arrangement whereby Dr. James received referrals from chiropractors and physical therapy facilities in Michigan in return for Dr. James performing procedures at Endosurgical, where Dr. James was the medical director.

169.    Dr. Jankowski called Dr. Sabit on several occasions and told him to schedule patients for surgery, even though Dr. Sabit had not seen or evaluated the patient.

170.    When asked by Dr. Sabit why he performed so many manipulation under anesthesia procedures (discussed more fully in section VIII below), Dr. Jankowski's response was that they paid really well.  Dr. Jankowski offered no other, including a medically-based, reason.

171.    In an e-mail dated July 14, 2011, Angelo wrote to Dr. Jankowski asking him to "put together a list of doctors/facilities/medical groups, that will work with us.  We cannot afford to refer patients to doctors/facilities/medical groups who do not refer work back to us anymore. We need to work with doctors/facilities/medical groups that will send work to you and Dr. Sabit."

172.     Dr. Jankowski had discussions with Angelo, Dr. Sabit, medical providers based in Michigan, attorneys, and other persons regarding ways to increase bills and claims submitted to insurance carriers.

173.     For example, Dr. Jankowski had discussions with several people, including Angelo, regarding purchasing a MRI machine in Michigan.

174.     Dr. Jankowski stated in an e-mail dated April 19, 2011 addressed to Angelo and non-party attorneys and medical providers that "the ability to bill for the [MRI] machine is the ultimate goal for all involved, although some ownership if possible is desired."

175.     In the same e-mail, Dr. Jankowski noted that the participants in this scheme to bill for MRIs would have to be careful to appear to be in compliance with the Stark law, 42 U.S.C. § 1395nn, a federal statute which governs physician self-referral of Medicare and Medicaid patients.  Michigan has adopted the federal Stark law and expanded it to include all physicians, not just those treating Medicare and Medicaid patients.  Mich. Comp. Laws § 333.16221.

176.     Dr. Jankowski further noted that involving Summit in this scheme to generate bills for MRIs "to capture the Auto rates is necessary for all involved."

177.     To demonstrate the profitability of MRI billings, Dr. Jankowski circulated a document on Summit letterhead on June 17, 2011 setting out the number of MRIs that several entities would generate monthly.  According to Dr. Jankowski's memo, Summit, for example, would "average 10 per day about 5 times a week = 50 per week or 200 per month."

178.     Dr. James was also included in the document as being responsible for "average about 8-12 auto per month" and "Average about 20-30 conventional per month."

179.     Dr. Jankowski also noted that "a commitment from 1800-pain or US lawyers which should be 300 month [sic]."

180.     In the e-mail sent on April 19, 2011, Dr. Jankowski identified several "[a]ncillary services" that "can make a very profitable number for all involved and the numbers are staggering," including "PT, PT post of [sic], MRI, x-ray[,] EKG[,] nerve conduction studies, VNG."

181.     Dr. Jankowski also suggested "Another ideal [sic] is to start a Water Therapy for post auto accidents patient [sic] which has come became [sic] very beneficial for these patient populations, the patient then can start a second round of PT after land therapy."

182.     In a separate e-mail between Dr. Jankowski and a Michigan medical provider dated August 9, 2011, the medical provider wrote "How come you don't send me MRI cases but you ask me for free ones?"  Dr. Jankowski replied, also on August 9, 2011, "I will send you patients tomorrow how many you want?"

183.     In the same exchange of e-mails, the Michigan medical provider wrote to Dr. Jankowski regarding his plan to purchase a MRI machine: "Are you and others and Mike Angelo interested in own [sic] a fix MRI and no pay a penny to anybody….Trust me and you and Mike Angelo will filled [sic] your pants full of money."  This particular e-mail in the chain was sent on August 13, 2011.

184.     Dr. Jankowski forwarded the August 13, 2011 e-mail promising "pants full of money" to several people, including Angelo.

185.     By Dr. Jankowski's own words, and by the agreements entered into by Dr. Jankowski and Dr. James with Weiner & Associates and Angelo, it is clear that Dr. Jankowski and Dr. James actively engaged in a scheme to defraud Allstate and sought additional ways to submit claims for unnecessary medical treatment.

186.    Dr. Jankowski's suggestions and ideas, as documented in e-mails and correspondence he wrote and distributed, demonstrate that Dr. Jankowski treated patients not based on their objective medical needs, but rather pursuant to predetermined arrangements designed specifically to increase the number of bills submitted to auto insurers like Allstate.

187.    The e-mails and correspondence sent by Dr. Jankowski also show that he worked in concert with several other people and providers to further the scheme to defraud Allstate, including Angelo, Dr. James, Summit, Michigan Surgical Group, and Endosurgical.

## VIII.   UNNECESSARY MEDICAL SERVICES

188.    The medical facility defendants are closely related.

189.    Indeed, almost every patient at issue in this Complaint who was treated at Endosurgical was also seen at or treated by Summit.  Many were also treated by a physician associated with Michigan Surgical Group.

190.    Greater Lakes Anesthesia was the sole provider of anesthesia services for Endosurgical patients.

191.    Greater Lakes Anesthesia did not provide anesthesia services for any patient other than those of the medical facility defendants.

192.    Endosurgical, Greater Lakes Anesthesia, and Summit are located in the same building in Clinton Township, Michigan.

193.    The medical facility defendants billed Allstate for medical services and medical procedures that were not warranted by the patients' actual clinical symptoms and/or that were not done in accordance with established medical standards.

194.    Dr. Jankowski and Dr. James were affiliated with and rendered medical services at or through the medical facility defendants.

27

195.    The goal in treating patients of the medical facility defendants was to perform as much treatment as could be justified, regardless of whether such treatment was reasonably necessary to the patient's care, recovery, or rehabilitation and/or arose out of a motor vehicle accident.

196.    Tests were ordered by the medical facility defendants to see what additional procedures could be done, rather than to acquire information to improve patient care or direct the course of treatment.

197.    This is evidenced by the medical facility defendants ordering tests, but doing treatments contraindicated by the test results and/or not waiting for the test results before proceeding with additional treatment.

198.    The services and treatment rendered by the medical facility defendants were not medically necessary.

199.    The services and treatments rendered by Dr. Jankowski, Dr. James, Dr. Zamorano, and Dr. Quiroga (collectively, "physician defendants") were not medically necessary.

200.    These unnecessary services include manipulations under anesthesia, injections, spinal fusion surgeries, and platelet-rich plasma injections, all of which are discussed more fully below, and all treatment that was ancillary to and/or derivative of these unnecessary procedures, including, but not limited to, the services and equipment set out in the charts attached hereto at Exhibit 1 (Endosurgical), 2 (Greater Lakes Anesthesia), 3 (Summit), and 4 (Michigan Surgical Group).

A.      **Manipulation Under Anesthesia**

201.    Manipulation under anesthesia (MUA) involves mobilizing parts of a patient's musculoskeletal system while the patient is sedated and, therefore, unable to tighten his muscles and guard against movement.

202.    Patients may tense up during manipulations without anesthesia (MWA) due to fear, anxiety, unfamiliarity with techniques, and guarding.

203.    Many clinicians will use other forms of manipulation before resorting to MUA, including myofascial release, strain/counterstrain, muscle energy, active release technique, acupressure, functional release technique, and cranio-sacral.

204.    All of these techniques avoid high-velocity thrusts, work well in treating chronic pain, and are well-tolerated by patients with most painful disorders.

205.    No evidence exists that shows the long-term benefit of MUA.

206.    The vast majority of publications regarding MUA are from fringe medical journals.

207.    In letters to Allstate appealing for coverage for MUA procedures, the medical facility defendants and the physician defendants cite case studies, but not peer-reviewed medical journals or any other publication, regarding the proven efficacy of MUA.

208.    Individual case studies do not speak to the long-term efficacy of a procedure.

209.    MUA is considered experimental, investigational, and/or unproven for use on most areas of the body, including the spine (cervical, lumbar, and thoracic); ankle; finger; hip; pelvis; temporomandibular joint; toe; and wrist.

210.    MUA is generally considered reasonable for treatment of the following conditions only: arthrofibrosis of the knee; arthrofibrosis of the elbow; reduction of a displaced fracture; reduction of an acute dislocation; and adhesive capsulitis (i.e., frozen shoulder).

211.    Nearly every patient at issue in this Complaint who received MUA had his or her spine manipulated.  Many also had their pelvis and/or hips manipulated.

212.    As MUA was performed on areas of the body for which MUA is not generally accepted, the procedures were not reasonably necessary and the MUA treatment was not lawfully rendered.

213.    Even where MUA was performed on generally accepted body regions, the need for resort to MUA is not evident in the patients' medical records and is not supported by documented diagnoses.

214.    Moreover, the defendants failed to adhere to the community standards for performing MUA.

215.    The National Academy of MUA Physicians (NAMUAP) issues guidelines to recommend, promote, and review protocols and standards for the ethical use of MUA.

216.    The guidelines published by the NAMUAP include clinical justification for performing MUA, establishing medical necessity for MUA, frequency of MUA procedures, safety guidelines, compensation, and anesthesia standards.

217.    The procedure notes and operative reports from the medical facility defendants and the physician defendants cite and reference the NAMUAP guidelines.

218.    In a September 1, 2010 letter to Allstate recommending MUA, Dr. Jankowski, on behalf of Endosurgical, states that patient T.G. (Claim No. 0162469241) is a candidate for MUA

30

based on "The [N]ational Academy of MUA Physician's standards and protocols." *See Exhibit 5.*

219.    As the medical facility defendants and the physician defendants reference the NAMUAP standards frequently in medical records and in correspondence to Allstate, it is clear that they were aware of and purported to rely on and adhere to the NAMUAP guidelines.

220.    However, as detailed below, these defendants frequently violated the NAMUAP standards.

221.    The MUA procedures performed by the medical facility defendants and the physician defendants were unnecessary for the following reasons:

### 1.    Performing MUA Before Conservative Treatment

222.    MUA should only be performed after the patient has tried, and failed to experience relief from, conservative and generally-accepted treatment, including MWA, pain medication, and injections.

223.    The medical facility defendants and the physician defendants, however, recommended and performed MUA without regard for whether conservative treatment had been employed and/or been utilized a sufficient amount of time to determine if it would relieve the patient's symptoms.

224.    This is evidenced in several ways.

225.    First, most of the patients who received MUA were undergoing MWA without any documented fear or nervousness that would limit the usefulness of MWA.

226.    Second, several patients had documented positive responses to conservative treatment, yet were needlessly referred for MUA.

227.     Third, although MUA should only be resorted to where MWA has failed, numerous patients received MWA at the same time they underwent MUA to the same area of the body.

228.     Finally, though MUA should only be resorted to where more conservative treatment, such as injections, has failed, several patients received injections only during and/or after undergoing MUA.

### a.     Patients Not Experiencing Difficulty with MWA

229.     As MUA is just manipulation with the patient under anesthesia, the results to be expected from MUA should not differ from MWA.

230.     There is no logical reason to expect results from MUA to be better than MWA.

231.     Thus, the only justification for MUA is lack of success using MWA.

232.     The defendants, however, often performed MUA on patients who were progressing with MWA.

233.     The medical records and notes for these patients do not document that the patients had fear or anxiety while undergoing MWA.

234.     In fact, several patients had MWA during the time they received MUA.

235.     As such, resort to MUA was not justified and was medically unnecessary.

### i.     Exemplar Claims

### (1)     K.B. (Claim No. 0100212501)

236.     Patient K.B. testified that he was relaxed and had no nervousness while receiving MWA.

237.     As there was no barrier to MWA, there was no need for MUA.

238.     Nevertheless, K.B. underwent three MUA procedures at Endosurgical on March 5, 2011, March 12, 2011, and March 19, 2011 that were allegedly performed by Dr. Jankowski and Dr. James (assistant surgeon), none of which had any lasting effect on his pain symptoms.

### (2)     R.H. (Claim No. 0100203001)

239.     At the time of her MUA procedures, patient R.H. had undergone over 150 sessions of MWA.  None of the notes from these sessions indicate that she could not tolerate these manipulations.

240.     To the contrary, R.H.'s lower back pain had improved and her knee and neck pain had resolved before she underwent MUA.

241.     Nevertheless, three MUA procedures were performed on R.H. by Dr. James on March 24, 2011, March 26, 2011, and March 31, 2011 at Endosurgical.

242.     As there was no justification for resort to MUA where the patient was tolerating and benefitting from MWA, the MUA procedures were not medically necessary.

### (3)     S.T. (Claim No. 0167726223)

243.     At the time of her MUA procedures, S.T. had undergone over 150 sessions of MWA.

244.     None of the notes from these sessions describe any difficulties being adjusted due to spasm or difficulty relaxing.

245.     Nevertheless, S.T. underwent three MUA procedures performed by Dr. Zamorano at Endosurgical on January 14, 2011, January 15, 2011, and January 16, 2011.

246.     As the results to be expected from MUA are the same as those to be expected from MWA, and as S.T. was not experiencing difficulty with MWA that would warrant resort to MUA, the MUA procedures performed on S.T. were not medically necessary.

33

### b.      Patients Had Not Failed Conservative Treatment

247.    MUA should only be performed after the patient has tried, and failed, more conservative treatment.

248.    Several patients, however, were still undergoing and/or were still progressing with conservative treatment at the time MUA was performed.

249.    MUA was not reasonably necessary in these circumstances.

### i.      Exemplar Claims

### (1)      S.S. (Claim No. 0147742571)

250.    Dr. Zamorano stated that S.S. failed conservative treatment, but Dr. Zamorano's own notes indicate that chiropractic treatment, muscle relaxers, and ice were helping S.S.'s symptoms.

251.    On S.S.'s first visit with Dr. Zamorano on August 12, 2010, Dr. Zamorano gave the patient a lumbar brace.

252.    On S.S.'s second visit on September 2, 2010, Dr. Zamorano gave the patient Mobic, Vicodin, Valium, and a Lidocaine patch, all of which had not previously been tried by the patient.

253.    Instead of waiting to assess whether this more conservative treatment would help the patient, and ignoring her own findings that chiropractic treatment, muscle relaxers, and ice were helping, Dr. Zamorano instead scheduled MUA for the spine at the time of S.S.'s second visit on September 2, 2010.

254.    MUA was performed on S.S. by Dr. Zamorano on September 24, 2010, September 25, 2010, and September 26, 2010 at Endosurgical.

255.     Conservative treatment was not adequately attempted and its positive effect was improperly ignored before resort to MUA.

256.     The MUA procedures were, therefore, medically unnecessary.

### (2)     S.C. (Claim No. 0151883022)

257.     In S.C.'s MUA operative reports from September 2, 2010, September 11, 2010, and September 15, 2010, the treating physician, who was assisted by Dr. James, states that "considering the patient . . . has not experienced relief or fears treatment with chronic medications, MUA is medically necessary and appropriate at this time."

258.     There is no indication that S.C. had fear of using chronic medications.

259.     In fact, S.C. used medications consistently until the time of the MUA procedures.

260.     As S.C. had not exhausted conservative treatment (namely, medication), MUA was not medically necessary.

### c.     Patients Underwent MWA at the Same Time They Underwent MUA

261.     As discussed above, MUA and MWA are the same procedure, the only difference being that the patient is under anesthesia.

262.     The only justification for performing MUA, therefore, is that the patient engages in tightening and guarding during MWA such that sedation is required for manipulation.

263.     Several patients, however, underwent MWA at the same time they were receiving MUA.

264.     The concurrently-performed MUA was done on the same area of the body as the MUA.

265.     If patients were not exhibiting fear or anxiety such that MWA was recommended and performed as a necessary medical procedure, there was no need for resort to MUA.

### i.   Exemplar Claims

### (1)   R.H. (Claim No. 0100203001)

266.   Patient R.H. had her first MUA procedure, performed by Dr. James at Endosurgical, on March 24, 2011 and her second MUA procedure on March 26, 2011.

267.   In between, on March 25, 2011, R.H. underwent MWA.

268.   R.H. also had additional MWA in excess of thirty (30) times after receiving MUA.

269.   MUA should be resorted to only where MWA is not an effective treatment option.

270.   Here, MWA was still an appropriate treatment option for R.H., as evidenced by the fact that received MWA to the same area of her body (namely, her spine) while she was undergoing MUA.

271.   Accordingly, the MUA procedures were not medically necessary, and Allstate is not obligated to pay for such services pursuant to Michigan law.

### (2)   S.T. (Claim No. 0167726223)

272.   Patient S.T. had MWA on January 10, 2011, January 11, 2011, and January 13, 2011.

273.   S.T. then underwent MUA to her spine on three consecutive days from January 14-16, 2011, performed by Dr. Zamorano at Endosurgical.

274.   S.T. again had MWA, also to her spine, on January 18, 2011, January 19, 2011, and January 20, 2011.

275.   As S.T. was still undergoing MWA to the same area of her body, there was no need for MUA procedures.

### d.      Patients Received Injections During and/or After MUA

276.     Patients under the care of the medical facility defendants and the physician defendants were often given injections at the same time as and/or after MUA.

277.     This is problematic for two reasons.

278.     First, MUA should be largely a procedure of last resort for patients and clinicians.

279.     This means that more generally-accepted and proven procedures, such as epidural steroid injections (ESIs) and trigger point injections (TPIs), should be administered and their effect on the patient measured before MUA is justified.

280.     Second, as discussed more fully below, the NAMUAP guidelines state that a patient should be evaluated over a period of time after a MUA procedure to determine what, if any, lasting relief is experienced.

281.     The use of any other intervention or treatment, such as the administration of ESIs or TPIs, hinders the ability of the physician to evaluate the patient's response to the MUA because it may not be possible to deduce which treatment – the MUA or the injection – actually helped the patient and to what degree.

### i.      Exemplar Claims

### (1)      D.R. (Claim No. 0200584076)

282.     Dr. James performed MUA on and administered an ESI and TPIs to D.R.'s spine on the same day on two separate occasions: March 5, 2011 and March 12, 2011.

283.     As the spine was injected with anesthetics and steroids at the same time that MUA was performed on the spine, there is no way to know if the MUA helped D.R. or how much.

284.    Moreover, the ESI and TPIs should have been administered prior to MUA being done to determine if they could relieve D.R.'s pain without the need for MUA, particularly where MUA is not generally accepted for use on the spine.

### (2)    T.G. (Claim No. 0162469241)

285.    T.G. purportedly underwent MUA procedures performed by Dr. Jankowski at Endosurgical on June 30, 2010, July 1, 2010, and July 6, 2011.

286.    After undergoing MUA, T.G. received multiple ESIs and TPIs from Dr. James, also at Endosurgical, including injections administered on September 11, 2010, October 2, 2010, November 18, 2010, and December 11, 2010.

287.    Injections, such as ESIs and TPIs, are well-researched and approved treatment options for pain, such as pain arising from a motor vehicle accident.

288.    Thus, MUA was improperly rendered before injections were utilized as a treatment option.

### (3)    S.C. (Claim No. 0151883022)

289.    On the same days that MUA procedures were done on September 11, 2010 and September 15, 2010, S.C. also received ESIs at the lumbar level and multiple bilateral paraspinal TPIs.

290.    Dr. James, who assisted on the MUA procedures, administered the injections.

291.    The MUA procedures were thus medically unnecessary because more conservative treatment – namely, the ESIs and TPIs – had not yet been tried and found unsuccessful in treating S.C.'s symptoms.

292.    Moreover, the fact that S.C. received these injections on the same day that he received MUA made it impossible to tell the efficacy of the MUA procedures.

293.     As such, justification for the subsequent MUA performed on S.C. on September 15, 2010 cannot be discerned.

### 2.     Unsubstantiated Diagnoses Made to Justify MUA

294.     Several patient medical records list diagnoses and/or findings that are unsubstantiated and/or false and which appear to be made only to support performing expensive, but unnecessary, MUA procedures.

295.     For example, several patient pre-operative reports list "displacement" of a spinal disc, "dislocation of the pelvis," and/or "closed dislocation, coccyx" as the diagnosis for which MUA is being prescribed.

296.     However, these diagnoses are almost never substantiated by imaging or clinical examination.

297.     For every patient who underwent MUA, there was no MRI or CT of the pelvis performed to assess the diagnosis of dislocated pelvis.

298.     A dislocation of the pelvis is a serious condition that involves a complete separation of the pubic symphysis or sacroiliac joint, or it can refer to a hip dislocation, where the femoral head slides completely out of the socket.

299.     The medical records of the patients at issue in this Complaint do not demonstrate anything as significant as a dislocation of the pelvis or hip, yet the diagnosis is routinely made to justify performing MUA on the pelvis/hip.

300.     Similarly, patient medical records do not show dislocation of the coccyx, yet that diagnosis is often made and cited as justification for performing MUA.

a.      **Exemplar Claims**

i.      **J.B. (Claim No. 0215247941)**

301.    The following are listed as MUA pre-operation and post-operation diagnoses in patient J.B.'s medical records by Dr. James: displacement of the cervical intervertebral disc without myelopathy; displacement of the thoracic intervertebral disc without myelopathy; displacement of the lumbar intervertebral disc without myelopathy; dislocation of the pelvis, closed; dislocation of the coccyx, closed; enthesopathy of the hip region; contracture of the pelvic/thigh region; and dislocation of the sacrum, closed.

302.    None of these diagnoses are specifically noted in any clinical exam or imaging study in J.B.'s medical records.

303.    In fact, the MRIs of J.B.'s spine show only spinal disc bulges, not displacements.

304.    Nor is there any effort to substantiate these diagnoses.

305.    For example, there is no orthopedic exam done to the hip other than simply finding trigger points.

306.    Despite the lack of substantiated diagnoses, J.B. underwent MUA on March 3, 2012, March 17, 2012, and March 24, 2012 at Endosurgical.

307.    As the diagnoses that Dr. James cited and relied on to justify performing MUA are not supported, there was no medically reasonable basis to perform MUA.

ii.      **R.H. (Claim No. 0100203001)**

308.    R.H. had neck and knee pain that had resolved after she was struck by a motor vehicle.  Her medical records do not contain complaints of thoracic or hip pain.

309.    No imaging was ever done of R.H.'s thoracic spine, coccyx, or pelvis.

310.    No physical examination was ever done of R.H.'s thoracic spine, coccyx, or pelvis.

311.    R.H. had MRIs taken of her cervical and lumbar spine on December 30, 2010. Both reports showed no pathology at any vertebral level.

312.    Yet, Dr. James stated that R.H.'s pre-MUA and post-MUA diagnoses included displacement of the cervical, thoracic, and lumbar intervertebral discs; closed dislocations of the coccyx and pelvis; and enthesopathy of the hip.

313.    R.H. received cervical, thoracic, lumbar, pelvis, and hip joint MUA on three separate occasions on March 24, 2011, March 26, 2011, and March 31, 2011, despite the fact the diagnoses supporting MUA on these regions were unsubstantiated.

### iii.    J.L. (Claim No. 0200584076)

314.    Two diagnoses were made by Dr. Jankowski regarding J.L.'s shoulder: "adhesive capsulitis" and "contracture of the shoulder joint," which are in fact the same.

315.    However, there were no measurements made to justify this diagnosis.

316.    Nor was imaging or a clinical examination of J.L.'s shoulder performed.

317.    Nonetheless, MUA was performed on J.L.'s shoulder three times at Endosurgical on March 5, 2011 and March 12, 2011 (Dr. James), and March 19, 2011 (Dr. Jankowski).

### iv.    S.T. (Claim No. 0167726223)

318.    S.T.'s medical records do not contain any diagnoses involving the pelvis or hips.

319.    Nor was any dedicated imaging of the pelvis or hips ever done.

320.    S.T.'s physician, Dr. Zamorano, never examined the pelvic ring or hips, nor palpated these structures.

41

321.    Despite the lack of diagnosis, Dr. Zamorano performed MUA on S.T.'s hips and pelvic ring (in addition to her spine) on three consecutive days from January 14-16, 2011.

322.    As no proper diagnosis existed to justify the MUA procedures, MUA was not medically necessary.

### 3.    Contraindications to MUA

323.    Several patients exhibited symptoms that are clear contraindications to the performance of MUA.

324.    Most frequently, patients had disc herniations in excess of five (5) millimeters, which are absolute contraindications to MUA.

#### a.    Exemplar Claims

##### i.    S.S. (Claim No. 0147742571)

325.    A MRI of S.S.'s thoracic spine was taken on September 13, 2010.

326.    The thoracic MRI revealed a disc herniation of one (1) centimeter.

327.    Despite the existence of a herniation in excess of five (5) millimeters, S.S. had MUA on her spine done by Dr. Zamorano on three consecutive days from September 24-26, 2010 at Endosurgical.

##### ii.    S.C. (Claim No. 0151883022)

328.    S.C.'s December 5, 2009 lumbar spine MRI showed a L5-S1 herniation measured at approximately 8.66 millimeters.

329.    The presence of a disc herniation in excess of five millimeters is an absolute contraindication to MUA.

330. Nonetheless, MUA was performed on S.C.'s spine on three occasions on September 2, 2010, September 11, 2010, and September 15, 2010. Dr. Quiroga and Dr. James performed and/or assisted in these procedures.

### 4. Serial MUA Procedures

331. According to the NAMUAP standards, a subsequent MUA after a preceding MUA procedure should only occur after evaluation to determine if the patient's response falls within the guidelines established by the NAMUAP to justify additional MUA.

332. Specifically, the NAMUAP states that if a patient regains 80% or more of normal biomechanical function during the first MUA and retains at least 80% of the functional improvement during post-MUA evaluation, then subsequent MUA is usually unnecessary.

333. If a patient regains 50% - 70% or less of normal biomechanical function during the first procedure and retains only 50% - 70% of improvement during post-MUA evaluation, then a second MUA is recommended.

334. If the patient continues to improve with the second MUA, but does not achieve at least an 80% improvement in function, then a third MUA is recommended.

335. If a patient shows a 10% - 15% improvement during the first MUA and continues to show a 10% - 15% functional improvement during post-MUA evaluations, it is recommended that additional evaluations be completed to establish the appropriateness of additional MUA.

336. The NAMUAP guidelines clearly state that evaluation is necessary after each MUA procedure in order to measure the effectiveness of the preceding procedure and to determine whether additional MUA is necessary.

337. The medical facility defendants and the physician defendants, however, prescribe "a series of three MUAs" for every patient.

338.    This recommendation for serial MUA is made in violation of NAMUAP standards, despite the fact that the medical facility defendants' and the physician defendants' procedure notes all contain the following sentence immediately after recommending three consecutive MUA procedures:  "The standards and protocols followed are set forth by the National Academy [sic] of MUA Physicians."

339.    The medical facility defendants and the physician defendants also ignore the NAMUAP guidelines regarding appropriate patient responses to warrant subsequent MUA.

340.    As discussed above, the ability to gauge a patient's response to MUA was often compromised by the fact that injections were commonly administered at or near the same time that MUA was performed.

341.    For all of these reasons, the serial MUA procedures recommended and performed by the medical facility defendants and the physician defendants were medically unnecessary.

            a.       **Exemplar Claims**

            i.        **S.T. (Claim No. 0167726223)**

342.    Patient S.T. was scheduled for and underwent MUA on three consecutive days: Friday, January 14, 2011; Saturday, January 15, 2011, and Sunday, January 16, 2011.

343.    As S.T.'s MUA procedures were scheduled without any intervening time between each over the course of a weekend, it is clear that Dr. Zamorano planned to proceed with all three MUA regardless of S.T.'s response to the preceding procedure.

344.    This is a clear violation of the NAMUAP guidelines, which mandate evaluation after each MUA procedure to justify the need for subsequent MUA.

### ii.    S.S. (Claim No. 0147742571)

345.    Patient S.S. was also scheduled for and underwent MUA on three consecutive days from September 24-26, 2010.

346.    As S.S.'s MUA procedures were scheduled and performed without any intervening time between each, it is clear that Dr. Zamorano planned to proceed with all three regardless of S.S.'s response to the preceding procedure.

347.    S.S.'s MUA procedures were performed in violation of the NAMUAP guidelines and without any medically-documented justification for the subsequent MUA procedures.

### iii.    S.C. (Claim No. 0151883022)

348.    Patient S.C. reported 90% relief of his pain after undergoing his second MUA treatment on September 11, 2010.

349.    Nonetheless, S.C. underwent a third MUA on September 15, 2010.

350.    The NAMUAP guidelines state that a third MUA is recommended where the patient does not achieve at least an 80% improvement in function after the second MUA.

351.    As S.C. reported improvement in excess of 80% (namely, 90%), the third MUA was performed in violation of NAMUAP standards and was medically unnecessary.

### iv.    T.G. (Claim No. 0162469241)

352.    After her first MUA procedure, allegedly performed by Dr. Jankowski on June 30, 2010, T.G. reported a 10%-20% relief from pain.

353.    The NAMUAP guidelines state that if the patient shows a 10%-15% improvement during the first MUA and continues to show a 10%-15% function improvement thereafter, additional evaluation should be conducted to establish the appropriateness of additional MUA.

354.    However, T.G. underwent a second MUA procedure the very next day, July 1, 2010.

355.    Her medical records do not reflect that an evaluation was done first to determine if the second MUA was appropriate.

356.    As the NAMUAP guidelines were ignored by the medical facility defendants and the physician defendants, and as the patient reported relief that may have rendered the second MUA unnecessary, the defendants are not entitled to reimbursement for the same.

### v.    R.H. (Claim No. 0100203001)

357.    Patient R.H. had her first MUA procedure on March 24, 2011 and her second MUA procedure on March 26, 2011.

358.    Both were performed by Dr. James at Endosurgical.

359.    In between, on March 25, 2011, R.H. underwent MWA.

360.    The NAMUAP guidelines state that "After the first MUA, patient rests at home after heat, interferential, stretching.  No manipulation."

361.    As R.H. underwent MWA the day after her first MUA, the efficacy of the first MUA could not be accurately assessed.

362.    Moreover, R.H. undergoing MWA on March 25, 2011 was contradictory to NAMUAP guidelines.

363.    Accordingly, there was no medical justification to perform the second MUA.

### vi.    A.C. (Claim No. 0159236595)

364.    Patient A.C. had MUA done on June 30, 2010, July 13, 2010, and July 20, 2010, all performed by Dr. Jankowski.

46

365. A.C. fell sometime between the second MUA (July 13, 2010) and the third MUA (July 20, 2010).

366. A.C. stated that she had almost 90% relief of her pain until her fall between the second and third MUAs.

367. After her fall, she again experienced significant pain.

368. Despite a separate trauma that occurred between the second and third MUAs and which dramatically increased the patient's pain, Dr. Jankowski did not examine A.C. or order testing or imaging to determine the source of her new pain or whether she had any fractures.

369. MUA is not indicated for an acute injury, particularly where there is no diagnosis.

370. Yet, Dr. Jankowski proceeded with a third MUA, even though A.C. had reported 90% pain relief after the second MUA until she suffered an acute injury (her fall). There was thus no diagnosis to justify the third MUA.

### 5. Excessive Anesthesia

371. The NAMUAP guidelines state in no uncertain terms that "MUA is performed with the patient in a semiconscious state."

372. Semiconscious is also called "twilight" anesthesia.

373. The medical facility defendants and the physician defendants were aware of the NAMUAP guidelines regarding anesthesia and also represented to Allstate that they used twilight anesthesia.

374. Indeed, in a letter to Allstate, Dr. Jankowski stated, "By placing the patient in a *twilight sleep*, . . . ." *See Exhibit 5 (emphasis added).*

375.     Despite the NAMUAP guidelines and the medical facility defendants' and the physician defendants' own representations, most patients were fully sedated during their MUA procedures, usually with Propofol.

376.     The medical facility defendants and the physician defendants ignored the guidelines that they represented to Allstate they adhere to and which are established by the same entity that trains them to perform MUA, and rejected other sedation options in favor of one that is more costly and poses a higher risk to patients.

377.     Full sedation is not needed for MUA.

378.     In fact, twilight anesthesia is often used in procedures more invasive than MUA, including gastrointestinal endoscopic procedures such as colonoscopies and esophagogastroduodensocopies.

379.     Serious complications can arise from the use of excessive anesthesia.

            a.     **Exemplar Claims**

                  i.     **K.B. (Claim No. 0100212501)**

380.     As discussed above, patients were subjected to excessive anesthesia when undergoing MUA.

381.     K.B. was one such patient.

382.     K.B. was fully sedated during a MUA procedure performed by Dr. Jankowski and Dr. James on March 12, 2011.

383.     In recovery after this procedure, K.B.'s blood oxygenation plummeted to 29%, an extremely low level.

384.     A jaw thrust maneuver was required to reestablish K.B.'s airway.

385.    Despite this serious trauma, K.B. was discharged from Endosurgical less than thirty (30) minutes after the MUA procedure.

### ii.    S.S. (Claim No. 0147742571)

386.    Patient S.S. underwent MUA on three consecutive days from September 24-26, 2010, all performed by Dr. Zamorano at Endosurgical.

387.    S.S.'s airway became blocked while undergoing the second MUA procedure.

388.    S.S. became cyanotic and awoke to a clinician performing a jaw thrust maneuver to reestablish her airway.

389.    Despite the complications during the second MUA, S.S. had a third MUA the very next day.

390.    Three days after the jaw thrust maneuver was done to reestablish her airway, and two days after S.S. completed MUA, S.S. developed Bell's Palsy, which is paralysis of the facial nerve.

391.    A brain MRI and MRA of S.S.'s head and neck revealed swelling of the facial nerve.

392.    Bell's Palsy can be caused by virus, but it can also be caused by trauma.

393.    Three consecutive days of cervical neck thrusts, which involve hands on the skull over the facial nerve, and emergency jaw thrusts to reestablish an airway are a more plausible and logical explanation for S.S.'s Bell's Palsy than a virus.

394.    Moreover, if S.S. had been placed only in twilight sleep, which the defendants should have done for the reasons discussed above, hypoxia may not have occurred, the jaw thrust may not have been necessary, and S.S.'s Bell's Palsy may never have developed.

**B.     Other Unnecessary Medical Treatment**

395.   In addition to performing medically unnecessary MUA, the defendants also subjected patients to other unnecessary medical procedures.

**1.     Injections**

396.   For example, ESIs and TPIs were often administered in areas where patients had not complained of symptoms and/or where there had not been an examination or imaging of the area to be injected.

**a.     Exemplar Claims**

**i.     E.B. (Claim No. 0200485696)**

397.   Patient E.B. never complained of thoracic pain.

398.   E.B. was examined by no less than four medical professionals whose records and notes do not document that there was tenderness or pain in E.B.'s thoracic region.

399.   In fact, on September 1, 2011, E.B. separately saw Dr. Sabit and another physician.

400.   In both visits, she stated that she had no pain and that she was going back to the Philippines because she was pain-free.

401.   Nonetheless, five days later, Dr. James saw E.B.

402.   Dr. James's pre-operative and post-operative diagnosis was "severe lumbar and thoracic pain due to post motor vehicle accident trauma."

403.   Dr. James then administered thoracic TPIs on E.B. on September 6, 2011.

404.   There was no justification for the TPIs, as the patient never complained of thoracic pain and no doctor ever found anything wrong with her thoracic spine during the entire course of her treatment.

### ii.   S.B. (Claim No. 0188111892)

405.   Dr. James performed thoracic paraspinal TPIs on patient S.B. on September 22, 2011.

406.   S.B.'s medical records do not contain any mention of thoracic pain until September 22, 2011, when Dr. James performed the TPIs.

407.   In fact, Dr. Quiroga had earlier stated that S.B.'s cervical and thoracic spine were asymptomatic.

408.   As there was no documented need for S.B. to receive TPIs to her thoracic spine, the same were medically unnecessary.

### iii.   L.M. (Claim No. 0159823789)

409.   On February 22, 2010, in his first visit with patient L.M., Dr. James recommended and planned to administer ESIs and TPIs.

410.   L.M.'s motor vehicle accident had occurred only three weeks earlier (February 3, 2010).

411.   No imaging had been done before Dr. James made his recommendation for injections.

412.   L.M. in fact received ESIs on May 22, 2010 and June 5, 2010 at Endosurgical.

413.   As there was no documented basis to administer ESIs, the same were medically unnecessary.

### 2.   Spinal Fusion Surgeries

414.   Lumbar vertebral fusions were performed on three of the patients at issue in this Complaint.

51

415.    There was little indication for such invasive procedures as to any of the three patients.

416.    Indeed, all three patients were young at the time of their respective fusion surgeries.

417.    Young patients are not routine candidates for intervertebral fusions without overt evidence of instability, such as vertebrae sliding off of another (spondylolisthesis), vertebral fractures, or defects.

418.    Moreover, lumbar fusion is not recommended as routine treatment following primary or recurrent disc excision, unless there is evidence of preoperative lumbar deformity, instability, or chronic low back pain.

419.    Nor is posterolateral lumbar fusion recommended as a treatment option in patients with lumbar stenosis without preexisting spinal instability.

420.    Finally, lumbar fusion should not be pursued where nonsurgical treatment options exist.

### a.    Exemplar Claims

#### i.    N.P. (Claim No. 0164903106)

421.    N.P. underwent lumbar fusion surgery on November 30, 2011.

422.    Dr. Jankowski assisted on this surgery.

423.    At the time of his fusion surgery, N.P. was in his early thirties.

424.    In August 2010, just a few months after his alleged motor vehicle accident on April 7, 2010, N.P. was examined by an orthopedic spine surgeon, who stated, "I do not think that the pathology that I see is significant enough to warrant surgery based on his symptoms and the examination."

425.    N.P. also told the orthopedic spine surgeon that the pain in his leg only went to his knee, not past, which is not a typical referral pattern for lumbar radiculopathy, particularly at the L4-5 level where N.P.'s fusion eventually occurred.

426.    N.P.'s pathology leading up to the surgery did not support that he needed fusion surgery.

427.    Moreover, N.P. had not exhausted less invasive treatment than spinal surgery before undergoing fusion.

428.    For all of these reasons, the lumbar fusion performed on N.P. was not medically necessary.

### ii.    J.L. (Claim No. 0200584076)

429.    J.L. underwent lumbar fusion surgery on May 20, 2011.

430.    Dr. Jankowski assisted on the surgery.

431.    J.L. was in his early thirties at the time of the surgery.

432.    J.L. was involved in a minor motor vehicle accident on November 23, 2010.

433.    J.L.'s vehicle was rear-ended and had little damage as a result of the accident.

434.    Nonetheless, less than six months after this minor accident, J.L. underwent a two-level spinal fusion at L4-5 and L5-S1.

435.    J.L.'s MRIs showed only annular tears at the two levels and a disc protrusion at L5-S1.

436.    These findings were not sufficient to warrant spinal fusion surgery.  As such, J.L.'s surgery was not medically necessary.

### 3.    Platelet-Rich Plasma Injections

437.    Platelet-rich plasma (PRP) injection is a procedure that involves drawing blood from the patient; spinning the blood in a centrifuge to separate the red blood cells from the healing elements in the plasma, including platelets; and then injecting the healing elements back into the patient's tissue.

438.    PRP is not a mainstream procedure and no long-term research supports its use as a first-line treatment for pain.

439.    PRP is not indicated for pain management and is not designed to manage pain.

440.    PRP is not appropriate treatment for rotator cuff impingement.

441.    Indeed, no long-term evidence exists to support its use in rotator cuff tendinitis or tears.

### a.    Exemplar Claims

#### i.    S.N. (Claim No. 0181065624)

442.    S.N. was allegedly injured in a motor vehicle accident on May 1, 2010.

443.    S.N. treated with Dr. Jankowski at Summit for several months thereafter related to her complaints of low back pain.

444.    On February 1, 2011, S.N. complained of right shoulder pain for the first time.

445.    Dr. Jankowski diagnosed S.N. with right shoulder internal derangement, including rotator cuff tendinitis and impingement, but did not perform an exam to measure her strength scales, though he purported to rely on the same in rendering his diagnosis.

446.    Nor was imaging of S.N.'s shoulder ever done to support this diagnosis.

447.     Neither Dr. Jankowski nor any other physician at Summit recommended physical therapy and/or a therapeutic corticosteroid injection, both of which are scientifically proven to treat rotator cuff impingement.

448.     Instead, on April 30, 2011, S.N. needlessly underwent PRP at Endosurgical performed by Dr. James.

449.     The operative report for the PRP procedure states that it is "being performed today for pain management."

450.     PRP is not indicated for pain management and is not designed to manage pain.

451.     As the diagnosis of rotator cuff tendinitis and impingement was never substantiated, and as PRP is not indicated for the use it was expressly prescribed for (namely, pain management), the PRP injection administered to S.N. was not medically necessary.

452.     Allstate was also billed $3,630 for anesthesia services provided during the PRP.

453.     The use of anesthesia for PRP injections is unnecessary.

454.     Indeed, the pain provoked by the PRP injection continues well after the injection procedure.

455.     Thus, there is no justification to sedate the patient during the procedure itself.

### ii.     J.L. (Claim No. 0200584076)

456.     Patient J.L. also received a series of PRP injections to his shoulder.

457.     As noted previously, PRP is not approved for pain management.

458.     Nonetheless, Dr. James states that "a plasma rich platelet therapy injection have [sic] been prescribed along with a manipulation under anesthesia procedure to help [J.L.] with his pain management."

459.     Nor was an examination of J.L.'s shoulder ever done to substantiate the diagnosis of rotator cuff tear or impingement.

460.     Accordingly, the PRP injections administered to J.L. were not medically necessary.

### C.     Use of Boilerplate and Template Reports/Notes

461.     The procedure notes for MUA and for the injections performed by the medical facility defendants and the physician defendants reveal that the defendants did not evaluate and document treatment and progress for individual patients.

462.     Instead, the medical facility defendants and the physician defendants utilized template reports and boilerplate notes in the records of nearly every patient to justify the expensive, but unnecessary, procedures they were recommending and performing.

463.     The same note is repeated throughout the patient's file by the medical facility defendants.

464.     The only change is an extra paragraph referencing the patient's response to a prior procedure.

465.     That additional paragraph is also remarkably similar each time.

466.     Susan Barone, the office manager of Endosurgical, testified on October 14, 2011 that she prepares the notes and reports for the procedures done at Endosurgical using templates.

467.     The only change Susan Barone makes to the report to make it accurate to the patient to whom it applies is to note the date of the particular procedure.

468.     Susan Barone further testified that doctors do not review and sign the reports she generates.

469.     Instead, the reports are sent directly to the billing company.

470.     Thus, the notes and reports submitted to Allstate by Endosurgical were neither written nor reviewed by a person who was present during the procedure.

471.     Clinic notes should accurately describe what happened in every physician encounter with the patient.

472.     This is essential for proper billing and compliance with medical and ethical standards.

473.     It is also essential for patient safety.

474.     The lack of properly maintained clinic notes can lead to needless duplicative services being documented in medical records and billed to Allstate.

475.     Moreover, the occurrence of multiple physicians dictating the same note undermines the credibility of any note written by the physician defendants.

476.     Using boilerplate templates leads to procedures and techniques being performed that are not specific to the patient's individual complaints and findings.

477.     They allow clinicians, like the medical facility defendants and the physician defendants, to bill for procedures that can be done rather than should be done.

## IX.     <u>SERVICES NOT RENDERED</u>

478.     In addition to billing Allstate for medical procedures that were not reasonably necessary, the defendants also billed Allstate for procedures that never actually occurred.

479.     For example, Allstate was billed for a MUA procedure that was purportedly performed on patient T.G. (Claim No. 0162469241).

480.     Dr. Jankowski generated a report for MUA that he purportedly performed on T.G. on June 30, 2010.

57

481.   Reports were also created for two additional MUA procedures on July 1, 2010 and July 6, 2010.

482.   The procedure notes for all three MUA are nearly identical, except where Dr. Jankowski references the prior MUA in the notes for the second and third MUA.

483.   Allstate was billed for the performance of MUA to three regions of the body on the three days of MUA treatment, including June 30, 2010.

484.   Nursing notes from June 30, 2010, however, show that T.G.'s blood pressure was elevated each time it was measured on that day.

485.   The nursing notes state that the scheduled MUA procedure was cancelled because the patient's blood pressure was not controlled.

486.   Indeed, the following handwritten note appears on the operative note from Dr. Jankowski and Summit: "Procedure was cancelled/stopped due to patient not taking meds." *See Exhibit 6.*

487.   Despite the fact that the June 30, 2010 procedure was cancelled, a procedure note was generated for a MUA procedure that never happened.

488.   Subsequent procedure notes also indicate that MUA took place on June 30, 2010.

489.   For example, the note for the July 1, 2010 MUA procedure references improvement in pain and sleep in response to the first MUA, even though the June 30, 2010 procedure never happened.

490.   The defendants billed Allstate for the June 30, 2010 MUA procedure, a service that was never actually rendered to T.G.

491.   Summit's billing for services not rendered to T.G. on June 30, 2010 is an example of fraudulent billing.

58

## X.    <u>FRAUDULENT BILLING PRACTICES</u>

492.    Michigan's No-Fault Act requires an insurer to reimburse all reasonable and customary charges and expenses rendered to an insured injured in a motor vehicle accident.

493.    The medical facility defendants routinely charged Allstate unreasonable amounts for the services they allegedly rendered.

494.    Bills submitted to Allstate by the medical facility defendants were submitted on Health Insurance Claim Forms (HCFA) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

495.    The back of all HCFA forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

496.    Despite the warning on the back of the HCFA forms, the medical facility defendants included false, incomplete, and/or misleading information in the bills and supporting documentation submitted to Allstate for payment.

497.    The medical facility defendants also engaged in a pattern of billing for procedures that were never performed, billing for office visits that were not documented as performed, billing for physicians who were not actually present during procedures, billing for post-operative visits during the ninety (90) day global period following a surgery, and billing incorrect procedure codes to inflate the charges submitted to Allstate.

498.    The medical facility defendants violated the Michigan No-Fault Act and defrauded Allstate by these fraudulent billing practices.

499.    As such, Allstate is not liable to pay said charges and is entitled to reimbursement for payments already made.

### A.    Amounts Charged by the Medical Facility Defendants Are Not Reasonable

500.    The medical facility defendants, and Endosurgical in particular, utilized an improper method to determine billing rates that are not reasonable.

501.    Patricia Clarke ("Clarke"), the biller for the ambulatory surgery center in New Jersey that is owned by Focazio, testified on August 25, 2011 that she performed the billing for Endosurgical for at least some of the time relevant to the allegations contained in the within Complaint.

502.    Clarke testified that she used the amount charged for services rendered at Focazio's ambulatory surgical center in New Jersey to bill for services performed at Endosurgical in Michigan and that she never adjusted the bills to reflect the difference between reasonable New Jersey charges and reasonable Michigan charges.

503.    Clarke agreed during her deposition that "charges in New Jersey are substantially higher than in Michigan."

504.    In his own deposition, also taken on August 25, 2011, Focazio too acknowledged that fees differ between New Jersey and Michigan.

505.    Despite this acknowledgement, Focazio further testified that the charges for procedures performed in Michigan at Endosurgical are the same as the charges for services provided at his New Jersey ambulatory surgical center.

506.    The testimony of Clarke and Focazio makes clear that the charges submitted to Allstate by Endosurgical and Greater Lakes Anesthesia were not reasonable because they were based on the amounts charged in New Jersey, a state with significantly higher average charges.

60

507.    Endosurgical's billing practice in this regard also violates the NAMUAP guidelines, which state that "[f]ees [for MUA] must be reasonable and in relation to standards and relative values within each state."

**B.    Billing for Office Visits Not Documented as Performed**

      **1.    Exemplar Claim**

           **a.    K.B. (Claim No. 0100212501)**

508.    Summit billed Allstate for office visits related to patient K.B. on three (3) dates of service: April 11, 2011; April 18, 2011; and May 9, 2011.

509.    Medical records subpoenaed from Summit regarding K.B. do not include any documentation to support office visits on any of these three (3) dates.

510.    Summit billed Allstate $100.00 for an April 11, 2011 office visit for K.B. that is not supported by the documentation and medical records subpoenaed from Summit.

511.    Summit billed Allstate $200.00 for a April 18, 2011 office visit for K.B. that is not supported by the documentation and medical records subpoenaed from Summit.

512.    Summit billed Allstate $200.00 for a May 9, 2011 office visit for K.B. that is not supported by the documentation and medical records subpoenaed from Summit.

513.    Summit's billing for office visits not documented as performed for K.B. is an example of a fraudulent billing practice.

**C.    Billing for Physicians Not Present During Procedures**

514.    The medical facility defendants submitted bills to Allstate seeking payment for the services of physicians who are not documented as being present during the billed-for procedure.

### 1.      Exemplar Claims

#### a.      S.C. (Claim No. 0151883022)

515.    Michigan Surgical Group billed Allstate for MUA procedures of S.C.'s cervical spine, thoracic spine, lumbar spine, pelvis, bilateral hips, shoulder, and knee on September 2, 2010.

516.    The Endosurgical operative report for the September 2, 2010 MUA procedures lists Dr. Quiroga as the primary surgeon and Dr. James as the assistant surgeon.

517.    The Endosurgical medical record documentation does not support that Dr. Quiroga was even present for any portion of S.C.'s MUA procedures on September 2, 2010.

518.    Despite this fact, Michigan Surgical Group billed Allstate $12,150 for Dr. Quiroga's services purportedly performed for S.C. on September 2, 2010.

519.    Michigan Surgical Group also billed Allstate $12,150 for Dr. James's services performed at the same time Dr. Quiroga purportedly performed services for S.C. on September 2, 2010.

520.    In total, Michigan Surgical Group billed Allstate $24,300 for the September 2, 2010 MUA procedures purportedly performed for S.C.

**521.**    Michigan Surgical Group's billing for Dr. Quiroga's services not supported as rendered to S.C. on September 2, 2010 is an example of a fraudulent billing practice.

#### b.      K.B. (Claim No. 0100212501)

522.    Summit billed Allstate for MUA procedures of K.B.'s lumbar spine, pelvis and hips on March 5, 2011.

523.    The Endosurgical operative report for the March 5, 2011 MUA procedures lists Dr. Jankowski as the primary surgeon and Dr. James as the assistant surgeon.

524.     The Endosurgical medical record documentation does not support that Dr. Jankowski was even present for any portion of K.B.'s MUA procedures on March 5, 2011.

525.     Despite this fact, Summit billed Allstate $8,650 for Dr. Jankowski's services purportedly performed for K.B. on March 5, 2011.

526.     Summit also billed Allstate $8,650 for Dr. James's services performed at the same time Dr. Jankowski purportedly performed services for K.B. on March 5, 2011.

527.     In total, Summit billed Allstate $17,300 for the March 5, 2011 MUA procedures purportedly performed for K.B.

528.     Summit's billing for Dr. Jankowski's services not supported as rendered to K.B. on March 5, 2011 is an example of a fraudulent billing practice.

### c.     K.B. (Claim No. 0100212501)

529.     Summit billed Allstate for MUA procedures of K.B.'s lumbar spine, pelvis and hips on March 12, 2011.

530.     The Endosurgical operative report for the March 12, 2011 MUA procedures lists Dr. Jankowski as the primary surgeon and Dr. James as the assistant surgeon.

531.     The Endosurgical medical record documentation does not support that Dr. Jankowski was even present for any portion of K.B.'s MUA procedures on March 12, 2011.

532.     Despite this fact, Summit billed Allstate $8,650 for Dr. Jankowski's services purportedly performed for K.B. on March 12, 2011.

533.     Summit also billed Allstate $8,650 for Dr. James's services performed at the same time Dr. Jankowski purportedly performed services for K.B. on March 12, 2011.

534.     In total, Summit billed Allstate $17,300 for the March 12, 2011 MUA procedures purportedly performed for K.B.

535.    Summit's billing for Dr. Jankowski's services not supported as rendered to K.B. on March 12, 2011 is an example of fraudulent billing practices.

**D.      Summit Billed for Post-Operative Office Visits By a Surgeon During the 90 Day Global Period Following a Surgery**

**1.      Exemplar Claims**

**a.      K.B. (Claim No. 0100212501)**

536.    Summit billed Allstate for an April 5, 2011 surgery at a Summit facility for K.B.

537.    It is well-established that medical providers cannot bill for post-operative visits for a  ninety (90) day period following a surgery.

538.    Despite this fact, Summit billed Allstate for three (3) different post-operative office visits K.B. purportedly had at Summit's facility on April 11, 2011; April 18, 2011; and May 19, 2011.

539.    These three (3) post-operative visits should not have been billed as these office visits were within ninety (90) days of K.B.'s surgery and, therefore, were considered to be included in the surgeon's fee billed for the procedure performed on April 5, 2011.

540.    Summit's billing for office visits within ninety (90) days of K.B.'s April 5, 2011 surgical procedure is another example of a fraudulent billing practice.

**E.      Billing Incorrect Procedure Codes to Submit Inflated Charges to Allstate**

541.    In order for medical providers to receive correct payment for their services, they must correctly identify the procedure performed.

542.    Specific procedures performed are identified by the use of Current Procedural Terminology (CPT) codes created by the American Medical Association (AMA) and found in the CPT codebook, which is updated annually.

64

543.    The AMA provides directives on how to correctly apply these CPT codes in both the CPT codebook and in the monthly CPT Assistant publication.

544.    It is the responsibility of the medical provider to select the CPT code that accurately identifies the services performed.

545.    Some CPT codes are considered to be at a higher level due to the complexity of the procedure.

546.    Reimbursement for medical services is directly proportionate to the level of the CPT code billed, i.e., the higher the level of CPT code billed the greater the amount of reimbursement.

547.    A medical provider who bills at a higher level CPT code than that actually performed, for the purpose of receiving higher reimbursement, is an example of a fraudulent billing practice.

      **1.**      **Upcoding: Billing for Diagnostic Epidurograms to Receive More Money Than Billing for Fluoroscopic Guidance for Needle Placement During Spinal Injections**

548.    As the AMA explains in the CPT Assistant publication, epidurograms are diagnostic in nature to evaluate the anatomy of the epidural space to discern if there are any obstructions that would prevent the spread of therapeutic substances injected.

549.    The CPT code for epidurograms is 72275.

550.    In contrast, fluoroscopic guidance is used when performing spinal injections to confirm accurate placement of the spinal needle before medication is injected.

551.    The CPT code for fluoroscopic guidance of spinal injections is 77003.

552.    Because an epidurogram is considered to be more complex than fluoroscopic guidance, the provider bills a higher amount for an epidurogram.

553.    The presence of a formal report, in itself, does not elevate fluoroscopic guidance for needle placement to that of a diagnostic epidurogram, especially when previous normal epidurogram results were reported.

554.    Billing a diagnostic epidurogram when no more than fluoroscopic guidance for needle placement is done, is an example of upcoding.

555.    Upcoding, when done with knowledge and intent, is an example of a fraudulent billing practice.

### a.    Exemplar Claims

### i.    T.G. (Claim No. 0162469241)

556.    Summit billed Allstate for Dr. James's services performing a diagnostic epidurogram while also performing lumbar spine epidural injections on T.G. on four (4) dates of service: September 11, 2010; October 2, 2010; November 18, 2010; and December 11, 2010.

557.    Dr. James reported  T.G.'s epidurogram results to be normal.

558.    Despite the normal findings, Summit upcoded when it billed Allstate for Dr. James's performance of diagnostic epidurograms on all four (4) dates of service instead of billing fluoroscopic guidance after normal results were found.

559.    Summit's billing for Dr. James's services for diagnostic epidurograms after normal results were found is an example of a fraudulent billing practice.

### ii.    S.C. (Claim No. 0151883022)

560.    Michigan Surgical Group billed Allstate for Dr. James's performance of diagnostic epidurograms while also performing lumbar spine epidural injections on S.C. on three (3) dates of service:  September 11, 2010; September 15, 2010; and October 23, 2010.

561.    Dr. James reported  S.C.'s epidurogram results to be normal.

66

562.     Despite the normal findings, Michigan Surgical Group upcoded when it billed Allstate for Dr. James's performance of diagnostic epidurograms on all three (3) dates of service instead of billing fluoroscopic guidance after normal results were found.

563.     Michigan Surgical Group's billing for Dr. James's services for diagnostic epidurograms after normal results were found is an example of a fraudulent billing practice.

> ## 2.     Unbundling:  Billing Individual Components of a Procedure That Are Included in a Single CPT Code

564.     An example of unbundling occurs when a medical provider bills separately for individual components of a procedure which are included in another CPT code also billed for the same date of service.

> ### a.     Exemplar Claims

> ### i.     K.B. (Claim No. 0100212501)

565.     As of January 1, 2011, providers billing CPT code 64483 for transforaminal epidural steroid injections of the lumbar area are required to provide fluoroscopic imaging guidance for needle placement.

566.     Therefore, providers billing CPT code 64483 as of January 1, 2011 could not also bill CPT code 77003 for fluoroscopic guidance of needle placement, which is a required part of that procedure.

567.     Summit billed Allstate using CPT code 64483 for transforaminal epidural steroid injections of the lumbar area on K.B. on three (3) dates of service:  June 28, 2011; July 12, 2011; and August 2, 2011.

568.     Despite the CPT codebook directive that CPT code 64483 now includes fluoroscopic guidance, Summit billed Allstate using CPT code 77003 in addition to CPT code 64483 on each of the three (3) dates of service.

569.     Summit's billing for CPT code 77003 in addition to CPT code 64483 is an example of unbundling.

570.     Unbundling, if done with knowledge and intent, is an example of fraudulent billing.

## XI.     SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

571.     As discussed above, the medical facility defendants, Dr. Jankowski, Dr. James, Angelo, Focazio, Weiner & Associates, Pacific Marketing, and Firosz devised and agreed to enact a scheme to defraud Allstate by soliciting legal clients/medical patients.

572.     This solicitation was accomplished through the use of runners by Weiner & Associates (including Joe Barone); the utilization of 800-US-LAWYER by Angelo, Weiner & Associates, and Pacific Marketing; and agreements by and between the defendants identified in the preceding paragraph that were arranged by Angelo.

573.     The solicitation of clients/patients was done for the purpose of ensuring that victims of motor vehicle accidents would be sent to the medical facility defendants, who billed Allstate for medical treatment that was not necessary and the charges for which were not reasonable.

574.     The treatment purportedly provided by the medical facility defendants was not necessary because (1) it was done pursuant to a predetermined protocol and not based on the client's/patient's clinical needs, (2) it was not supported by a proper medical assessment/diagnosis, and (3) it did not adhere to established medical guidelines and standards.

575.     Despite knowing that the services provided by the medical facility defendants were not compensable under the No-Fault Act (both because Weiner & Associates adhered to the predetermined protocol in place and because Weiner & Associates directed patient care), Weiner

68

& Associates used the extent and fact of treatment to inflate and bolster the claims submitted to Allstate when negotiating payment and during litigation of claims.

576.     The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibit 7 was to collect No-Fault benefits to which the medical facility defendants, Dr. Jankowski, Dr. James, Angelo, Focazio, Weiner & Associates, Pacific Marketing, and Firosz were not entitled because the medical services rendered, if at all, were not necessary and because these defendants engaged in fraudulent billing practices, including those discussed in section X above.

577.     This objective necessarily required the submission of claims to Allstate.

578.     The medical facility defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

579.     Unless otherwise pled to the contrary, all documents, medical records, notes, reports, HCFAs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

580.     Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

581.     Allstate estimates that the fraudulent medical billing scheme detailed herein generated hundreds of mailings.  A table highlighting representative examples of mail fraud arising from the medical facility defendants' patient/business files is annexed hereto at Exhibit 7.

582.     Angelo, Focazio, Dr. Jankowski, and Dr. James are the owners of Endosurgical and Greater Lakes Anesthesia, Summit, and Michigan Surgical Group, respectively.

583.     Thus, Angelo, Focazio, Dr. Jankowski, and Dr. James, by and through the medical facility defendant in which each has an interest, mailed or caused to be mailed documents, including medical reports, records, and bills, that materially misrepresented that the medical facility defendants were (1) providing reasonably necessary medical treatment, and (2) that the charges for said services were reasonable.

584.     Weiner & Associates knew, and it was reasonably foreseeable, that the medical facility defendants would submit false medical documentation, including the representative mailings detailed in Exhibit 7 annexed hereto, for No-Fault reimbursement through the U.S. Mail related to the clients/patients that Weiner & Associates referred to them.

585.     Indeed, it was within the ordinary course of business for each medical facility defendant to submit claims for No-Fault reimbursement to insurance carriers like Allstate through the U.S. Mail, as Weiner & Associates was aware.

586.     Moreover, Weiner & Associates facilitated the use of the mails by the medical facility defendants by wrongfully soliciting clients/patients and referring them to the medical facility defendants in the first place.

587.     As Angelo, Focazio, the medical facility defendants, Dr. Jankowski, Dr. James, Weiner & Associates, Pacific Marketing, and Firosz agreed that the medical facility defendants would use (and did in fact use) the mails in furtherance of their scheme to defraud Allstate by

70

seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.  A table detailing representative examples of the mail fraud agreed to and perpetrated by these defendants is attached hereto at Exhibit 7, and includes specific information regarding the date, the sender, the recipient, and the content of such mailings.

588.    As discussed above, the representative mailings identified on Exhibit 7 contained misrepresentations of fact regarding the medical necessity of the treatment for which Allstate was billed.

589.    Allstate reasonably relied on the submissions it received from the medical facility defendants through the U.S. Mail in tendering payment to the medical facility defendants, including those payments detailed in Exhibits 8 (Endosurgical), 9 (Greater Lakes Anesthesia), 10 (Summit), and 11 (Michigan Surgical Group).

590.    As Angelo, Focazio, the medical facility defendants, Dr. Jankowski, Dr. James, Weiner & Associates, Pacific Marketing, and Firosz agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XII.  SPECIFIC ALLEGATIONS OF MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.    Misrepresentations by the Medical Facility Defendants and Their Owners

591.    To induce Allstate to promptly pay the fraudulent charges for unnecessary medical services, the medical facility defendants submitted or caused to be submitted to Allstate false medical documentation which materially misrepresented that the medical services they provided were necessary within the meaning of the Michigan No-Fault Act and that the charges for the same were reasonable.

71

592.    Each HCFA submitted to Allstate by the medical facility defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

593.    Through the submission of patient records, invoices, HCFAs, and other medical documentation to Allstate via the U.S. Mail, the medical facility defendants attested to the fact and medical necessity of the visits, examinations, interviews, screenings, testing, procedures, and ancillary services for which they billed Allstate.

594.    As the medical facility defendants did not render reasonably necessary medical treatment and as they engaged in fraudulent billing practices (discussed in sections VIII and X above, respectively), each bill and accompanying documentation submitted by the medical facility defendants to Allstate constitutes a material misrepresentation.

595.    The medical facility defendants are owned by Angelo (Endosurgical and Greater Lakes Anesthesia), Focazio (same), Dr. Jankowski (Summit), and Dr. James (Michigan Surgical Group).

596.    As licensed medical professionals, Dr. Jankowski and Dr. James were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

597.    The facially valid documents submitted to Allstate by the medical facility defendants and their owners were designed to, and did in fact, induce Allstate to rely on the accuracy of such documents.

## B.  Misrepresentations by Weiner & Associates

598.    As discussed above, Weiner & Associates knew, and it was reasonably foreseeable, that the medical facility defendants would submit bills, and related documentation, for No-Fault reimbursement through the U.S. Mail related to the clients/patients that Weiner & Associates referred to them.

599.    Weiner & Associates also submitted correspondence, medical records, and bills directly to Allstate for services allegedly provided to its clients by the medical facility defendants.

600.    The correspondence sent to Allstate by Weiner & Associates was for the purpose of collecting payments under the No-Fault Act and was often accompanied by medical records and bills regarding the treatment allegedly provided to clients by the medical facility defendants. *See examples of correspondence from Weiner & Associates to Allstate attached hereto at Exhibit 12.*

601.    The sample correspondence annexed hereto at Exhibit 12 is representative of correspondence sent to Allstate by Weiner & Associates related to all of its clients identified in paragraph 139 above.

602.    Similarly, employees of Weiner & Associates engaged in telephone conversations with employees of Allstate regarding the payment of No-Fault benefits to and on behalf of the client, including payment for medical services provided by the medical facility defendants.

603.    These telephone conversations by and between Weiner & Associates employees and Allstate employees include:

- Call from Weiner & Associates to Allstate on June 8, 2010 regarding claim submitted relative to patient M.H. (Claim No. 0168743235);

73

- Call from Weiner & Associates to Allstate on November 2, 2010 regarding additional paperwork needed by Allstate regarding claim submitted relative to patient M.H. (Claim No. 0168743235);

- Call from Weiner & Associates to Allstate on November 3, 2010 requesting that Allstate fax application of benefits relative to patient M.H. (Claim No. 0168743235);

- Call from Weiner & Associates to Allstate on January 6, 2011 leaving voice message inquiring about PIP benefits relative to patient S.N. (Claim No. 0181065624); and

- Call between Weiner & Associates and Allstate on November 12, 2010 regarding claim information relative to patient P.S. (Claim No. 0181475161).

604.    Weiner & Associates, thus, telephonically transmitted misrepresentations of fact regarding the compensability of the treatment rendered to its clients by the medical facility defendants.

605.    The correspondence, and medical records and bills submitted therewith, sent to Allstate by Weiner & Associates likewise contained material misrepresentations of fact regarding the compensability of the treatment rendered by the medical facility defendants.

606.    Indeed, as Weiner & Associates referred its clients to the medical facility defendants for the purpose of generating claims and not based on clients' actual medical needs, and as Weiner & Associates directed and ordered the medical treatment received by its clients, Weiner & Associates knew that in fact the services rendered by the medical facility defendants were not reasonably necessary and, therefore, were not compensable under Michigan's No-Fault Act.

607.    Despite knowing that the medical treatment received by its clients from the medical facility defendants, to the extent it was actually rendered, was not medically necessary, Weiner & Associates verbally communicated and submitted letters and medical records to Allstate demanding payment for the same.

608.    Weiner & Associates intended for Allstate to act in reliance on its submissions representing the medical necessity of the treatment received by its clients.  The intended action was payment by Allstate for the claims submitted by Weiner & Associates and the medical facility defendants relative to clients of Weiner & Associates.

609.    In reasonable reliance on the submissions by Weiner & Associates, including the medical records and bills from the medical facility defendants, Allstate did in fact tender payment for the medical treatment purportedly rendered to Weiner & Associates clients, including those Weiner & Associates clients identified in Exhibits 8 to 11.

### C.    Allstate's Justifiable Reliance

610.    At all relevant times, the medical facility defendants, Dr. Jankowski, Dr. James, Angelo, Focazio, Weiner & Associates, and Firosz concealed from Allstate facts regarding the fact and medical necessity of medical procedures performed for patients of the medical facility defendants/clients of Weiner & Associates to prevent Allstate from discovering that the claims submitted by Endosurgical, Greater Lakes Anesthesia, Summit, and Michigan Surgical Group were not compensable under the No-Fault Act.

611.    These misrepresentations include submitting false medical documentation, including HCFAs, documenting the fact and necessity of medical treatment in order to seek reimbursement under the No-Fault Act.

75

612.     These misrepresentations include submissions and statements made by Weiner & Associates, including those set out in paragraphs 598 to 609 above.

613.     Evidence of the fraudulent scheme detailed herein was not discovered until after patterns had emerged and Allstate began to investigate the medical facility defendants, Dr. Jankowski, Dr. James, Angelo, Focazio, Weiner & Associates, Pacific Marketing, Elite Surgical, and Firosz, revealing the true nature and full scope of their fraudulent scheme.

614.     Due to these defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed its original Complaint.

615.     In reliance on these defendants' misrepresentations, Allstate paid money to the medical facility defendants to its detriment.

616.     Allstate would not have paid these monies had the defendants provided true and accurate information about the necessity of the medical services provided.

617.     Allstate would not have paid these monies had the medical facility defendants and Weiner & Associates not misrepresented the facts surrounding how patients were referred to the medical facility defendants (i.e., pursuant to a predetermined arrangement).

618.     As a result, Allstate has paid in excess of $171,064 in reasonable reliance on the false medical documentation and false representations regarding the medical facility defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XIII.   DAMAGES

619.     The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

76

620.     Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $171,064.

621.     Exhibits 8 (Endosurgical), 9 (Greater Lakes Anesthesia), 10 (Summit), and 11 (Michigan Surgical Group), annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the medical facility defendants.

622.     Allstate's claim for compensatory damages, as set out in Exhibits 8 to 11, does not include payment made with respect to any assigned claim facility claimant.

623.     Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the fraudulent activities of defendants Endosurgical, Greater Lakes Anesthesia, Summit, GLMM, Michigan Health, Angelo, Focazio, Dr. Jankowski, Elite Surgical, Pacific Marketing, Weiner & Associates, Dr. James, Michigan Surgical Group, and Firosz, and the cost of claims handling for claims submitted by all defendants pursuant to Mich. Comp. Law § 500.3148(2).

## XIV.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Endosurgical Enterprise)
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

624.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

625.     Endosurgical constitutes an "enterprise," as defined in 18 U.S.C. § 1961(4).

77

626.    In connection with each of the claims identified in the within Complaint, Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Endosurgical, or knew that such false medical documentation would be mailed in the ordinary course of Endosurgical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Endosurgical would occur, in furtherance of the Count I defendants' scheme to defraud.

627.    The Count I defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 7.

628.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

629.    Policies of insurance were delivered to insureds through the U.S. Mail.

630.    Payments to Endosurgical from Allstate were transmitted through the U.S. Mail.

631.    As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Endosurgical to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

632. As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Endosurgical for the benefit of the Count I defendants that would not otherwise have been paid.

633. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

634. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

635. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

636. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Endosurgical for the benefit of the Count I defendants.

637. Endosurgical constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

638. The Count I defendants participated, both directly and indirectly, in the conduct of this enterprise through a pattern of racketeering activities.

639. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

640. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

641.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

642.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

643.     By virtue of the Count I defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Endosurgical Enterprise)
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

644.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

645.     Defendants Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Endosurgical.

646.     The Count II defendants each agreed to further, facilitate, support, and/or operate the Endosurgical enterprise.

647.    As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

648.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Endosurgical even though Endosurgical was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

649.    The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

650.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

651.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Greater Lakes Anesthesia Enterprise)
### Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; and David P. Jankowski, D.O.

652.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

653.    Greater Lakes Anesthesia constitutes an "enterprise," as defined in 18 U.S.C. § 1961(4).

654.    In connection with each of the claims submitted to Allstate by Greater Lakes Anesthesia, Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; and David P. Jankowski, D.O. ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation, or knew that such false medical documentation would be mailed in the ordinary course of Greater Lakes Anesthesia's business, or should have reasonably foreseen that the mailing of such false medical documentation by Greater Lakes Anesthesia would occur, in furtherance of the Count III defendants' scheme to defraud.

655.    The Count III defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 7.

656.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

657.    Policies of insurance were delivered to insureds through the U.S. Mail.

658.    Payments to the defendants from Allstate were transmitted through the U.S. Mail.

659.    As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed by Greater Lakes Anesthesia to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

660.     As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Greater Lakes Anesthesia for the benefit of the Count III defendants that would not otherwise have been paid.

661.     The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

662.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

663.     By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

664.     The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Greater Lakes Anesthesia for the benefit of the Count III defendants.

665.     Greater Lakes Anesthesia constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

666.     The Count III defendants associated with the foregoing enterprise and participated, both directly and indirectly, in the conduct of this enterprise through a pattern of racketeering activities.

667.     Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

668.    The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

669.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

670.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

671.    By virtue of the Count III defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
**(Greater Lakes Anesthesia Enterprise)**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

672.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

673.    Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and

Edward Firosz ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Greater Lakes Anesthesia.

674.     The Count IV defendants each agreed to further, facilitate, support, and/or operate the Greater Lakes Anesthesia enterprise.

675.     As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

676.     The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Greater Lakes Anesthesia even though Greater Lakes Anesthesia was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

677.     The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

678.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

679.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT V</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(Summit Enterprise)**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; and David P. Jankowski, D.O.**

680.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

681.   Summit constitutes an "enterprise," as defined in 18 U.S.C. § 1961(4).

682.   In connection with each of the claims identified in the within Complaint, Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; and David P. Jankowski, D.O. ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation, or knew that such false medical documentation would be mailed in the ordinary course of Summit's business, or should have reasonably foreseen that the mailing of such false medical documentation by Summit would occur, in furtherance of the Count V defendants' scheme to defraud.

683.   The Count V defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 7.

684.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

685.   Policies of insurance were delivered to insureds through the U.S. Mail.

686.   Payments to the defendants from Allstate were transmitted through the U.S. Mail.

86

687.    As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Summit to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

688.    As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Summit for the benefit of the Count V defendants that would not otherwise have been paid.

689.    The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

690.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

691.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

692.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Summit for the benefit of the Count V defendants.

693.    Summit constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

694. The Count V defendants associated with the foregoing enterprise and participated, both directly and indirectly, in the conduct of this enterprise through a pattern of racketeering activities.

695. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

696. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

697. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

698. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

699. By virtue of the Count V defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT VI</u>
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Summit Enterprise)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

700. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

701.     Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Summit.

702.     The Count VI defendants each agreed to further, facilitate, support, and/or operate the Summit enterprise.

703.     As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

704.     The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Summit even though Summit was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

705.     The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and legal documents containing material misrepresentations and/or material omissions.

706.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

707.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(Pacific Marketing Enterprise)**
**Against Michael Angelo and Edward Firosz**

708.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

709.     Pacific Marketing constitutes an "enterprise," as defined in 18 U.S.C. § 1961(4).

710.     In connection with each of the claims identified in the within Complaint, Michael Angelo and Edward Firosz ("Count VII defendants"), through the operation and management of Pacific Marketing, knew that the medical facility defendants would utilize the mails to transmit fraudulent medical documentation, in furtherance of the Count VII defendants' scheme to defraud.

711.     The Count VII defendants utilized their control over Pacific Marketing, including 800-US-LAWYER, to obtain patients for the medical facility defendants, which employed two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 7.

712.     Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail related to the clients/patients obtained via Pacific Marketing and 800-US-LAWYER.

713.     Policies of insurance were delivered to insureds through the U.S. Mail.

714.     Payments to the medical facility defendants from Allstate were transmitted through the U.S. Mail.

715.    As documented above, the Count VII defendants repeatedly and intentionally caused documentation to be submitted to Allstate for medical expenses and/or services that were purportedly performed at the medical facility defendants to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

716.    As a result of, and in reasonable reliance on, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to the medical facility defendants for the benefit of the Count VII defendants that would not otherwise have been paid.

717.    The Count VII defendants' pattern of obtaining patients for the medical facility defendants by and through the use of Pacific Marketing and 800-US-LAWYER, and causing to be submitted fraudulent claims from the medical facility defendants that appeared legitimate on their face, prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

718.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

719.    By participating in a scheme that caused numerous fraudulent claims to be filed with Allstate by the medical facility defendants, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

720.    The activities alleged in this Complaint had the effect of causing funds to be transferred from Allstate to the medical facility defendants for the benefit of Pacific Marketing and the Count VII defendants.

721.    Pacific Marketing constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

722.     The Count VII defendants associated with the foregoing enterprise and directly participated in the conduct of this enterprise through a pattern of racketeering activities.

723.     Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

724.     The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

725.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

726.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

727.     By virtue of the Count VII defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Pacific Marketing Enterprise)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz**

728.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

729.     Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Elite

92

Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; Michael Angelo; David P. Jankowski, D.O.; and Edward Firosz ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Pacific Marketing.

730.    The Count VIII defendants each agreed to further, facilitate, support, and/or operate the Pacific Marketing enterprise.

731.    As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

732.    The purpose of the conspiracy was to obtain patients for the medical facility defendants through the use of automatic referrals generated by Weiner & Associates, which used 800-US-LAWYER (which is owned by Pacific Marketing).

733.    The medical facility defendants then sought No-Fault payments from Allstate though they were not eligible to collect No-Fault payments by virtue of their unlawful conduct, namely, providing unnecessary medical services.

734.    The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including using Pacific Marketing and 800-US-LAWYER to generate mandatory referrals to the medical facility defendants, who in turn created insurance claim and legal documents containing material misrepresentations and/or material omissions.

735.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

736.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII

defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**COMMON LAW FRAUD**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

737.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

738.    The scheme to defraud Allstate perpetrated by Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz ("Count IX defendants") was dependent upon a succession of material misrepresentations of fact that the medical facility defendants, Dr. Jankowski, and Dr. James were lawfully rendering medical treatment in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

739.    The misrepresentations of fact made by the Count IX defendants include, but are not limited to, material misrepresentations regarding the necessity and fact of medical services provided by the medical facility defendants and/or whether the injury arose out of a motor vehicle accident.

740.    The Count IX defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

94

741.    The misrepresentations were intentionally made by the Count IX defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

742.    The Count IX defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

743.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims.

744.    As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged as previously described herein.

<u>**COUNT X**</u>
**CIVIL CONSPIRACY**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

745.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

746.    Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz ("Count X defendants")

combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the medical facility defendants did not provide reasonably necessary medical treatment, (2) the medical facility defendants did not actually provide the services for which they billed Allstate, and (3) the medical facility defendants engaged in fraudulent billing practices that inflated the charges submitted to Allstate.

747. The Count X defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for their personal gain). This purpose was known to all of the Count X defendants and intentionally pursued.

748. Angelo, Focazio, Pacific Marketing, Elite Surgical, Weiner & Associates, and Firosz utilized 800-US-LAWYER to generate legal referrals to Weiner & Associates for the purpose of having Weiner & Associates refers its clients to the medical facility defendants, Dr. Jankowski, and Dr. James, all of whom were aware that Weiner & Associates was soliciting clients for the purpose of referring those clients/patients to them.

749. Once clients/patients were referred to the medical facility defendants, Dr. Jankowski, and Dr. James, they received services, if at all, that were not medically necessary because (1) patients were referred for medical services pursuant to a predetermined arrangement established by and between the Count X defendants that did not take into account the patient's individual needs, (2) services were often performed by the medical facility defendants, Dr. Jankowski, and Dr. James at the direction of and/or under pressure from non-medical individual Angelo and Weiner & Associates, and (3) treatment did not adhere to established medical practices and guidelines.

750.    The medical facility defendants, Dr. Jankowski, and Dr. James also engaged in fraudulent billing practices when billing Allstate, including charging unreasonable amounts, upcoding, unbundling, billing for procedures and office visits not performed as documented.

751.    Despite knowing that the medical facility defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not reasonably necessary and because they engaged in fraudulent billing practices, the medical facility defendants, their owners, and Weiner & Associates nonetheless submitted claims (with accompanying false medical documentation) to Allstate seeking payment to the medical facility defendants.

752.    In reasonable reliance on the false medical documentation submitted by the medical facility defendants, their owners, and Weiner & Associates, Allstate paid certain of the claims submitted, including those amounts identified in Exhibits 8 to 11.

753.    All of the Count X defendants benefitted from the payments wrongfully procured from Allstate.  The medical facility defendants, Angelo (co-owner of Endosurgical and Greater Lakes Anesthesia), Focazio (same), Dr. Jankowski (owner of Summit), Dr. James (owner of Michigan Surgical Group), and Firosz (agent of Endosurgical) directly benefitted from the payments made to the medical facility defendants.  Weiner & Associates benefitted from the ability to use the extent and fact of treatment allegedly rendered by the medical facility defendants to inflate and bolster the claims submitted to Allstate when negotiating payment and during litigation of claims related to its clients.

754.    Therefore, the Count X defendants committed acts that caused damage to Allstate.

755.     All of the Count X defendants actively and intentionally partook in the scheme to defraud Allstate and also encouraged and aided other Count X defendants in the commission of acts done for the benefit of all Count X defendants and to the unjustified detriment of Allstate.

756.     Accordingly, all of the Count X defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

**COUNT XI**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; and Michigan Surgical Group, PLLC**

757.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

758.     Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the necessity of medical services purportedly provided by the medical facility defendants.

759.     Allstate sustained damages by paying under a mistake of fact the claims submitted by, or on behalf of, defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; and Michigan Surgical Group, PLLC ("Count XI defendants"), which misrepresented the reasonableness and necessity of the medical treatment allegedly rendered and/or whether the patient's injury arose out of a motor vehicle accident.

760.     The Count XI defendants, individually and jointly and severally, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

761.     Allstate is entitled to restitution from each of the Count XI defendants,

individually and jointly and severally, for all monies paid to and/or received by them from

Allstate.

**COUNT XII**
**UNJUST ENRICHMENT**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at**
**Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; and**
**Michigan Surgical Group, PLLC**

762.     Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set

forth above as if fully set forth herein.

763.     Allstate paid monies in response to the claims submitted, or caused to be

submitted, by defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical

Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; and

Michigan Surgical Group, PLLC ("Count XII defendants") in reasonable belief that it was

legally obligated to make such payments based upon fraudulent misrepresentations.

764.     Allstate's payments constitute a benefit which the Count XII defendants

aggressively sought and voluntarily accepted.

765.     The Count XII defendants wrongfully obtained payments from Allstate through

the fraudulent scheme detailed herein.

766.     The Count XII defendants have been unjustly enriched by receipt of these

wrongfully-obtained payments from Allstate.

767.     The Count XII defendants' retention of these payments would violate

fundamental principles of justice, equity, and good conscience.

**COUNT XIII**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; and Martin F. Quiroga, D.O.**

768.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above as if fully set forth herein.

769.    Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; and Martin F. Quiroga, D.O. ("Count XIII defendants") routinely performed medically unnecessary treatment, including MUA, with respect to those patients at issue in this Complaint, including those patients of Dr. Zamorano identified in paragraph 65 and those patients of Dr. Quiroga identified in paragraph 72.

770.    Defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; and David P. Jankowski, D.O. also rendered medical treatment pursuant to a fraudulent scheme whereby clients of Weiner & Associates were referred to the medical facility defendants for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

771.    Pursuant to the Michigan No-Fault Act, Mich. Comp. Law. § 500.3100, *et seq.*, an insurer is liable to pay benefits only for reasonable and necessary expenses arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105 and 500.3107.

772.    The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Law § 500.3107.

100

773.    Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

774.    The Count XIII defendants continue to submit claims under the No-Fault Act for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

775.    The Count XIII defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay pending, previously-denied, and/or any future No-Fault claims submitted by any of the Count XII defendants.

776.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants provided medically unnecessary treatment that is not compensable under Michigan's No-Fault Act.

777.    Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that defendants Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; and David P. Jankowski, D.O., at all relevant times, were engaged in a fraudulent scheme whereby they provided medically unnecessary treatment and submitted unreasonable charges for the same to Allstate.

778.    As such, the Count XIII defendants have no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

XV.    **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and

Allstate Property & Casualty Insurance Company respectfully pray that judgment enter in their

favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(Endosurgical Enterprise)**
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes**
**Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner &**
**Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.;**
**Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(Endosurgical Enterprise)**
**Against Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes**
**Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific**
**Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC;**
**William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group,**
**PLLC; David P. Jankowski, D.O.; and Edward Firosz**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Greater Lakes Anesthesia Enterprise)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; and David P. Jankowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Greater Lakes Anesthesia Enterprise)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Summit Enterprise)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; and David P. Jankowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### (Summit Enterprise)
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Pacific Marketing, Inc.; Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**(Pacific Marketing Enterprise)**
**Against Michael Angelo and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(Pacific Marketing Enterprise)**
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at**
**Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater**
**Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC;**
**Elite Surgical Media Consultants, L.L.C.; Weiner & Associates, PLLC; Michael Angelo;**
**David P. Jankowski, D.O.; and Edward Firosz**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest,

costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the

wrongful conduct alleged in the within Complaint; and

105

(d)      GRANT all other relief this Court deems just.

## COUNT IX
## COMMON LAW FRAUD
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)      AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the defendants' illegal conduct; and

(c)      GRANT all other relief this Court deems just.

## COUNT X
## CIVIL CONSPIRACY
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Greater Lakes Medical Management, LLC; Michigan Health Care Services Management, LLC; Weiner & Associates, PLLC; William J. Focazio, M.D.; Michael Angelo; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; and Edward Firosz**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at

trial;

(b)      AWARD Allstate its costs, including, but not limited to, investigative costs incurred in

the detection of the defendants' illegal conduct; and

(c)      GRANT all other relief this Court deems just.

## COUNT XI
## PAYMENT UNDER MISTAKE OF FACT
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; and Michigan Surgical Group, PLLC**

(a)      AWARD Allstate its actual damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XII
## UNJUST ENRICHMENT
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; and Michigan Surgical Group, PLLC**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at

trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; and Martin F. Quiroga, D.O.**

(a)     DECLARE that Greater Lakes Ambulatory Surgical Center, LLC d/b/a Endosurgical

Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical Group, PLLC;

Reese James, D.O.; Michigan Surgical Group, PLLC; David P. Jankowski, D.O.; Lucia J.

Zamorano, M.D.; and Martin F. Quiroga, D.O. wrongfully submitted bills for medical

treatment that was not reasonably necessary and, therefore, not compensable under the

Michigan No-Fault Act;

(b)     DECLARE that the activities of Greater Lakes Ambulatory Surgical Center, LLC d/b/a

Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC; Summit Medical

Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC; and David P.

Jankowski, D.O. were fraudulent and;

(c)     DECLARE that Allstate has no obligation to pay pending, previously-denied, and/or

future No-Fault insurance claims submitted by Greater Lakes Ambulatory Surgical

Center, LLC d/b/a Endosurgical Center at Great Lakes; Greater Lakes Anesthesia, PLLC;

107

Summit Medical Group, PLLC; Reese James, D.O.; Michigan Surgical Group, PLLC;

David P. Jankowski, D.O.; Lucia J. Zamorano, M.D.; and Martin F. Quiroga, D.O.; and

(d)      GRANT all other relief this Court deems just and appropriate.

## XVI.  **JURY TRIAL DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*

_____

Richard D. King, Jr.
Nathan A. Tilden
Michael W. Whitcher
Jacquelyn A. McEttrick
350 Granite Street
Suite 2303
Braintree, MA  02184
617-770-2214 (phone)
rking@smithbrink.com
ntilden@smithbrink.com
mwhitcher@smithbrink.com
jmcettrick@smithbrink.com


SMITH & BRINK MI, PLLC

Lisa K. Anderson (P52913)
38777 W. Six Mile Road
Suite 314
Livonia, MI  48152
734-308-4668 (phone)
landerson@smithbrink.com


*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Property & Casualty*
*Insurance Company*

Dated:  November 8, 2012